1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3
     KENNETH CHAPMAN, et al.,          Case No. 1:16-cv-1114
4
                  Plaintiffs,          Cleveland, Ohio
5
          vs.                          MONDAY, JULY 10, 2017
6
     TRISTAR PRODUCTS, INC.,
7
                  Defendant.           VOLUME 1-B
8

9

10

11                    TRANSCRIPT OF TRIAL BY JURY

12             HELD BEFORE THE HONORABLE JAMES S. GWIN

13                   UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19   Court Reporter:           Donnalee Cotone, RMR, CRR
                               United States District Court
20                             801 West Superior Avenue
                               Court Reporters 7-189
21                             Cleveland, Ohio 44113
                               216.357.7078
22

23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

1                                    INDEX

2

3     WITNESSES:                                              PAGE:

4
      JOHN D. PRATT, Ph.D..............................     83
5
      Direct Examination by Mr. Coleman.................     83
6     Cross-Examination by Mr. Lewis....................    114
      Redirect Examination by Mr. Coleman...............    130
7
      JESSICA R. VENNEL................................    133
8
      Direct Examination by Mr. Edwards ...............    133
9     Cross-Examination by Mr. Lewis...................    147

10    KENNETH CHAPMAN..................................    152

11    Direct Examination by Mr. Wallace.................    152
      Cross-Examination by Mr. Feczko..................    160
12

13

                                  *****
14

15

16

17

18

19

20

21

22

23

24

25

```
1    APPEARANCES:

2    For the Plaintiffs:        GREGORY F. COLEMAN, ESQ.
                                ADAM A. EDWARDS, ESQ.
3                               Law Office of Greg Coleman
                                1100 First Tennessee Plaza
4                               800 South Gay Street
                                Knoxville, TN 37929
5
                                JACK LANDSKRONER, ESQ.
6                               Landskroner Grieco Merriman
                                1360 West Ninth Street, Suite 200
7                               Cleveland, OH 44113

8                               EDWARD A. WALLACE, ESQ.
                                Wexler Wallace
9                               55 West Monroe Street, Suite 3300
                                Chicago, IL 60603
10
     For the Defendant:         JOHN Q. LEWIS, ESQ.
11                              JONATHAN F. FECZKO, ESQ.
                                ZACHARY J. ADAMS, ESQ.
12                              Tucker Ellis - Cleveland
                                950 Main Avenue, Suite 1100
13                              Cleveland, OH 44113

14                              ROGER A. COLAIZZI, ESQ.
                                Venable
15                              600 Massachusetts Avenue, NW
                                Washington, DC 20001
16

17

18

19

20

21

22

23

24

25
```

1          (In Open Court.)

09:10:40    2          THE COURT:  I'll ask the jury that's been

09:10:44    3   selected at this time to stand so as to be sworn.

09:10:51    4          (The impaneled jury was sworn.)

09:11:09    5          THE COURT:  And I'd ask the jurors to take a

09:11:12    6   seat.  I'd ask everybody else to take a seat.

09:11:16    7      Now, members of the jury, now that you have been sworn

09:11:21    8   in, I'm going to give you some preliminary instructions to

09:11:23    9   guide you in your participation in this trial.

09:11:26    10     In this case, it will be your duty to find from the

09:11:29    11  evidence what the facts are.  You and you alone will be the

09:11:33    12  judges of the facts.  You will then have to apply those

09:11:36    13  facts to the law as I will give it to you.  You must follow

09:11:40    14  that law whether you agree with it or disagree with it.

09:11:45    15     Now, nothing that the Court may say or do during the

09:11:48    16  course of the trial is intended to indicate or should be

09:11:51    17  taken by you as indicating what your verdict should be.

09:11:56    18     Now, the evidence from which you will find the facts

09:11:59    19  will consist of the testimony of the witnesses, documents

09:12:03    20  and other things received into the record as exhibits, and

09:12:07    21  any facts that the lawyers agree to, or stipulate to, or

09:12:11    22  that the Court could potentially instruct you to find.

09:12:14    23     Certain things are not evidence and must not be

09:12:19    24  considered.  I will give you a list of them now.

09:12:23    25     Statements, arguments, and questions by lawyers are

09:12:26  1   not evidence.  Importantly, the questions give context to

09:12:32  2   the answers, but it is the answers that are the evidence.

09:12:36  3   The questions themselves are never evidence in the case.

09:12:40  4       Objections to the questions are also not evidence.

09:12:46  5   Lawyers have an obligation to their clients to make

09:12:49  6   objections when they believe evidence being offered is

09:12:52  7   improper under the rules of evidence.  You should not be

09:12:55  8   influenced by the objection or by the Court's ruling on it.

09:13:00  9       If the objection is sustained, ignore the question.

09:13:03  10  If it is overruled, treat the answer just like any other.

09:13:08  11      If you are ever instructed that some item of evidence

09:13:12  12  is received for a limited purpose only, you must follow that

09:13:15  13  instruction.

09:13:16  14      Now, testimony that the Court has excluded or

09:13:20  15  testimony that the Court has instructed you to disregard is

09:13:24  16  also not evidence and must not be considered.

09:13:28  17      And anything you may have seen or heard outside the

09:13:31  18  courtroom is not evidence and must be disregarded.  You are

09:13:35  19  to decide this case solely on the evidence presented here in

09:13:40  20  the courtroom.

09:13:41  21      And importantly, I'll instruct you later, but I'll

09:13:46  22  also instruct you now that you're not allowed to do any

09:13:51  23  outside investigation.  So no looking things up on the

09:13:54  24  Internet, no Googling things, no things of that nature.  No

09:14:01  25  communications at all about the nature of the case or the

09:14:03  1   evidence.  No questioning anybody else about what evidence

09:14:08  2   as of or background facts.

09:14:11  3        You need to rely solely upon the evidence that comes

09:14:14  4   to you in this trial.  So stay away from any kind of, you

09:14:19  5   know, online investigation or comment about this case.

09:14:23  6        Now, there are two types of evidence:  Direct evidence

09:14:29  7   and circumstantial evidence.

09:14:31  8        Direct evidence is direct proof of a fact, such as the

09:14:34  9   testimony of an eyewitness.

09:14:37  10       Circumstantial evidence is proof of facts from which

09:14:40  11  you may infer or conclude that other facts exist.  I begin

09:14:46  12  this morning with kind of an example of the difference.

09:14:50  13       If you had a witness that came in and testified that

09:14:54  14  "I saw Tommy eating the cake," that would be direct

09:14:59  15  evidence.  If you believe the witness, you could find that

09:15:03  16  Tommy ate the cake.

09:15:05  17       Now, in contrast, you could have a witness that came

09:15:09  18  in and testified that "I baked a cake.  I finished putting

09:15:14  19  icing on it.  I opened the refrigerator door and put the

09:15:19  20  full cake on the top shelf of the refrigerator.  Just then

09:15:26  21  the phone down the hall rang.  I walked down to answer the

09:15:30  22  phone.  My son, Tommy, was coming the opposite direction

09:15:35  23  into the kitchen.  I passed him in the hallway.  I was on

09:15:38  24  the phone about a minute or so.  I came back in towards the

09:15:44  25  kitchen and I saw Tommy scurrying out the other door, but I

09:15:49  1   could see as he was leaving the room he had icing on his

09:15:53  2   face.  I opened the refrigerator door and immediately saw

09:15:58  3   that somebody had taken a big chunk out of the cake I had

09:16:03  4   just put in there."

09:16:05  5        That would all be circumstantial evidence, but someone

09:16:07  6   could reasonably draw an inference that Tommy had opened the

09:16:13  7   refrigerator door and eaten the cake.

09:16:15  8        So there's no inherently -- neither direct evidence

09:16:19  9   nor circumstantial evidence is inherently more trustworthy.

09:16:23  10  Instead, you should consider all the evidence and use your

09:16:28  11  usual sense of, you know, belief in deciding whether to

09:16:33  12  credit or not credit evidence.

09:16:36  13       Now, once again, it will be up to you to decide which

09:16:40  14  witnesses to believe and which witnesses not to believe and

09:16:43  15  which part or all of their testimony you would choose to

09:16:47  16  believe or not believe.

09:16:48  17       Now, in making judgments on credibility or

09:16:54  18  believability, you will use the general rules that you apply

09:16:58  19  in your everyday lives.  In general, those include whether

09:17:04  20  the witness was in a position to accurately see what they

09:17:09  21  testify about, whether they accurately recall what they

09:17:12  22  testified to, whether they accurately describe what they

09:17:16  23  testified to, also whether they have some modus or bias that

09:17:24  24  might cause them to slant the testimony or some other reason

09:17:29  25  that in your everyday lives would cause you to discount or

09:17:33   1   support the testimony of a witness.

09:17:34   2         Now, I'll give you some factors you can consider later

09:17:39   3   in the case, but in general, you're not required to believe

09:17:42   4   any witness.  You're free to choose all a witness' testimony

09:17:47   5   or none of it or some portion of it.  But that's, again,

09:17:51   6   committed to you.  And you should use the judgments and

09:17:55   7   tests that you use in your everyday lives in making that

09:17:59   8   decision.

09:18:01   9         This, again, is a civil case.  The plaintiff in this

09:18:05   10  case has the burden of proving their case by what is

09:18:08   11  referred to as a preponderance of the evidence.  That means

09:18:11   12  that the plaintiff has to produce evidence which, when

09:18:15   13  compared and considered in light of all the facts, leads you

09:18:19   14  to believe that what the plaintiff claims is more likely

09:18:22   15  true than not true.

09:18:26   16        To put it differently, if you were to put the

09:18:29   17  plaintiff and the defendant's evidence on opposite sides of

09:18:33   18  the scale, the plaintiff would have to make the scale tip

09:18:36   19  somewhat to their side.  If the plaintiff fails to meet this

09:18:40   20  burden, the verdict must be for the defendant.

09:18:42   21        Now, some of you may have heard on TV or may have even

09:18:48   22  sat on juries where there was a burden of proof described as

09:18:54   23  proof beyond a reasonable doubt.  That's a high burden

09:18:56   24  that's used in criminal cases.  It doesn't apply in this

09:19:00   25  case.

09:19:05   1        So once again, the burden of proof in this case is by

09:19:13   2    proof beyond a reasonable doubt.

09:19:20   3             MR. COLEMAN:  Your Honor, I don't mean to

09:19:23   4    interrupt.  I think you said the burden of proof in this

09:19:26   5    case is beyond a reasonable doubt.

09:19:29   6             THE COURT:  No, I'm sorry.  I meant the burden

09:19:31   7    of proof is not beyond a reasonable doubt.

09:19:37   8        Now, just to summarize.  I'll give you more specific

09:19:43   9    instructions at the conclusion of the case, but the disputed

09:19:48  10    issues that you're going to generally decide will include

09:19:52  11    whether or not the cookers that will be described to you had

09:19:57  12    a defect.  You will then also decide whether -- if the

09:20:02  13    cookers did have a defect, whether or not that defect

09:20:07  14    breaches an express warranty between the defendant, Tristar,

09:20:15  15    and the purchasers.  And you will also make a decision that

09:20:20  16    if the cookers had a defect, whether the cookers breached an

09:20:25  17    implied warranty that was given to consumers.

09:20:32  18        And if you find that it did, you will then make some

09:20:37  19    decision as well as to -- or you will make the decision as

09:20:41  20    well as to whether the defect was sufficient that it made

09:20:45  21    the respective cookers worthless.

09:20:50  22        Now, I'll explain these claims in more detail, but

09:20:53  23    those are going to be the general issues that you'll be

09:20:58  24    deciding.

09:20:59  25        Let me give you some brief introductions about your

09:21:04   1   conduct as jurors.  First, I'm going to instruct that until

09:21:10   2   you begin deliberations, keep your mind open.  The evidence

09:21:15   3   in the case comes to you sequentially, and you don't have

09:21:19   4   all the evidence until the exhibits are given to you in the

09:21:24   5   jury room and you begin deliberations.  So keep your mind

09:21:29   6   open.  Don't reach or form or express any conclusions.

09:21:32   7        So you're obviously not allowed to say anything about

09:21:35   8   the case outside the courtroom, but you're also forbidden

09:21:39   9   from saying anything among yourselves during the interim

09:21:43  10   before the case has been submitted to you.  I'm sure you can

09:21:48  11   appreciate there's a tendency in human nature that once we

09:21:52  12   have expressed an opinion on something, there's an ownership

09:21:56  13   interest that sometimes would impair somebody from, you

09:22:00  14   know, fairly deciding the issue.  So stay away from taking

09:22:05  15   any positions on the evidence.

09:22:09  16        Don't -- you're not to have any conversation with any

09:22:13  17   of the parties, witnesses, or attorneys.  They're not to

09:22:16  18   talk to you; you're not to talk to them.  You know, don't

09:22:21  19   engage in any conversation, you know, at all with them.  You

09:22:28  20   know, no conversations about how the Indians left so many

09:22:33  21   base runners on base last night and let Detroit sneak away

09:22:38  22   with a victory.  Nothing of that type.  So stay away from

09:22:42  23   them.  It's just -- the courtroom -- there's some meeting

09:22:46  24   facilities here and you'll likely be seeing some of the

09:22:50  25   participants in the hallways, but stay away from them.

09:22:55  1        Also, as I indicated before, don't take -- don't do
09:22:58  2   any private investigation.  You'll get everything you need
09:23:02  3   to hear in trial.
09:23:03  4        I'm going to let you take notes, and we'll
09:23:08  5   distribute -- well, you've got the pads and pens to help you
09:23:12  6   with that.
09:23:14  7        Never let the taking of notes interfere with your
09:23:17  8   attention to the evidence.  The evidence won't be slowed and
09:23:20  9   won't be repeated, so it's important for you to not reach,
09:23:25  10  form or express any conclusions until you begin your
09:23:28  11  deliberations.  So don't let taking of notes interfere with
09:23:33  12  your attention to the evidence.
09:23:35  13       Also, the fact that somebody takes notes or may take
09:23:38  14  more extensive notes does not mean that those notes more
09:23:46  15  accurately reflect what the testimony had been.  So you're
09:23:49  16  to use your individual judgment and collective wisdom as to
09:23:53  17  what the evidence was in this case.
09:23:55  18       If you have any personal problems during the trial,
09:23:58  19  report them to the deputies.  You've already probably met
09:24:04  20  Jessica and Patrick.  And Jackson is the person immediately
09:24:09  21  in front of me.  So if you have any issues, bring it to
09:24:13  22  their attention.
09:24:14  23       At this point in time, we're going to take a brief
09:24:19  24  recess to allow the parties to get ready for opening
09:24:23  25  statements.

| | |
|---|---|
| 09:24:24 | 1 |
| 09:24:29 | 2 |
| 09:24:33 | 3 |
| 09:24:36 | 4 |
| 09:24:39 | 5 |
| 09:24:45 | 6 |
| 09:38:22 | 7 |
| 09:38:25 | 8 |
| 09:38:28 | 9 |
| 09:38:38 | 10 |
| 09:38:39 | 11 |
| 09:38:40 | 12 |
| 09:38:42 | 13 |
| 09:38:45 | 14 |
| 09:38:51 | 15 |
| 09:38:53 | 16 |
| 09:39:00 | 17 |
| 09:39:03 | 18 |
| 09:39:07 | 19 |
| 09:39:10 | 20 |
| 09:39:14 | 21 |
| 09:39:20 | 22 |
| 09:39:26 | 23 |
| 09:39:29 | 24 |
| 09:39:32 | 25 |

1   So you'll be taken back to the jury room.  We'll plan

2   on reconvening in about 10 minutes, but all afford the

3   parties -- I'm not sure if they have any electronic

4   materials they want to use for opening or otherwise.

5        So we'll take an adjournment for about ten minutes.

6                  (Recess taken.)

7                  THE COURT:  The jury can be brought back in.

8        But there was some indication that the parties wanted

9   to go over some evidentiary rulings.  Is that correct?

10                  MR. LEWIS:  Yes, Your Honor.

11                  MR. COLEMAN:  Yes.

12                  THE COURT:  Kind of to cut to the quick.  My

13   understanding was there was some issue with regard to

14   whether -- how much the plaintiff could get into personal

15   injury damages.

16        And I would say the plaintiff cannot get into those

17   for the reasons in the ruling I gave the other day.

18        So I think you can describe the incident.  I think you

19   can -- why don't everybody else sit down.

20        I think you can describe, you know, the nature of the

21   incident, and you can even ask the party or the witness

22   whether, you know, materials scorched them or something of

23   that nature, but I don't want to get into anything

24   particular about the personal injury claims.

25                  MR. COLEMAN:  And, Your Honor, just so I don't

09:39:34    1    screw up, which I could do:  No photos of the burn injuries,

09:39:39    2    is that what you're saying?

09:39:40    3            THE COURT:  Right.  Right.

09:39:42    4            MR. COLEMAN:  I just want to make sure.  We'll

09:39:45    5    take them out of our opening statement portion.

09:39:48    6            THE COURT:  Okay.  There's also a question

09:39:49    7    regarding evidence and arguments in other lawsuits and other

09:39:56    8    Tristar products.

09:39:57    9       Stay away from those generally.  But I'd caution the

09:40:01   10    defense counsel, if defense counsel starts getting into

09:40:06   11    offering evidence or argument that there -- you know, that

09:40:12   12    there was di minimis notice of other injuries or other, I

09:40:16   13    think you may open yourself up to giving the plaintiff an

09:40:20   14    opportunity to offer evidence on that.  So don't use as some

09:40:27   15    kind of defense the idea that these were, you know,

09:40:31   16    one-of-a-kind incidents.

09:40:34   17       So I'll grant the motion in limine but caution that

09:40:41   18    defense counsel, you get very close to that argument, you're

09:40:44   19    going to open it up.

09:40:45   20       With regard to the consumer product safety council, I

09:40:52   21    am still somewhat unclear.  I think the findings of the

09:40:58   22    consumer product safety council are generally admissible if

09:41:02   23    it's a final ruling.  It was somewhat unclear to me as to

09:41:05   24    whether the Consumer Product Safety Commission had made

09:41:07   25    final rulings.

09:41:09    1            MR. COLEMAN:  I think from my standpoint, and

09:41:11    2   I think John will agree, they have not, Your Honor.  I think

09:41:15    3   it's still under investigation.

09:41:17    4      But let me ask this:  The complaints that the CPSC

09:41:22    5   had, they're redacted as to who they are and that sort of

09:41:25    6   thing.

09:41:26    7      The complaints that Tristar sent to the CPSC, are

09:41:32    8   those allowed to gotten into or am I to stay away from

09:41:34    9   those.

09:41:34   10            THE COURT:  Stay away from the substance of

09:41:37   11   the complaints unless they open it up.

09:41:38   12            MR. COLEMAN:  Okay.

09:41:39   13            MR. LEWIS:  May I ask a clarification on that,

09:41:41   14   Your Honor?

09:41:42   15      My understanding was that if we limited it to the

09:41:46   16   products at issue here, that the incidents -- and the

09:41:49   17   incidents, right, would be fair game -- but it's the

09:41:53   18   products outside of this series that we were moving in

09:41:57   19   limine to exclude because the number is very small for the

09:42:02   20   overall product line at issue here.

09:42:04   21            THE COURT:  I'm not sure what you're saying.

09:42:06   22   Are you asking about nonpressure cookers involved in this

09:42:10   23   case?

09:42:11   24            MR. LEWIS:  Pressure -- I'm asking

09:42:15   25   about -- the data that I was intending to utilize was data

| | | |
|---|---|---|
| 09:42:18 | 1 | about incidents with this series of pressure cookers. |
| 09:42:22 | 2 | THE COURT:  Well, unless there's a final |
| 09:42:24 | 3 | ruling, I'm not sure how you get into that. |
| 09:42:27 | 4 | MR. LEWIS:  I'm sorry.  Not on the CPSC, on |
| 09:42:31 | 5 | the incidents themselves, the other incidents. |
| 09:42:33 | 6 | THE COURT:  I caution you, you go into that, I |
| 09:42:35 | 7 | think you may open it up and let the plaintiff bring in |
| 09:42:38 | 8 | details about those. |
| 09:42:39 | 9 | MR. LEWIS:  About other incidents with these |
| 09:42:42 | 10 | particular series? |
| 09:42:44 | 11 | THE COURT:  Right. |
| 09:42:45 | 12 | MR. LEWIS:  And with details, like pictures |
| 09:42:47 | 13 | and things like that? |
| 09:42:49 | 14 | THE COURT:  Maybe.  So I don't think you can |
| 09:42:50 | 15 | fairly defend by saying no other incidents have occurred or |
| 09:42:55 | 16 | the other incidents are of a minimal nature and not give the |
| 09:43:03 | 17 | plaintiff an opportunity to respond to that. |
| 09:43:10 | 18 | MR. COLEMAN:  All right.  Your Honor, I'll |
| 09:43:12 | 19 | take that there will be no reference to that in my opening. |
| 09:43:15 | 20 | THE COURT:  Okay.  You know, normally, the |
| 09:43:21 | 21 | plaintiff's attorney wears a different color suit than the |
| 09:43:24 | 22 | defense attorney. |
| 09:43:25 | 23 | MR. LEWIS:  Yeah.  Switch, right?  That's how |
| 09:43:27 | 24 | you tell us apart. |
| 09:43:28 | 25 | MR. COLEMAN:  Your Honor, Mr. Edwards and I |

09:43:30  1   both were on that side of the V for about 15 years, so I

09:43:34  2   guess I had to stop it.

09:43:35  3             THE COURT:  Okay.  You want to get the jury?

09:43:39  4             MR. COLEMAN:  Can I stand here to address the

09:43:42  5   jury?

09:43:43  6             THE COURT:  That's fine.

09:43:44  7        How long do you expect?

09:43:46  8             MR. COLEMAN:  20, 25 minutes, Your Honor.

09:43:48  9             THE COURT:  Okay.  Before they begin, let me

09:44:13  10  ask the attorneys to come up to the bench.

09:44:26  11       (At side bar.)

09:44:26  12            THE COURT:  I was curious.  Judge Greenberg I

09:44:29  13  happen to notice was here.  I wondered if there's been -- I

09:44:33  14  know you guys didn't settle the case, but I wondered if

09:44:36  15  there's any benefit to -- whether there's any benefit to

09:44:40  16  taking a few minutes maybe even over the lunchtime to try to

09:44:46  17  talk.

09:44:48  18            MR. LANDSKRONER:  I've been -- John and Greg

09:44:49  19  have been prepping for trial.

09:44:51  20            MR. COLEMAN:  John and I have been in the

09:44:53  21  trenches.

09:44:53  22            MR. LANDSKRONER:  Roger Colaizzi and I have

09:44:56  23  been talking, and it probably is worth a couple of minutes

09:45:00  24  at lunch, and I'm glad to do that with him.

09:45:01  25            THE COURT:  Okay.  I'll ask if he's got a

09:45:04  1   couple of minutes.

09:45:30  2        (The jury is present.)

09:45:30  3             THE COURT:  So I'll ask everyone to take a

09:45:58  4   seat.

09:46:08  5        Ladies and gentlemen of the jury, at this point, the

09:46:11  6   parties are given the chance to make opening statements to

09:46:15  7   you, which is an opportunity for both sides to give you an

09:46:19  8   overview of evidence they anticipate is going to be offered.

09:46:24  9   It's also their opportunity to give you in some ways kind of

09:46:29  10  a roadmap to the evidence.

09:46:31  11       So in the order of the trial will be the plaintiff

09:46:34  12  will go first.  The defense will then follow.

09:46:38  13       I wanted to raise one other thing with you, and that

09:46:42  14  is just simply that in this case, you'll be permitted to

09:46:48  15  take notes.

09:46:49  16       I'm also going to let you propose questions once we

09:46:52  17  get the witnesses in.  So after each witness has testified,

09:46:58  18  I'll look over to you.  If any of you have a question you

09:47:02  19  want to propose to that witness, give some indication.

09:47:08  20  Write the question down.  I'll go through it with the

09:47:12  21  parties.  If I make a ruling that it's appropriate to ask

09:47:15  22  the question, we'll ask the question that you propose.

09:47:22  23       Importantly, you need to move quickly because once the

09:47:25  24  witness has left the stand, it's too late.  And also caution

09:47:29  25  that I'll make the decision on that.  So, you know, if you

09:47:34  1    proposed a question and it's not, you know, asked, it's

09:47:38  2    because I've ruled that.

09:47:40  3         So at this point in time, I'd ask plaintiff to make

09:47:43  4    opening statement.

09:47:45  5                   MR. COLEMAN:  Thank you, Your Honor.

09:47:45  6              <u>OPENING STATEMENT BY THE PLAINTIFFS</u>

09:47:47  7                   MR. COLEMAN:  Good morning again, ladies and

09:47:49  8    gentleman.  I'll formally introduce myself.  I'm Greg

09:47:53  9    Coleman.  You can probably tell from my accent I'm from a

09:47:57  10   little further south from here.

09:47:59  11        I forgot to introduce two of the most important folks

09:48:02  12   that are here in addition to our -- well, three actually.

09:48:02  13   That's Danielle Coleman.  Don't hold it against her that

09:48:06  14   she's my daughter.  That's Dawn Holt.  And that's Deb

09:48:10  15   Spaller.  And that's the rest of our team.

09:48:13  16        And we're privileged today to talk to you about three

09:48:16  17   very good, fine, important people, and that's

09:48:24  18   Kenneth Chapman, Jessica Vennel, and Jason Jackson, who is

09:48:30  19   seated.  As I said, Mr. Jackson and Mr. Chapman -- raise

09:48:34  20   your hand one more time, Mr. Jackson.

09:48:35  21        There in the kind of aqua shirt.

09:48:39  22        Mr. Chapman is there in the suit and tie.

09:48:39  23        As I indicated earlier, Jessica Vennel would be here.

09:48:45  24   In fact, she's very upset she's not able to be here, but she

09:48:46  25   had some pretty tough surgery with some complications

09:48:50    1    following the surgery on June 28th, and so the Court and

09:48:55    2    opposing counsel, we're going to present her testimony via

09:48:59    3    videoconference.  So you'll get to see her and observe her

09:49:02    4    and hear her testimony.  It's just she's unable to be here

09:49:06    5    live because she can't travel this far.

09:49:09    6         Well, I want to talk to you about --

09:49:13    7         Can you turn on the stuff back here, please?  Thank

09:49:18    8    you so much.

09:49:18    9         As the Court indicated, it's our opportunity to give

09:49:22   10    you an overview -- and you'll see it coming up on your

09:49:26   11    screen -- about what is this about?  Why are we here?  Why

09:49:32   12    are you taking time away from grandchildren and families and

09:49:35   13    jobs and things like that?  Because it's an important case

09:49:39   14    is why.

09:49:40   15         And this case, as the court indicated earlier, is a

09:49:44   16    class action case.  I think sometimes we -- and I'm guilty

09:49:49   17    of this because I used to be on that side of the V before I

09:49:54   18    changed several years ago.  And I'm guilty of this.  We have

09:49:57   19    this preconceived notion, class actions, that's something

09:50:01   20    where lawyers just make a lot of money and somebody gets a 5

09:50:05   21    cent coupon.  This is not one of those cases.  So if there's

09:50:09   22    any preconceived notion about that, that's not what this

09:50:12   23    case is about.

09:50:13   24         A class action occurs where you've got a group of

09:50:16   25    people like Mr. Jackson, who is from Colorado, like

| | | |
|---|---|---|
| 09:50:20 | 1 | Mr. Chapman, who is from right here in Ohio, and Ms. Vennel, |
| 09:50:25 | 2 | who is from Pennsylvania, they've already been vetted and |
| 09:50:29 | 3 | approved by the Court to stand as a representative of their |
| 09:50:33 | 4 | states.  In other words, as opposed to having thousands of |
| 09:50:36 | 5 | people come in and take up your time and the Court's time, |
| 09:50:40 | 6 | these three folks stand as representatives for their states |
| 09:50:43 | 7 | with respect to the claims in this case.  I hope that kind |
| 09:50:45 | 8 | of makes sense to you.  As opposed to having witness after |
| 09:50:49 | 9 | witness talk about it. |
| 09:50:51 | 10 | Class certification has already taken place, meaning |
| 09:50:55 | 11 | the Court has gone through a process with opposing counsel, |
| 09:50:58 | 12 | with me, and with the plaintiffs identifying the claims that |
| 09:51:01 | 13 | you're going to decide -- you heard the Court talk about |
| 09:51:03 | 14 | them -- and whether these plaintiffs are entitled to |
| 09:51:07 | 15 | recover. |
| 09:51:08 | 16 | You say, well, what's the big deal?  It's a 100 to |
| 09:51:13 | 17 | $160 product. |
| 09:51:14 | 18 | Well, as you're going to hear, it is a big deal, |
| 09:51:17 | 19 | because all we're asking for really is our money back, and |
| 09:51:21 | 20 | we're having a little trouble getting it. |
| 09:51:23 | 21 | Why we are here.  There are two things you've got to |
| 09:51:26 | 22 | be deciding.  Judge Gwin has given us a roadmap. |
| 09:51:31 | 23 | Number one, as you'll see on your screen, is this |
| 09:51:34 | 24 | pressure cooker defective?  Does it operate the way it was |
| 09:51:38 | 25 | intended to or is it defective such that it does not operate |

09:51:38    1    the way it's intended to?

09:51:41    2        If it is defective, is it worthless?  You heard the

09:51:46    3    Court talk about that in his opening comments to you right

09:51:49    4    before you left for your break.  Meaning, if something's not

09:51:53    5    able to be used for its intended purpose -- our position is

09:51:56    6    a pressure cooker, you're supposed to be able to use it as a

09:51:59    7    pressure cooker.

09:52:00    8        If it's not able to be used safely for its intended

09:52:04    9    purpose, well, that product is worthless.  And the defense,

09:52:06   10    of course, will explain their position after I'm done with

09:52:11   11    this portion.

09:52:11   12        Here's the key:  If you find these two questions are

09:52:14   13    answered in our favor, what we're asking for is a full

09:52:17   14    refund.  Just give us our money back for the products that

09:52:21   15    we paid and bought, and we want that back because they're

09:52:23   16    not worth what we thought they were when we bought them.

09:52:28   17        Now, who is Tristar.  Well, what you're going to hear,

09:52:32   18    it's a company with over a billion dollars in sales.  They

09:52:36   19    import products made in China to sell to the US and around

09:52:40   20    the world, a company that has made -- since 2014, it's sold

09:52:45   21    over 2 million Pressure Cooker XL units.  Those are the

09:52:51   22    units right here.  These are actually, if you'll look with

09:52:53   23    me, the three units of the plaintiffs.

09:52:55   24        We've had stipulations with cocounsel about certain

09:52:57   25    things, and everybody agrees that this is Miss Vennel's

09:53:01  1   unit, this is Mr. Chapman's unit, and this is Mr. Jackson's

09:53:06  2   unit, so there's no dispute about that.

09:53:11  3        Over 2 million of those have been sold.  There are

09:53:13  4   three models.  There's the -- well, three-plus.

09:53:16  5        There's the 770 series, which includes the 770-1.

09:53:21  6   What does that mean?  It's 6 quart, all right?  It's the

09:53:25  7   smaller model.  The 780 model.  You can imagine as the

09:53:29  8   numbers increase, the units are going to be bigger.  So the

09:53:32  9   770 model is 6 quart, the 780 model is 8 quart, the 790

09:53:40  10  model is 10 quart.

09:53:41  11       Those are the products that we're here asking you for

09:53:45  12  relief on today and the next couple of days.

09:53:54  13       Now, the meat of the issue in this case, no pun

09:53:58  14  intended with the cooking, a company that touts the safety

09:54:01  15  of the Power Pressure Cooker units as its primary selling

09:54:02  16  point to an unsuspecting public is also who Tristar is.

09:54:06  17       You're going to hear about evidence about, oh, this is

09:54:08  18  the safest product.  If there's even human error, the lid is

09:54:13  19  never supposed to come off while the unit is under pressure.

09:54:17  20       Well, as you'll hear from these three folks, the exact

09:54:19  21  opposite happened.  Some very severe burns.  And you heard

09:54:24  22  the Judge talk about there were some burns that occurred to

09:54:27  23  the plaintiffs as a result of the products in this case.

09:54:30  24       Tristar also boasts and warrants that its safety

09:54:35  25  locking device will prevent the removal of the lid of

09:54:38  1    pressure cooker while the contents are under pressure.  So

09:54:42  2    you should be able to -- just as this is an example right

09:54:44  3    here.

09:54:45  4        This unit, you should be able to put your food in,

09:54:48  5    make sure the lid is on securely.  You cook it for however

09:54:52  6    long you cook it, then you will release the steam.  That's

09:54:56  7    the only way that you know that the product is done cooking

09:54:59  8    and there's no more pressure in the unit, because the steam

09:55:03  9    has been released.

09:55:04  10       Once that steam is released, you should be able to

09:55:07  11   open the product safely without any issues.  But

09:55:10  12   unfortunately that's not what happened, not with these three

09:55:13  13   folks.

09:55:13  14       Now, here are the units that we've talked about.  This

09:55:21  15   is the box it comes in.  You'll see, it says up at the top,

09:55:26  16   Power Pressure Cooker XL.  This is the 6 quart box as you

09:55:31  17   see in red.  There are the three units sizes.  The 770 model

09:55:36  18   on the far left, in the middle is the 780 model, and on the

09:55:41  19   far right is the 790 model.

09:55:43  20       Now, here are the warranties, the representations made

09:55:46  21   by the company in the owner's manual that every class member

09:55:51  22   gets, that these three folks will testify they reviewed,

09:55:55  23   they relied upon.  And this is what the owner's manual says.

09:56:00  24       Lid safety device:  It prevents pressure buildup if

09:56:05  25   the lid is not probably closed.  That's number one.  And

09:56:09  1   prevents the lid from opening until all pressure is

09:56:12  2   released.

09:56:13  3       So there's two things.  Did you catch that?  Two

09:56:14  4   things.  Number one, it prevents the pressure from building

09:56:18  5   up if you can't get the darn thing closed.  The pressure

09:56:21  6   won't build up because it's not on properly.

09:56:25  7       The other thing that the pressure cooker is supposed

09:56:27  8   to be able to do, is that once the lid is on properly, you

09:56:31  9   should never, ever, as you'll hear, be able to remove the

09:56:35  10  lid with any pressure in the unit.  Okay?  That, again,

09:56:38  11  makes sense.

09:56:39  12      If there's pressure in the unit and the lid is able to

09:56:43  13  come off while there's pressure there, what's going to

09:56:45  14  happen?  Those super hot contents are going to come over

09:56:50  15  somebody and other areas of the kitchen, okay?  That's the

09:56:55  16  primary claim in this case.

09:56:56  17      What's also represented in the owner's manual under

09:57:01  18  the frequently asked questions portion is this.  It's a

09:57:04  19  great question.  Why would the lid come off when it

09:57:07  20  shouldn't?  Look at the answer:  It should only come off if

09:57:13  21  there was no pressure inside.

09:57:16  22      I want you to remember those statements because

09:57:19  23  they're statements that the plaintiffs in this case, again,

09:57:22  24  all class members receive one of these when they buy these

09:57:26  25  that folks rely on.

09:57:28  1      What else do we know?  We know that Mr. Lozano, who is

09:57:33  2  the company representative in this case, that you'll hear

09:57:36  3  live testimony from, he says the following.

09:57:38  4      The question was asked of Mr. Lozano:  The Power

09:57:43  5  Pressure Cooker XLs are designed so that if there's pressure

09:57:46  6  in the unit, the lid should not be able to come off.  Right?

09:57:49  7      The answer he gave was:  Yes.

09:57:51  8      And then the follow-up question:  If the lid can come

09:57:54  9  off, the unit's defective?

09:57:57  10      His answer:  If the unit -- if the lid can come off?

09:58:01  11      Question:  While there's pressure in it.

09:58:03  12      Answer:  I will say that it's defective.

09:58:06  13      Well, of course.

09:58:08  14      So we know that we have to present evidence to the

09:58:11  15  Court, because the Judge wouldn't let us if we didn't.  We

09:58:14  16  know it's got to be competent evidence.  So we asked an

09:58:18  17  expert witness, who you'll hear from after defense and I are

09:58:23  18  finished with opening statements, and his name is Dr. John

09:58:28  19  Pratt.

09:58:29  20      Dr. Pratt, just raise your hand back there.

09:58:30  21      You're going to hear from him next.  He is a Ph.D.

09:58:34  22  His background is immaculate.  Structural mechanics from the

09:58:39  23  University of California.  He has a Ph.D. in civil

09:58:42  24  engineering from there.  He's a master of science in

09:58:45  25  mechanical engineering, California State University,

09:58:48    1    Fullerton.  He holds over 40 patents.  Not only is he an

09:58:52    2    engineer, he's an inventor.

09:58:53    3        I like this part.  I didn't know this until I met

09:58:58    4    Dr. Pratt.  He's a coinventor and lead developer of the

09:59:01    5    post-9/11 secure terrorist-proof cockpit door decompression

09:59:09    6    latches now installed on half the world's aircraft.  You

09:59:12    7    think he knows about pressure?  I think so.  He's the author

09:59:16    8    of numerous publications.

09:59:18    9        Well, what we did was, Dr. Pratt and Tristar's expert

09:59:23   10    witness, Mr. Mattice, had a joint testing session on these

09:59:30   11    three units.  We had them all meet together.

09:59:35   12    Mr. Landskroner, cocounsel of the case, was present, along

09:59:38   13    with another opposing counsel, along with the experts.  And

09:59:42   14    they did the testing of these three units together so that

09:59:47   15    everybody had a fair shake to understand what the other was

09:59:50   16    doing.  That makes sense.

09:59:52   17        And this is what the results of those tests -- well,

09:59:55   18    let me -- before I go to that.

09:59:56   19        An important thing to remember -- and you'll see this

09:59:59   20    in the video clips that we'll show -- to make sure that

10:00:03   21    while they were doing the tests, that when they rotated the

10:00:06   22    lid, the lid didn't come off and blow stuff all over them,

10:00:10   23    Dr. Pratt made a stop key device to stop the lid from

10:00:16   24    completely opening and the burning contents burning all over

10:00:19   25    Mr. Mattice and Dr. Pratt.  That was done.  You'll see that

10:00:22   1   on the video clip.

10:00:23   2       The results of the SEA testing was, you'll see on the

10:00:26   3   video, Dr. Pratt was able to rotate the lid of the

10:00:30   4   pressurized Chapman unit at a dangerously high pressure.

10:00:36   5   We'll talk about that more in a second.  Mr. Mattice,

10:00:40   6   Tristar's expert, was able to rotate the lid.

10:00:41   7       And when I say rotate, that means they rotated it to

10:00:45   8   the stop key device.  Because if you rotated it further, it

10:00:47   9   might blow off, and they didn't want to have that happen,

10:00:48   10   hence the device to stop it from happening.  So being able

10:00:53   11   the rotate the lids means that you would be able to continue

10:00:57   12   the maneuver and open it.

10:00:59   13       The tests revealed that for all three of these units,

10:01:03   14   Dr. Pratt and Mr. Mattice were able to open them while there

10:01:08   15   was still dangerously high pressure in the units.

10:01:11   16       Now, here's what you'll hear from numbers.  Now, I'm

10:01:14   17   not an engineer, good brief.  I don't have that background.

10:01:18   18   But I trust people in authority who do have that background.

10:01:21   19       What the testing revealed -- and both experts agreed

10:01:25   20   with these numbers.  It's not that Dr. Pratt said, for

10:01:28   21   example, the Chapman unit was a 3.8 and Mr. Mattice says it

10:01:35   22   was at, you know, 1.1.  They agree as to the numbers for the

10:01:38   23   pressure.

10:01:38   24       For Chapman, a gauge pressure at 3.8 psi was found to

10:01:38   25   be present when you could rotate the lid.  And if you rotate

10:01:45  1   the lid, that means it could have come off.

10:01:48  2       For Miss Vennel, the gauge pressure was 3.6 psi.

10:01:54  3       And for Mr. Jackson, the gauge pressure was a very

10:01:57  4   high 4.42 psi.

10:02:00  5       What does this mean?  You know, the numbers, what does

10:02:02  6   that mean?  This is what it means.  Look at that next

10:02:04  7   sentence.

10:02:05  8       A pressure of 2.5 -- now, remember, all of these were

10:02:09  9   well above the pressure of 2.5 -- equates to a force of

10:02:13  10   approximately 177 pounds.  This force would launch the

10:02:17  11   2.2-pound lid and the superheated contents at over 50 feet

10:02:22  12   per second.  50 feet per second.  Yeah.  That's what spilled

10:02:32  13   all over Mr. Jackson, Mr. Chapman, and Ms. Vennel.

10:02:41  14       Dr. Pratt's conclusions -- and you'll hear about this

10:02:43  15   from the stand -- the pressure cooker that can be opened

10:02:46  16   while still pressurized is unreasonably dangerous.  For once

10:02:49  17   the law and experts kind of make sense.

10:02:52  18       Tristar misled consumers by expressly representing

10:02:55  19   that the pressure cookers could not be opened while the

10:02:59  20   contents remained under pressure when, in fact, the lid

10:03:01  21   could be rotated only using normal force while the unit

10:03:06  22   remains pressurized, in direct contradiction to the

10:03:10  23   representations.

10:03:10  24       They also represented that the lids of the pressure

10:03:13  25   cookers could not be removed with the contents under

10:03:15  1   pressure, when, in fact, they can be opened with the

10:03:18  2   contents under pressure.

10:03:20  3        And then his opinion that you'll hear him render:

10:03:23  4   It's my conclusion within a reasonable degree of scientific

10:03:26  5   and engineering certainty that all models of Tristar's Power

10:03:32  6   Pressure Cooker XLs are unreasonably dangerous.

10:03:34  7        Well, why is it we can say all models?  They all have

10:03:38  8   the exact same design and manufacturing specifications.  If

10:03:41  9   you get one of these -- you could get one right here in

10:03:45  10  Cleveland, Ohio, and you could get another one in Colorado,

10:03:48  11  you could get another one in Pennsylvania.  They're all

10:03:51  12  designed to be the exact same.  That's why we can say that.

10:03:55  13       With regard to that testing, as I mentioned earlier,

10:04:02  14  Mr. Mattice -- and I keep -- I don't know if I'm

10:04:08  15  mispronouncing his name, whether it's Mattice or Mattice.

10:04:10  16  I've talked to him before, but I just don't remember.

10:04:11  17       The methods of the pressure values Dr. Pratt reports

10:04:15  18  are accurate to a reasonable degree of scientific certainty.

10:04:19  19  That's what he says.

10:04:20  20       Well, here is Tristar's response.  So you've heard,

10:04:24  21  you know, why we're here, what we're bringing this case to

10:04:28  22  you for.

10:04:29  23       Tristar completely denies the failure of their lid

10:04:31  24  safety device, and they blame the victims.

10:04:34  25       Well, what do you mean they blame the victims?

10:04:37   1      What you're going to hear their expert say,

10:04:40   2  Mr. Mattice, is that Ms. Vennel, Mr. Jackson and Mr. Chapman

10:04:44   3  all spilled the contents on themselves.

10:04:46   4      The problem with that is when the contents exploded,

10:04:50   5  as you'll hear from Ms. Vennel, the contents were so hot and

10:04:56   6  exploded so badly that there was warping on her cabinetry

10:05:01   7  from it.  Because it also hit her as well as other areas  in

10:05:04   8  the kitchen and went up to the roof.

10:05:07   9      Mr. Jackson, when he opened the lid as he normally

10:05:10  10  did, the contents were still under pressure, unknown to him.

10:05:13  11  The contents blew out all over his face and body and went up

10:05:19  12  to the ceiling.

10:05:22  13      Mr. Chapman, the contents -- the same way.  He opened

10:05:24  14  it normally.  They blew out all over him, his torso and

10:05:30  15  body, and up to the ceiling.

10:05:31  16      I don't understand Mr. Mattice when he says they

10:05:33  17  spilled it on themselves.  What did they do, throw it up to

10:05:37  18  the ceiling too?

10:05:37  19      Those are the allegations made by Tristar.  They're

10:05:39  20  going to blame the victim.  That's what they do.  Don't fall

10:05:46  21  for that kind of reasoning.

10:05:46  22      The other thing Tristar says -- and that's that top

10:05:50  23  bullet point -- well, they claim, okay, even if there is a

10:05:54  24  defect, they still have value from use either before the

10:05:58  25  episode happened or they fail from -- or they can use some

10:06:04 1    other features on the pressure cooker.

10:06:07 2        Now, let me explain that a little bit.  To get around

10:06:10 3    that these products are worthless, what Tristar is going to

10:06:13 4    tell you is, well, you know, we don't think they're

10:06:15 5    defective, but if they are defective, they do have value.

10:06:18 6    They're going to say that because, gosh, Ms. Vennel used

10:06:23 7    hers safely two times and then on -- or however many times

10:06:26 8    it happened to be, and then the later time it exploded.  So,

10:06:30 9    hey, she must have received some value.

10:06:33 10       You can't fall for that.  Why?  Because these pressure

10:06:36 11   cookers, because the design defect is present at the time of

10:06:40 12   the design and manufacture, and at the point of sale, that's

10:06:44 13   where the defect is present.

10:06:46 14       Now, the way it manifests itself, it's like playing

10:06:48 15   Russian roulette.  You don't know which time the gun with

10:06:51 16   the bullet in it is actually going to trigger.  You just

10:06:54 17   don't know.

10:06:55 18       So that's why we say the product, as you'll hear from

10:06:59 19   Dr. Pratt, is defective, because the lid design is all the

10:07:03 20   same at the point of purchase.  It's just a matter of when

10:07:07 21   or if it manifests later on.  But that's not the issue that

10:07:11 22   you need to concern yourself about.

10:07:13 23       The intended purpose of a pressure cooker is not as a

10:07:16 24   browner or as a slow cooker.  It's to cook safely under

10:07:21 25   pressure.  It makes sense.

| | | |
|---|---|---|
| 10:07:23 | 1 | The next slide, please, Dawn. |
| 10:07:26 | 2 | Here are some other representations about the safety |
| 10:07:31 | 3 | of the Power Pressure Cooker XL.  Don't just believe Greg. |
| 10:07:34 | 4 | This is what else is being said. |
| 10:07:37 | 5 | George Cruz is a Tristar employee.  He says he's a |
| 10:07:41 | 6 | chef and product engineer behind the Power Pressure Cooker. |
| 10:07:42 | 7 | This is what Mr. Cruz says.  And I really ask you to think |
| 10:07:46 | 8 | about this statement all throughout the trial.  He's talking |
| 10:07:49 | 9 | about the safety features of the Power Pressure Cooker XL. |
| 10:07:52 | 10 | This is what he says.  Not my words, his. |
| 10:07:55 | 11 | All these features are designed to make sure that |
| 10:07:58 | 12 | whether human error or mechanical malfunction occur using |
| 10:08:02 | 13 | the Power Pressure Cooker is always safe. |
| 10:08:08 | 14 | That's what they thought they were getting. |
| 10:08:11 | 15 | These representations are in addition to those we |
| 10:08:14 | 16 | talked about the owner's manual.  This is Mr. Cruz, his own |
| 10:08:17 | 17 | self. |
| 10:08:19 | 18 | I may need some sound.  Technical difficulty.  Please |
| 10:08:26 | 19 | stand by. |
| 10:08:29 | 20 | If necessary, use the mic. |
| 10:08:33 | 21 | It worked before we started this morning.  That's all |
| 10:08:35 | 22 | I can tell you, ladies and gentlemen. |
| 10:08:53 | 23 | If we can't get it, I'll just represent that that's |
| 10:08:57 | 24 | what he says. |
| 10:09:05 | 25 | MR. EDWARDS:  It's feeding out of here but not |

10:09:08  1    there.

10:09:15  2              MR. COLEMAN:  I wouldn't even bother except

10:09:17  3    it's important.  And, again, if we don't get it up, I'll

10:09:22  4    just read to you what it says.

10:09:44  5        I don't want to take up the Court and jury's time.

10:09:48  6    Are we able to get it or not?

10:09:50  7              MR. EDWARDS:  It's not working.

10:09:53  8              MR. COLEMAN:  Let me read to you what --

10:09:56  9    again, the slide before that we talked about from Mr. Cruz,

10:09:59  10   a direct quote was as follows that I want you to really pay

10:10:03  11   attention to.

10:10:04  12       The gentleman you happened to see who was talking but

10:10:08  13   you didn't hear what he was saying, that's Mr. Cruz.  And

10:10:11  14   I'm quoting this because, as you can imagine, if I didn't

10:10:16  15   quote it correctly, I would get an objection, number one.

10:10:17  16   And number two, the Court wouldn't let me do it.

10:10:20  17       So this is what Mr. Cruz says yet again:  All these

10:10:21  18   features are designed to make sure that whether human error

10:10:24  19   or mechanical malfunction occur using the Power Pressure

10:10:29  20   Cooker XL is always safe.

10:10:32  21       Now, what else do we know?  You're going to hear from

10:10:38  22   this gentleman --

10:10:40  23       No, wait.  Go back, please, Dawn.

10:10:42  24       -- from this gentleman, whose name is Eric Theiss.  He

10:10:47  25   is the product spokesperson.

10:10:49   1     If we go to the next screen, this is what Mr. Theiss

10:10:53   2   is going to say.  He's their -- you may have seen him on TV.

10:10:57   3   I don't know.  He's on QVC, he's on some other channels,

10:11:01   4   marketing products for different companies.

10:11:03   5     What you'll hear about Mr. Theiss also is he makes a

10:11:05   6   percentage point or half of a percentage point on every

10:11:08   7   product of the Power Pressure Cooker units that he sells for

10:11:13   8   Tristar.  So he has a vested interest in this product as you

10:11:18   9   can image.  The more he sells, the more money he makes.

10:11:20   10     But this is what Mr. Theiss says.  When referring to

10:11:22   11   the lid, Eric Theiss states:  You couldn't get this open if

10:11:27   12   you wanted to.  It's one of the safest ones you can get.

10:11:31   13     Those are the things that you see on TV, the

10:11:33   14   infomercials.  And the evidence is just flat out going to

10:11:37   15   show that these representations and warranties are false.

10:11:40   16   The lid can be opened with a dangerous amount of pressure

10:11:44   17   inside, and we believe that's what you're going to find.

10:11:47   18     Why don't this matter?  Reality.

10:11:50   19     Ms. Vennel, I'm not going to show you the pictures,

10:11:53   20   but were able to describe to you she had extensive burns on

10:12:00   21   her right breast with some residual scarring, also some

10:12:05   22   burns in other areas that you'll get to hear her describe.

10:12:08   23     Mr. Chapman, extensive burns on his face, torso, arms.

10:12:15   24     Mr. Jackson, all over his body, but specifically some

10:12:18   25   very tough burns to his face that have thankfully healed,

10:12:23  1    but he had to go through the process.

10:12:25  2         All of those incidents occurred because the Power

10:12:28  3    Pressure Cooker still had pressure in it when the lid was

10:12:32  4    opened, despite what all of these representations say.

10:12:35  5    That's the damage that can be done.

10:12:37  6         Why are you here?  And I'm going to wrap up with this.

10:12:41  7    You're here to sold Tristar accountable for selling a

10:12:46  8    defective product.  You're here to hold Tristar to their

10:12:50  9    promise that even with human error, these lids will not come

10:12:54  10   off while the units are under pressure.  You're here to hold

10:12:55  11   these units are worthless because it's unsafe and unfit for

10:12:59  12   it's intended purpose as a pressure cooker.  You're hear to

10:13:02  13   give these three plaintiffs and the class members a refund

10:13:06  14   of the purchase price.

10:13:07  15        And you're like, that's why I'm here?  It's important.

10:13:11  16   Number one, to make sure others don't have this exact same

10:13:14  17   thing happen to them.  That's why.  You're not just speaking

10:13:21  18   for these three, you'll be speaking for others.

10:13:24  19        So at the end of the case -- I'm going to sit down and

10:13:28  20   shut up, and you'll probably be saying thank you.  At the

10:13:31  21   end of the case, after all the evidence -- and I want you to

10:13:33  22   listen to all of it.  You're going to hear our side, you're

10:13:36  23   going to hear their side, but at the end of the case I'm

10:13:39  24   going to come back to you.

10:13:41  25        And I'm going to say, number one, we've proven to you

10:13:42  1    there was a defect.  Number two, I'm going to say we've

10:13:46  2    proven to you that they're worthless.  And I'm going to ask

10:13:48  3    you to come back with a verdict accordingly.

10:13:51  4         Thank you so much for your attention.

10:13:55  5              THE COURT:  Mr. Lewis.

10:13:55  6              OPENING STATEMENT BY THE DEFENDANT

10:13:55  7              MR. LEWIS:  May it please the Court, counsel,

10:13:58  8    members of the jury, good morning.

10:14:01  9         April 9th of this year, I'm sitting on the floor of my

10:14:08  10   house over the river in Tremont with my hair out to here.

10:14:12  11   My son's birthday present was a robotic arm.  I'm trying to

10:14:17  12   put it together.  It's not working.  I can't figure it out,

10:14:21  13   and my brilliant son says to me, "Dad, read the

10:14:28  14   instructions."  Of course, I hadn't because I know

10:14:33  15   everything.  And when I did read the instructions, or

10:14:38  16   frankly when Jamison read the instructions to me, the

10:14:40  17   robotic arm worked just fine.

10:14:43  18        Ladies and gentlemen, the evidence is going to show in

10:14:47  19   this case that when the instructions are followed, this

10:14:52  20   cooker is a safe and valuable product.

10:15:00  21        Over 2 million people feeding their families, 2

10:15:04  22   million.  Think of this.

10:15:06  23        Remember last year about this time we had a big parade

10:15:10  24   in this city.  We put a million folks here after the Cavs

10:15:16  25   won the NBA championship.  Double that.  That's how many

10:15:22  1   folks are feeding their families with this cooker.  Safety

10:15:25  2   and value.

10:15:26  3       The evidence is going to show that this expert,

10:15:30  4   Dr. Pratt, from California, who appears to have a fantastic

10:15:36  5   resumé, was unable to replicate, duplicate, simulate,

10:15:43  6   recreate, what the plaintiffs describe happened to them in

10:15:49  7   this case.  Unable to do it.

10:15:52  8       At the end of this trial, we're going to ask you to

10:15:55  9   apply these everyday concepts - safety, value, but, most

10:16:00  10  importantly, common sense - and find for Tristar.

10:16:04  11      As you know, I'm John Lewis.  You're going to see a

10:16:08  12  handful of us working hard to make sure that the

10:16:11  13  presentation to you is efficient and as short as possible.

10:16:14  14  But this case is important to Tristar.  You will see in the

10:16:17  15  back of the courtroom, we've already introduced Keith

10:16:21  16  Mirchandani, the CEO, the founder of the Tristar, a 25-year

10:16:25  17  company.  Employs over 100 people and contracts with a

10:16:29  18  thousand other United States employees, keep them busy.

10:16:33  19      You'll see Matt Fisher, Alex Lozano, Jim Myers, other

10:16:38  20  folks from Tristar.  This is an important case for them.

10:16:43  21      Over 25 years ago, Mr. Mirchandani started this

10:16:47  22  company in his parents' garage.  He works with people who

10:16:54  23  have ideas, like the idea for the Power Pressure Cooker XL,

10:16:57  24  to bring it to the market in the United States.

10:17:01  25      And what you're going to hear, and you'll get this

10:17:04  1    testimony from Mr. Fisher, Matt Fisher, that the best United

10:17:11  2    States brands sell this cooker.

10:17:19  3         The brands that we all trust, Bed Bath & Beyond,

10:17:23  4    Kohl's, Amazon -- in fact, I think Amazon Prime Day is

10:17:27  5    tomorrow; I read all about it in the news -- QVC, Target,

10:17:32  6    sell this pressure cooker.  You don't get in those stores,

10:17:37  7    Mr. Fisher will tell you, without a good and valuable

10:17:40  8    product.  You don't stay in those stores without a good and

10:17:45  9    valuable product.

10:17:48  10        Talk a little bit about what this pressure cooker can

10:17:51  11   do.  First of all, beyond making food with its pressure

10:17:58  12   cooker function, it's a slow cooker, you can saute food, you

10:18:04  13   can do canning.

10:18:05  14        Why is that important?  Because as you heard

10:18:08  15   Mr. Coleman say, his view and the view of the plaintiffs is

10:18:11  16   that this is worthless.  It's not worthless even if the

10:18:16  17   pressure cooker feature doesn't work.  This is a multicooker

10:18:20  18   with lots of value to 2 million people feeding their

10:18:24  19   families in the United States today.

10:18:25  20        Why is this -- why do we know this is a high quality

10:18:30  21   product?  You're going to hear from Mr. Lozano about the

10:18:34  22   certifications and the compliance.  He's going to come and

10:18:41  23   testify about what Tristar did to make sure this product is

10:18:45  24   safe.  ISO, European standards, UL, American National

10:18:54  25   Standards Institute, all of the things that are required to

10:18:56   1   bring a product like this to the United States were

10:18:59   2   fulfilled.

10:19:00   3       And you'll see it right on the back when you get a

10:19:03   4   chance to look at the cooker.  You'll see all these

10:19:08   5   certifications.  You don't get to put this on your cooker

10:19:12   6   unless you pass all of these tests.  And that's what

10:19:15   7   Mr. Lozano will talk about.

10:19:17   8       There's also an extensive quality assurance process.

10:19:21   9   And this is just a high level summary.  You're going to hear

10:19:24  10   about Mr. Lozano talk about all of the things that are done

10:19:27  11   to this cooker before it's allowed to be put on the shelves

10:19:31  12   at Target, Bed Bath & Beyond, Kohl's.

10:19:37  13       Not only do we validate the design from the supplier,

10:19:41  14   we get regulatory approval.  We do testing on specific

10:19:46  15   devices.  And for each lot of devices that is brought to

10:19:50  16   market to the United States, specific cookers are taken off

10:19:54  17   the line and vigorously tested to make sure that they

10:19:59  18   comply, that the lid stays on, that they comply with the all

10:20:02  19   the design specs.

10:20:04  20       Additionally, every single one of these cookers is

10:20:07  21   tested individually before it's allowed to go on a shelf in

10:20:10  22   the United States at a Kohl's or a Target.  You can't get

10:20:15  23   that if there's a problem with the device.

10:20:19  24       Thank you.

10:20:23  25       Back to the owner's manual.  Now, I noticed

10:20:28  1    Mr. Coleman put on some pages of the manual but not all of

10:20:32  2    them.  So let's take a look at some of the pages of this

10:20:38  3    manual.

10:20:38  4         On the very front page, the bottom left-hand corner.

10:20:45  5    Important:  Do not use this pressure cooker until you have

10:20:50  6    read the entire manual thoroughly.

10:20:54  7         Do not use it until you've read the entire manual

10:21:02  8    thoroughly.

10:21:03  9         Page 6.  Read and follow all instructions carefully.

10:21:07  10        Of course.  It's a pressure cooker.  They have hot

10:21:10  11   liquids in it.  Always be careful.  When I boil water to

10:21:14  12   make hardboiled eggs, I should be careful.  When I use a

10:21:18  13   toaster, I should be careful.  I should make sure I know how

10:21:22  14   to use it.

10:21:25  15        Extreme caution must be used when moving the

10:21:29  16   appliance, the cooker.  It has hot liquids in it.

10:21:32  17        This appliance cooks under pressure.  Improper use may

10:21:37  18   result in scalding injury.

10:21:40  19        Here's the key:  Do not open the Power Pressure Cooker

10:21:47  20   XL until the unit has cooled and all internal pressure has

10:21:51  21   been released.

10:21:53  22        Right here.  This is the valve.  All internal pressure

10:21:59  23   has been released.

10:22:03  24        If the unit is difficult to open, if the unit.  This

10:22:10  25   has no pressure in it.  That's locked.

10:22:19  1        If this is hard to open, it indicates that the cooker

10:22:27  2   is still pressurized.  Do not force it open.

10:22:34  3        And, oh, just in case you didn't read that, in bold

10:22:39  4   caps:  Never force open the Power Pressure Cooker XL.  Never

10:22:46  5   force open the Power Pressure Cooker XL.

10:22:51  6        Why am I repeating myself on this?  Why am I

10:22:55  7   continuing to say, don't force open the Power Pressure

10:22:59  8   Cooker XL?  Because you're going to see in this case that

10:23:03  9   every single test that fancy expert from California did

10:23:07  10  violated that instruction right there.  Never force open the

10:23:11  11  Power Pressure Cooker XL.  Every single test that he did, he

10:23:15  12  violated that instruction.  That's what the evidence is

10:23:20  13  going to show.

10:23:22  14       When you follow the instructions, this product is safe

10:23:28  15  and valuable.

10:23:29  16       Can I see that next slide?

10:23:32  17       Hot lid warning:  Use the black composite handle -- do

10:23:40  18  you see how easy this is to open?  This is it.  Every single

10:23:43  19  time that you see someone from Tristar or a representative

10:23:47  20  from Tristar opening this lid after a cook cycle has been

10:23:51  21  completed, that's what they're doing.  That's how easy it is

10:23:55  22  to open.  Use this handle only when you open the lid.

10:24:01  23       This stuff down here, it's hot.  Start putting your

10:24:09  24  hands around here, it's hot, of course.  Use this to open.

10:24:20  25       Press down gently on the lid and turn clockwise until

10:24:25   1    it meets resistance.  This will not pressurize, will not

10:24:33   2    pressurize unless it's locked.  If you don't have this

10:24:36   3    locked, you cannot pressurize it.  Pressure will not build

10:24:39   4    on this.  It has to be in the locking position before it

10:24:44   5    pressurizes.  When the pressure is released, it opens.  It's

10:24:47   6    that simple.

10:24:52   7         This is the warranty.  You're going to hear about a

10:24:55   8    breach of warranty in this case.  That's what the plaintiffs

10:24:57   9    are claiming.  This is the warranty.

10:25:01   10        Number 2.  The warranty extends to the original

10:25:07   11   consumer.  This warranty is void if the product has been

10:25:11   12   subject to accident, misuse, abuse, improper maintenance or

10:25:17   13   repair, or unauthorized modification.

10:25:20   14        Ladies and gentlemen, I submit to you that every test

10:25:24   15   that was run by Dr. Pratt voided the warranty.  He abused

10:25:31   16   it, he misused it, and he made unauthorized modifications to

10:25:36   17   run this test.  That's a fact.  That's a fact.

10:25:44   18        So why are we here?  We need your help to solve a

10:25:49   19   dispute.  That's the great thing about the American jury

10:25:54   20   system.  You folks get to decide.  Judge Gwin will at the

10:25:58   21   end of the case read some instructions, some law.  You get

10:26:01   22   to take what you heard, the evidence that you're allowed to

10:26:04   23   use, and you get to make the decisions.  That's all in your

10:26:07   24   hands.  That's the great thing about this jury system.

10:26:10   25        And while the plaintiffs say, well, we were injured

10:26:15   1   and so on behalf of the class, these pressure cookers, which

10:26:19   2   are feeding 2 million families in the United States, are

10:26:22   3   worthless, we say, not so fast.  We say, if you can't

10:26:27   4   replicate, duplicate, or recreate what the plaintiffs say

10:26:32   5   happen, then you don't have a theory in this case of defect.

10:26:36   6   You can't show a breach of warranty.

10:26:39   7       If you can't prove that every single person who has

10:26:44   8   received a Power Pressure Cooker XL that's worthless to

10:26:47   9   them, you can't prove your case.  We know for a fact they

10:26:51   10  can't prove their case.

10:26:52   11      You're going to hear from chef Eric Theiss.

10:26:56   12  Mr. Coleman mentioned him earlier.  He's going to say, hey,

10:27:00   13  I've used this thing a thousand times.  He's going to say, I

10:27:04   14  tested the features myself.  I've let my friends' kids use

10:27:09   15  this cooker.  He's going to show you that when it's used as

10:27:14   16  intended, it's a safe and valuable product.

10:27:20   17      I'm going to end with this, ladies and gentlemen.  I

10:27:25   18  don't normally do this in opening statements.  Frankly, most

10:27:31   19  people would say, are you crazy?  But this is what I'm going

10:27:35   20  to do.

10:27:36   21      I had the company make a safe box.  I'll show it to

10:27:41   22  Dr. Pratt out in the hallway.  I got a factory cooker right

10:27:46   23  off the line.  Show me that if you follow the instructions,

10:27:53   24  that if you follow these instructions, that lid blows off

10:27:57   25  that cooker like the plaintiffs describe.  Go ahead.  Follow

**Pratt (Direct)**

| | | |
|---|---|---|
| 10:28:00 | 1 | the instructions and show me that that lid blows off that |
| 10:28:04 | 2 | cooker like the plaintiffs say.  They're not going to do it. |
| 10:28:10 | 3 | And at the end of the case when they haven't done it, |
| 10:28:13 | 4 | I'm going to ask you to find for Tristar.  Thank you. |
| 10:28:17 | 5 | Thank you, Your Honor. |
| 10:28:17 | 6 | THE COURT:  Would you call your first witness. |
| 10:28:21 | 7 | MR. COLEMAN:  Yes, Your Honor.  We'll call |
| 10:28:25 | 8 | Dr. John Pratt. |
| 10:28:43 | 9 | (Witness sworn.) |
| 10:28:48 | 10 | THE COURT:  Please take a seat.  Get close to |
| 10:28:50 | 11 | the microphone.  Once you get there, tell us your name and |
| 10:28:53 | 12 | tell us how you spell your last name. |
| 10:28:58 | 13 | THE WITNESS:  Yes.  My name is John Dillworth |
| 10:29:01 | 14 | Pratt.  And my last name is spelled P-R-A-T-T. |
| 10:29:06 | 15 | THE COURT:  Counsel. |
| 10:29:06 | 16 | MR. COLEMAN:  Thank you, Your Honor. |
| 10:29:06 | 17 | JOHN D. PRATT, Ph.D. |
| 10:29:06 | 18 | - - - - - |
| 10:29:10 | 19 | DIRECT EXAMINATION |
| 10:29:10 | 20 | BY MR. COLEMAN: |
| 10:29:11 | 21 | Q    Dr. Pratt, you just introduced yourself to the Court |
| 10:29:14 | 22 | and to the jury.  Can you just give the Court and jury an |
| 10:29:19 | 23 | overview of your educational background because I want to |
| 10:29:24 | 24 | cut to the chase with respect to -- |
| 10:29:27 | 25 | Okay.  We need to hit the screen. |

**Pratt (Direct)**

1    -- with respect to -- I think Mr. Lewis referred to

2    you as the fancy expert from California.  But let's make

3    sure the jury understands you're qualified and give your

4    background with respect to your CV.

5    **A**    Yes.  Well, I pretty much grew up in the fastener

6    industry, fasteners, latches, things that need to lock.  I

7    have a bachelor of science degree from California State

8    University, a bachelor of science degree from California

9    State University [sic].  Both of those are mechanical

10   engineering, having to do with mechanisms and things like

11   that.  And a Ph.D. in structural mechanics, civil

12   engineering from the University of California.

13       So I spent my entire career, basically in aerospace.

14   I did some sporting goods for a few years when aerospace was

15   down, some automotive, white goods, like, you know, washing

16   machines and lawnmowers and things like that.  Fasteners go

17   into just about everything, but primarily aerospace.

18       I left industry in 2005, pretty much retired, to go

19   into private practice as a consulting engineering.  So since

20   2005, I do engineering consulting.  I have clients in

21   France, Los Angeles, in Asia.  And then I also do litigation

22   consulting, this type of work, products liability and patent

23   infringement.

24   **Q**    And we see it there on our screen, Dr. Pratt.

25       So around 2005 you formed Argos Engineering out in

**Pratt (Direct)**

10:31:01  1  California?

10:31:01  2  **A**    That's correct.

10:31:02  3  **Q**    And you've talked about your background.  One of the

10:31:08  4  things that did interest me just from a pure interest

10:31:12  5  standpoint is, tell us about the fasteners, the pressure

10:31:15  6  fasteners that you developed and invented that go on these

10:31:19  7  airplane cockpit doors.

10:31:22  8  **A**    Well, I was working for Hartwell Aerospace at the

10:31:25  9  time.  And Hartwell is one of the largest manufacturers of

10:31:29  10  latching mechanisms, you know, the latches that keep the

10:31:31  11  engine nacelles closed or that are used for the overhead

10:31:36  12  bins on airplanes, access doors.

10:31:39  13      And prior to 9/11, it was -- you know, some of the

10:31:43  14  narrow body airplanes have decompression panels in the

10:31:48  15  flight deck door, so that if the window blows out in the

10:31:51  16  airplane, these panels are supposed to open up to equalize

10:31:54  17  the pressure between the cabin and the cockpit.  If you

10:31:57  18  didn't do that, that forward bulkhead would crash inward and

10:32:01  19  probably destroy some of the flight controls.  But,

10:32:05  20  unfortunately, they needed to open up under a very small

10:32:08  21  differential pressure.

10:32:09  22      Prior to 9/11, you could walk up to those cockpit

10:32:11  23  doors and just palm the panels open, reach in and undo the

10:32:15  24  doorknob.  The terrorists didn't need box knives to get in,

10:32:21  25  or keys.

**Pratt (Direct)**

10:32:22  1      So after 9/11, my team and I came up with mechanical

10:32:26  2   decompression latches that sensed a rapid decompression

10:32:30  3   event.  It would automatically unlock the door.  Had to do

10:32:34  4   that in about 4 milliseconds.  And those ended up on all of

10:32:38  5   the Boeing and Embraer and Bombardier single-aisle

10:32:41  6   airplanes, some of the old Douglas legacy airplanes, about

10:32:44  7   half the world's fleet of aircraft.  And they're still using

10:32:45  8   them today, now 16 years later.

10:32:51  9   **Q**      Dr. Pratt, with respect to your background and the

10:32:56  10   credentials you've talked to us, does it give you an ability

10:32:59  11   to do the testing and to form the opinions that you're going

10:33:02  12   to give here today?

10:33:03  13   **A**      Yes, it does.

10:33:05  14   **Q**      I want to move on to another area.

10:33:12  15          MR. COLEMAN:  And what I would like to do,

10:33:14  16   Your Honor, if that's okay with the Court -- well, let me

10:33:19  17   ask this of Dr. Pratt before I go any further.

10:33:24  18   **Q**      Dr. Pratt, just like Mr. Mattice on the defense end,

10:33:27  19   you get paid for your services in cases like this?

10:33:29  20   **A**      That's correct.

10:33:31  21   **Q**      Unfortunately, you don't give any freebies to lawyers.

10:33:33  22   We have to pay when we use services of folks, right?

10:33:37  23   **A**      That's right.

10:33:37  24   **Q**      All right.  With respect to some things that -- I want

10:33:42  25   to get it out of the way right now.

**Pratt (Direct)**

10:33:44  1   With respect to some statements Mr. Lewis made in his

10:33:48  2   opening statement, it sounds like instead of trying the

10:33:51  3   plaintiffs, he's going to try you.

10:33:53  4   His first comment was -- or not his first but

10:33:56  5   somewhere, and it was, you're going to see or hear that

10:34:00  6   Dr. Pratt didn't try to recreate what the plaintiffs did

10:34:03  7   with respect to how they opened their pressure cookers.

10:34:07  8   Can you explain to the Court and jury what you did do

10:34:10  9   and why you didn't try to do that?

10:34:12  10  **A**   Well, yes.  I wasn't asked to try to do an accident

10:34:16  11  reconstruction.  I was simply asked to inspect the three

10:34:22  12  accident units and some similar exemplars and see if I could

10:34:27  13  identify a defect in the design or manufacturing that would

10:34:31  14  allow that lid to come off under pressure.  I mean, it's

10:34:35  15  pretty obvious that if there's significant pressure inside,

10:34:38  16  it's going to blow that lid off and probable cause some

10:34:42  17  damage.

10:34:42  18  So I was tasked with finding out what those levels of

10:34:46  19  pressure were, whether a person could easily remove that lid

10:34:50  20  under pressure and look for any other defects that might

10:34:53  21  have contributed to the injuries to the class plaintiffs in

10:34:57  22  this case.

10:34:57  23  **Q**   Right.

10:34:58  24  You weren't asked by me to try to go recreate what

10:35:03  25  Mr. Jackson did or Mr. Chapman did or Ms. Vennel did,

**Pratt (Direct)**

10:35:08  1  because there's really no way to do that, is there, sir?

10:35:11  2  **A**    Well, yes.  I wasn't asked to do that, and I wouldn't

10:35:15  3  know about how to do it in the first place.

10:35:18  4  **Q**    Right.  I mean, what your sole job was to do was to

10:35:21  5  see if these units complied with the warranties about the

10:35:24  6  fact that they could never be opened under pressure and

10:35:28  7  whether that was true or not?

10:35:29  8  **A**    That's correct.

10:35:30  9  **Q**    Okay.  So was Mr. Mattice with you at the time that

10:35:37  10  the two of you tested all three of these units?

10:35:40  11  **A**    Yes.  I had tested the Chapman unit at my home office

10:35:46  12  before I sent them to the SEA labs.  But once at the SEA

10:35:50  13  labs, then Mr. Mattice and I tested the other three units.

10:35:55  14  Actually, I did the testing on the Chapman to show how I

10:35:59  15  thought it should be done, and then Mr. Mattice tested the

10:36:08  16  Vennel and the Jackson units afterwards.

10:36:10  17  **Q**    So you were there, Mr. Mattice was there, counsel for

10:36:12  18  plaintiff was there, and counsel for defendant was there?

10:36:15  19  **A**    That's correct.

10:36:16  20  **Q**    And there were certain conditions given for the test.

10:36:20  21  In fact, in a few minutes we'll look at some video clips.

10:36:24  22  And the thing is, you won't hear any sound on those clips,

10:36:29  23  will you, sir?

10:36:30  24  **A**    I don't think so.

10:36:30  25  **Q**    And that's because we wanted the jury to understand

**Pratt (Direct)**

10:36:34  1    and not hear any discussions between the parties that might

10:36:37  2    not be admissible so that they could see how the testing was

10:36:41  3    actually performed without comment; is that right?

10:36:43  4    **A**    That's right.

10:36:44  5            MR. COLEMAN:  Okay.  Your Honor, can I have

10:36:46  6    Dr. Pratt come down here to do a little show and tell with

10:36:49  7    the juror?

10:36:52  8            THE COURT:  Yes.  Just make sure you keep your

10:36:55  9    voice up.

10:36:57  10           THE WITNESS:  Okay.

10:36:59  11   BY MR. COLEMAN:

10:37:00  12   **Q**    Okay.  Dr. Pratt, would you just turn to the jury and

10:37:04  13   tell them which units we have here in front of us as shown?

10:37:08  14   **A**    Yes.  Well, we have the two 6-quart units, Chapman and

10:37:14  15   Vennel.  These are actually made by different manufacturers

10:37:16  16   in China.  One of these is a PPC770 and the other is the

10:37:21  17   770-1.  But otherwise they're identical.  You can't tell the

10:37:25  18   difference between them.

10:37:26  19       This is the 780.  This is the 8-quart unit that

10:37:31  20   belonged to Mr. Jackson.

10:37:33  21   **Q**    All right.  So far what I want you to do for the jury

10:37:37  22   and help them understand when we're talking about whether

10:37:40  23   pressure is still present in the unit while you're trying to

10:37:43  24   open it, did you undertake to do some testing with respect

10:37:47  25   to the Chapman unit?

**Pratt (Direct)**

10:37:49  1   **A**     Yes.  Let me walk you through how these locking

10:37:55  2   features work.

10:37:57  3         What I was doing was inspecting to see whether this

10:37:59  4   locking feature was effective in preventing this lid from

10:38:03  5   coming off.  This is a screen designed to help prevent food

10:38:08  6   debris from getting up here and clogging the works.  I'm

10:38:13  7   going to leave this out for the demonstration but --

10:38:22  8         (Reporter interjection.)

10:38:22  9   **Q**     Dr. Pratt, so that the court reporter and the jury can

10:38:27  10  hear you, we're going to ask you to have a mic attached to

10:38:31  11  your lapel on your jacket.

10:38:44  12  **A**     So this is the lid.  I'm looking at the Jackson unit.

10:38:48  13  The lid and the base --

10:38:53  14  **Q**     You can move them around.

10:38:55  15  **A**     If you notice on the base, there's a series of

10:38:58  16  protruding lugs.  There's six of these around the periphery.

10:39:02  17  And there are some mating lugs on the lid with gaps.  So

10:39:10  18  when this goes on, these lugs go through the gaps.  And when

10:39:17  19  I rotate it, now the lugs become overlapped so that I can't

10:39:22  20  get the lid off.  This one being the lid, I just can't get

10:39:25  21  it past there without breaking some metal.

10:39:31  22        So the idea is that once I get into this position, and

10:39:33  23  only in this position, should the contents pressurize.  So

10:39:37  24  to do that, we have what's called the locking pin.  That's

10:39:41  25  that little piece here.  You see it going in and out?  And

**Pratt (Direct)**

10:39:46  1     it goes out a lot.

10:39:49  2          This little locking pin is connected to a sheet metal

10:39:53  3     piece inside the lid.  It's actually about the shape of my

10:39:57  4     finger.

10:39:57  5          So I've got the pin coming out here.  Sheet metal

10:40:02  6     rides up into the lid.  And over here there's a hole in the

10:40:05  7     top of that sheet metal piece.  This float metal on the

10:40:11  8     bottom, pressure will push that up through that hole but

10:40:16  9     only if the lid is fully locked such that this pin is

10:40:22  10    retracted.

10:40:23  11         Now, that hole is aligned with the float valve and it

10:40:28  12    will pressurize.  If it's in that position, they're not

10:40:32  13    aligned, so the float valve cannot go up, it cannot

10:40:37  14    pressurize.  So Tristar is right when they say that this

10:40:38  15    thing cannot pressurize unless the lid has been rotated to

10:40:40  16    the fully locked position.

10:40:42  17         At that point, if I plug it in, I've got food in the

10:40:45  18    unit, I plug it in, the float valve will go up through that

10:40:48  19    hole, and that should be it.  It's like a deadbolt.  I

10:40:51  20    shouldn't be able to rotate that lid at all.  According to

10:40:56  21    Tristar, that's what prevents the lid from opening when it's

10:41:01  22    pressurized.

10:41:02  23         However, if I artificially extend that through the

10:41:09  24    hole, you can see it's not very effective.  The deadbolt

10:41:16  25    doesn't work.

**Pratt (Direct)**

10:41:20  1   **Q**     And you're not saying that the plaintiffs in this case

10:41:22  2   did that or that has anything to do with it.  You're just

10:41:25  3   giving an example of what could happen?

10:41:27  4   **A**     I'm giving an example of what could happen.

10:41:31  5         So there are actually two things that make it

10:41:34  6   difficult to open the lid when it's pressurized.  One is the

10:41:37  7   action of that deadbolt.  That's through that strike plate

10:41:40  8   so that pin can't move in and out.

10:41:43  9         And the other is there's going to be some natural

10:41:47  10  friction between these locking lugs and these locking lugs,

10:41:50  11  because pressure is trying to push this lid up and so

10:41:54  12  there's going to be a little friction there.

10:41:55  13        The fact is that the deadbolt doesn't work, at least

10:41:59  14  not well enough to keep the lid from opening.

10:42:03  15  **Q**     Is that what you're telling the Court and jury the

10:42:07  16  defect actually is, Dr. Pratt, and can you describe it in

10:42:10  17  detail for us?

10:42:11  18  **A**     I thought I just did.

10:42:13  19  **Q**     Just kind of encapsulate it because we're not

10:42:16  20  engineers.  That's what I mean.

10:42:17  21  **A**     The fact is that this locking feature doesn't work.

10:42:21  22  It's just ineffective.

10:42:23  23        And I was asked during my deposition why it wasn't

10:42:26  24  effective.  And my answer was that, well, the dimensions and

10:42:30  25  the features that make up this locking mechanism are such

**Pratt (Direct)**

10:42:35  1  that it's just ineffective.

10:42:37  2      This sheet metal piece, this pin it's connected to,

10:42:41  3  it's -- I guess it's about the shape of my finger, it's just

10:42:45  4  too flexible.  It's about 2 millimeters thick, which is a

10:42:50  5  little more than a 16th of an inch.  And as I rotate this

10:42:54  6  lid, this portion of the locking pin rides like a camel on

10:43:00  7  this outer surface, and it just bends that little sheet

10:43:05  8  metal piece.  It's not stiff enough.

10:43:08  9  **Q**    And is that design and defect present on all of the

10:43:14  10  770, 770-1, the 780, and the 790 series pressure cookers?

10:43:21  11  **A**    Yes.  The design is common between all the XL models.

10:43:25  12  About the only thing that changes is as these models get

10:43:28  13  bigger, that the -- you know, of course the diameter of the

10:43:31  14  pot gets larger, so the locking lugs are a little bit larger

10:43:35  15  and the lids are a little bit larger.  But the locking

10:43:39  16  feature itself is identical across all the models.

10:43:42  17  **Q**    And are they like that at the point of sale, meaning

10:43:45  18  when Mr. Jackson, Mr. Chapman, and Ms. Vennel purchased

10:43:48  19  these units?

10:43:50  20  **A**    Yes.  They're like that when they leave the factory in

10:43:53  21  China.

10:43:53  22  **Q**    Okay.  Is there any way for a consumer or a user to

10:43:56  23  know when they purchase these units that there's a defect

10:44:02  24  already present?

10:44:03  25  **A**    No, there's no way to know.

**Pratt (Direct)**

| | | |
|---|---|---|
| 10:44:04 | 1 | **Q**   Continue staying here for just one more minute, |
| 10:44:08 | 2 | Dr. Pratt, in case. |
| 10:44:09 | 3 | When you tested -- and we saw this on the PowerPoint. |
| 10:44:16 | 4 | When you tested Kenneth Chapman's unit, there was some |
| 10:44:20 | 5 | mention about the lid being able to be rotated at 2.5 psi? |
| 10:44:24 | 6 | Can you explain those terms to us?  You know, what is |
| 10:44:27 | 7 | psi, how is the pressure measured, and those sorts of |
| 10:44:33 | 8 | things? |
| 10:44:33 | 9 | **A**   Yes.  When I talk about pressure, I'm talking about |
| 10:44:35 | 10 | the pressure inside the unit that's above the pressure that |
| 10:44:39 | 11 | we have here.  I mean, we have ambient pressure that's |
| 10:44:43 | 12 | around 14.7 pounds per square inch. |
| 10:44:48 | 13 | **Q**   Is that present just in the courtroom? |
| 10:44:50 | 14 | **A**   That's just everywhere, right.  That's the average at |
| 10:44:52 | 15 | sea level, so -- which is actually the weight of 1 square |
| 10:44:58 | 16 | inch -- you know, we have a tube that's 1 inch square all |
| 10:45:00 | 17 | the way up to the outer space, that's how much that air |
| 10:45:04 | 18 | would weigh, 14.7 pounds. |
| 10:45:07 | 19 | But when we talk about pressure in relation to these |
| 10:45:10 | 20 | cases, I'm talking about the pressure above that that's |
| 10:45:12 | 21 | inside the unit.  So if there's still pressure inside the |
| 10:45:16 | 22 | unit, you should be able to take it off and nothing |
| 10:45:19 | 23 | happened.  Nothing's going to steam out. |
| 10:45:19 | 24 | But if I've got 2 or 3 or 4 psi, pounds per square |
| 10:45:26 | 25 | inch of pressure in the unit, when I open it -- if I go to |

**Pratt (Direct)**

10:45:28  1   open it like this, where the pressure in there, there's

10:45:30  2   going to be a lot of steam, a lot of hot contents flying out

10:45:34  3   of there.

10:45:35  4        In fact, if I've got, say, 4 pounds of pressure in

10:45:39  5   there, 4 psi of pressure, and I open up the relief valve, it

10:45:44  6   will sit there and steam for about 2 minutes.  That's a lot

10:45:50  7   of -- 4 psi pressure, for example, is a lot of compressed

10:45:56  8   air inside this unit.

10:45:58  9   **Q**    Let me ask you this:  When you talk about pressure

10:46:00  10  inside the unit, we discussed earlier the gauge readings

10:46:08  11  inside the unit, for example, 2.5.  What's that equivalent

10:46:11  12  to if there's 2.5 psi of pressure remaining in the units

10:46:16  13  when you go to open it?  Give us an example.

10:46:20  14  **A**    That's about 177 pounds.  So at the testing that I did

10:46:24  15  at my home office before we moved all the units over to the

10:46:27  16  SEA lab, I was able to open it with 2 1/2 pounds of pressure

10:46:34  17  in there, 2 1/2 pounds per square inch of pressure.

10:46:39  18       And I measured that pressure by removing this -- I did

10:46:40  19  it the same way the manufacturer in China does and the way

10:46:44  20  Tristar does it for their certification testing.  I removed

10:46:47  21  this pressure relief valve, and I put a little pressure --

10:46:50  22  steam pressure gauge on here instead in the same hole that

10:46:54  23  goes down inside, and they tell me what the pressure was

10:46:57  24  inside the unit.  The same way the manufacturer does it.

10:47:01  25  And at 2 1/2 psi, I was able to rotate that lid.

**Pratt (Direct)**

10:47:06  1    And when we moved these units to the SEA lab --

10:47:11  2  **Q**    Tell the Court and jury who the SEA lab is so that we

10:47:15  3  understand the context.

10:47:16  4  **A**    Yeah, I can't remember what the acronym stands for,

10:47:19  5  but it's a forensic engineering lab in Columbus, Ohio.

10:47:24  6  **Q**    And that is where Mr. Mattice and you and the lawyers

10:47:27  7  were present to conduct the joint testing?

10:47:29  8  **A**    Yes.  SEA was engaged by the defendants in this case

10:47:32  9  to do an examination.

10:47:33  10    So at the SEA labs, we repeated -- I demonstrated how

10:47:39  11  I run the test at my home office, and we repeated those

10:47:43  12  steps on all three units at SEA.  We made one minor change,

10:47:47  13  though.

10:47:49  14    When we run this test, when you're opening this thing

10:47:53  15  under pressure, if you go too far and open it, somebody is

10:47:58  16  going to get hurt.  Okay?

10:47:59  17    When I was doing the test at home, what I did is I

10:48:03  18  started with that thing in the halfway position and closed

10:48:05  19  it to determine if I could rotate it under 2 1/2 psi of

10:48:10  20  pressure.  Okay?

10:48:11  21    I would have been crazy to go this way and take it

10:48:15  22  off, ended up with severe burns.

10:48:17  23    So I made what I call a stop key.  A stop key is just

10:48:21  24  a little piece of sheet metal.  And by dropping that into

10:48:26  25  the unit, right there, in that little recess, now I can set

**Pratt (Direct)**

10:48:33  1   it to the fully closed position, plug it in, let it heat up,

10:48:37  2   and at various pressures that I see on my gauge, I can try

10:48:41  3   to rotate it until it rotates.  But that little stop key

10:48:46  4   prevents it from going that extra half an inch and cause

10:48:50  5   this thing to blow up.  Okay?  That's what the stop key

10:48:54  6   does.

10:48:54  7   **Q**    And that was what was done at the joint testing

10:48:58  8   facility to make sure that when you and Mr. Mattice were

10:49:01  9   doing the testing, it didn't come open and blow all over

10:49:06  10  you?

10:49:07  11  **A**    Right, so one of us didn't end up in the hospital as a

10:49:11  12  result.

10:49:11  13       Now, I know that the defendants in this case are going

10:49:12  14  to argue that the stop key prevented this thing, this

10:49:16  15  locking pin right here, from rising up to the maximum

10:49:19  16  outside diameter of this locking lug, which would have been

10:49:24  17  the greatest resistance, the most flexure of that strike

10:49:29  18  zone.

10:49:29  19       But that's not the case at all, because if I put that

10:49:32  20  in there, this thing is all the way out, as far as it goes.

10:49:37  21  At least a quarter of an inch of rotation before I even hit

10:49:41  22  the stop key, it's out.  It's not moving at all.  So I'm

10:49:46  23  already on the outside.

10:49:47  24       So the testing that we did at the SEA labs, when we

10:49:54  25  said we rotated it at, say, 3.8 psi, that was the maximum

**Pratt (Direct)**

10:50:00  1    resistance that we were going to see.  And without that stop

10:50:03  2    key, it would have gone all the way.

10:50:05  3    **Q**    And that would have caused it to open and spill the

10:50:09  4    super hot contents all over?

10:50:10  5    **A**    I'd probably still be in the hospital.

10:50:13  6             MR. COLEMAN:  Dawn, can we pull the video clip

10:50:16  7    of the testing done at SEA?  We hope.  Because this was the

10:50:23  8    joint testing done by Mr. Mattice and Mr. Pratt --

10:50:30  9    Dr. Pratt.

10:50:37  10            And if we cannot get it, we will talk about it just a

10:50:42  11   little further and just explain to the jury what was done.

10:50:55  12   BY MR. COLEMAN:

10:50:56  13   **Q**    Okay.  Chapman SEA inspection.  Here we go.

10:50:59  14            Now, Dr. Pratt, stand back here with me so you can

10:51:04  15   explain to the jury what we're seeing.

10:51:06  16            (Video clip played.)

10:51:06  17   **A**    Yes, that's the Chapman unit.  We've got the pressure

10:51:10  18   gauge on it.  This is the same kind of pressure gauge used

10:51:13  19   by the manufacturer.  And there I'm turning it.  You see it

10:51:19  20   going back and forth up to the stop key.

10:51:22  21            And so I'll be able to rotate that lid at a pressure

10:51:26  22   of I think this was 3.8 pounds per square inch, almost 4

10:51:32  23   pounds per square inch.

10:51:34  24   **Q**    Can you give us an idea -- so, for example, 2.5 psi,

10:51:38  25   what can that do to a 2-pound lid if it were to blow off?

**Pratt (Direct)**

10:51:45  1    What's the equivalent?  How does that --

10:51:45  2    **A**    Well, this is almost 4 psi.  So this is closer to

10:51:49  3    about 250 pounds of force.  So if that lid came off, it's

10:51:53  4    like all of a sudden it weighs 250 pounds in the up

10:51:56  5    direction.  It's going to blow out of my hands, break my

10:51:59  6    wrists, and expel some pretty hot contents.

10:52:03  7    **Q**    And what's the point of doing this type of testing

10:52:06  8    with respect to the psi?  I mean, what does this help us

10:52:09  9    determine?  Does it help us determine that you, yes, in

10:52:15  10   spite of what Tristar says, you can take the lid off under

10:52:18  11   pressure?

10:52:19  12               MR. LEWIS:  Objection.  Leading.

10:52:20  13               THE COURT:  Overruled.

10:52:22  14   BY MR. COLEMAN:

10:52:22  15   **Q**    You can answer.

10:52:23  16   **A**    Well, the whole idea is we want to see if we can

10:52:26  17   rotate the lid under pressure.  We don't have a convenient

10:52:30  18   way to measure how much force we're putting on the periphery

10:52:34  19   of the lid, you know, the torque.  It's hard to get a load

10:52:37  20   cell in there when you need that space for your hands.  But

10:52:40  21   we can measure the pressure.  So using the gauge, again,

10:52:44  22   just like the manufacturer uses and just like Tristar used

10:52:46  23   for certification, we can get an idea of what pressure that

10:52:50  24   thing is able to rotate.

10:52:52  25               If we couldn't rotate it until the pressure was nearly

**Pratt (Direct)**

10:52:56  1   zero, like .001 psi, big deal.  Might get a little pop.  So

10:53:01  2   what.  But we know that when this thing is up above 2, 3,

10:53:07  3   4 psi, it's exceedingly dangerous.  I mean, even at 2 1/2

10:53:11  4   psi, this lid is going to be expelled at, like, 50 feet a

10:53:18  5   second.  And at 4 psi, I've got video on a similar type

10:53:22  6   unit.  At 4 psi, I don't know if we're going to show it

10:53:25  7   today or not, but it makes a heck of a burn, a blast.  The

10:53:30  8   lid, I had it in the cage, would have blown up at least 10

10:53:35  9   or 15 feet.  And there was water -- steam and hot water all

10:53:42  10  over my garage when I ran this test.

10:53:47  11       So 4 psi is exceedingly dangerous, and I think even 2

10:53:52  12  1/2 or 2 psi is exceedingly dangerous.

10:53:55  13  **Q**    All right.  Let's go to the next clip of testing just

10:53:59  14  so the jury sees all three of these units that were tested

10:54:04  15  jointedly at SEA.  And it may take just a moment.

10:54:10  16            MR. COLEMAN:  The next PowerPoint video.

10:54:10  17       (Video clip played.)

10:54:13  18  **Q**    Okay.  This is the Jackson, ladies and gentlemen, you

10:54:16  19  see up in the left-hand corner.

10:54:18  20       And what do we have here?  Is that Mr. Mattice?

10:54:20  21  **A**    That's Mr. Mattice.  And Jackson is the bigger unit,

10:54:23  22  the 8-quart unit.

10:54:26  23  **Q**    And he's rotating at what psi?

10:54:29  24  **A**    Well, he was able to rotate it at almost 4 1/2 psi.

10:54:35  25  **Q**    And, again, 4 1/2 psi versus 0 to 0.1 psi, that means

**Pratt (Direct)**

10:54:45  1  there's no pressure in the unit, right?

10:54:46  2  **A**    Right.

10:54:48  3  **Q**    Okay.  Let's go to the next clip, because I want the

10:54:52  4  jury to see the readings from all three pressure cookers.

10:54:55  5      So we've looked at Chapman.  That was over 3.5 psi.

10:55:01  6  We've looked at Jackson, which was over 4 psi.  And then now

10:55:06  7  we've got Vennel.

10:55:06  8      (Video clip played.)

10:55:10  9  **Q**    Can you see in the top left-hand corner?

10:55:12  10 **A**    When you watch these videos, you'll notice that the

10:55:15  11 hands are out here to try to turn it.  That seems like a

10:55:21  12 natural place to put it.  I mean, you can go this way.  If

10:55:26  13 it's hard to turn, I think one is naturally going to go to

10:55:29  14 the outer periphery.

10:55:31  15     And if you notice the base unit handles are

10:55:36  16 conveniently in line with this handle.  So you can kind of

10:55:39  17 leverage that lid bearing force against the base unit

10:55:46  18 handles and not have to worry about this thing twisting on

10:55:49  19 the tabletop.

10:55:50  20 **Q**    Now, is it your understanding that with respect to the

10:55:52  21 measurements you listed in your report and the amount of psi

10:55:56  22 that was in the units, Mr. Mattice agreed with those

10:56:00  23 measurements, correct?

10:56:01  24 **A**    Yes.

10:56:02  25 **Q**    All right.  Can you go back up to the witness stand,

**Pratt (Direct)**

10:56:05　1　Dr. Pratt.

10:56:13　2　　　Now, during the testing that went on at SEA with you

10:56:18　3　and Mr. Mattice, did you ask him if he wanted to go ahead

10:56:20　4　and remove the stop key device and let the lid be able to be

10:56:26　5　rotated to fully off?

10:56:27　6　**A**　　　Yes.  Well, firstly, you know, I did the test on the

10:56:32　7　Chapman unit, showed him how it was done.  He tested the

10:56:36　8　Vennel and the Jackson units himself, and he asked to use

10:56:40　9　the stop key device in both cases.

10:56:44　10　　　And I think it was on the Jackson unit when he had

10:56:46　11　rotated it with using two hands on the handle to the stop

10:56:52　12　key, I asked him if he would care to remove the stop key and

10:56:56　13　take it the rest of the way.  And he just shook his head,

10:57:00　14　smiled and shook his head.  It was wise.

10:57:09　15　**Q**　　　All right.  So, you know, again, this is -- we've got

10:57:10　16　to help ourselves, the Court, and the jury understand what

10:57:13　17　all of this means.

10:57:14　18　　　What is your understanding about Tristar's

10:57:17　19　representations with respect to whether there's any pressure

10:57:20　20　in the unit when the lid can be opened?  What's your

10:57:23　21　understanding of that?

10:57:24　22　**A**　　　Well, my understanding from the representations, the

10:57:27　23　videos, and the owner's manuals, that if there's any

10:57:32　24　pressure in the unit, it should not be -- it cannot be

10:57:34　25　opened.

**Pratt (Direct)**

10:57:38  1    **Q**    And is that statement of Tristar consistent with the

10:57:40  2    testing that you and Mr. Mattice did?

10:57:43  3    **A**    No, it's not.

10:57:44  4    **Q**    And why is that?

10:57:45  5    **A**    Well, because you can -- the safety feature doesn't

10:57:50  6    work.  You can easily override it.

10:57:54  7    **Q**    Now --

10:57:55  8    **A**    And by safety feature, I mean this locking pin.

10:57:59  9    **Q**    And we saw it at the very end there, but for example,

10:58:05  10   for the Jackson unit, when Mr. Mattice was testing the unit

10:58:10  11   itself, was he able to move the lid with one hand on the top

10:58:16  12   of the lid?

10:58:17  13   **A**    Yes.  At a lower pressure, yes.

10:58:21  14   **Q**    I think it -- does 3.24 psi sound accurate?

10:58:26  15   **A**    It does, yes.

10:58:27  16   **Q**    Okay.  So with respect to all three units -- let me

10:58:33  17   make sure that the Court and jury understands, all three

10:58:37  18   units, is the design common for all three -- for all three

10:58:42  19   class members and for all of the members of the class?

10:58:44  20   **A**    It is.

10:58:46  21   **Q**    Is the design defect with respect to the locking lid

10:58:51  22   device, is it common to all of the units of the class reps

10:58:57  23   and all the class members that purchased these units within

10:59:01  24   the three states Colorado, Pennsylvania, and Ohio?

10:59:04  25   **A**    It is.

**Pratt (Direct)**

10:59:07 1  **Q**    Doctor, I'm going to ask you, those opinions that

10:59:11 2  you've just given the Court and jury about the defect and

10:59:15 3  that it was common to these units, was that opinion given

10:59:20 4  within a reasonable degree of professional and scientific

10:59:23 5  certainty?

10:59:24 6  **A**    Absolutely.

10:59:26 7  **Q**    Now, with respect to other things that you might be

10:59:35 8  asked about, both by me and by Mr. Lewis, is there a way to

10:59:43 9  make a fix for this?

10:59:46 10     Is there something you can do that Tristar knew or

10:59:49 11  should have known about that would have made this lid device

10:59:52 12  safer at the time they started selling them to the public?

10:59:55 13  **A**    Yeah.  There's at least one.  I mean, I'm not in the

10:59:59 14  pressure cooker design business, but I was able to come up

11:00:02 15  with a fix that I had a prototype and it worked great.

11:00:06 16  **Q**    What was that?  Explain it to the Court and jury.

11:00:09 17  **A**    Well, as I mentioned when I was down on the floor, the

11:00:13 18  inner part of that locking pin rides along the locking lugs

11:00:16 19  on the base unit, almost like a cam surface, in and out.

11:00:22 20  And those lugs conveniently have little 45-degree ramps on

11:00:27 21  each side.

11:00:28 22          MR. COLEMAN:  Can I approach, Your Honor?

11:00:33 23  **A**    So these locking lugs, as you can see, have nice

11:00:36 24  little ramps so that this locking pin can easily ride up,

11:00:42 25  along, down, up, along, and down.  Right?

**Pratt (Direct)**

11:00:47  1    So what I did on the prototype -- I don't know if we

11:00:52  2  have it here -- but instead of a 45-degree angle, I had my

11:00:56  3  machinist just cut that to a 90-degree angle, a square above

11:01:01  4  it, so when this pin came up in contact with it, it would

11:01:06  5  just stop.  Put the lid on, it rides up the ramp, comes

11:01:09  6  down, falls down.  And when you try to go back the other

11:01:14  7  way, it just buddied up against the square shoulder.

11:01:17  8  There's no way you can open it.

11:01:21  9    In order to open it, you've got to pull this pin out.

11:01:23  10  So the pin on the unit was actually a little bit too short,

11:01:27  11  so we just put a plastic knob on the end.  Now you can grab

11:01:31  12  it with your fingers.

11:01:33  13    So it had a couple of advantages.  One is, the unit,

11:01:35  14  if you stuck a broom handle in here, you couldn't force the

11:01:39  15  thing open without breaking something physically.  And

11:01:42  16  besides that, you still had to pull this out.  If you had to

11:01:44  17  pull this pin out, use one hand to pull this pin out, you

11:01:48  18  can't be using two hands to try to open this thing up under

11:01:52  19  pressure.  So it seemed to do the trick.

11:01:56  20  **Q**    And is that the kind of thing that would have been

11:02:00  21  able to Tristar design engineers or anyone else at the time

11:02:02  22  these things were manufactured and then later purchased?

11:02:05  23  **A**    Oh, yeah.  It's real simple.  I mean, in terms of, if

11:02:10  24  anything, it might add a couple of pennies to the cost for

11:02:14  25  the plastic knob, but it's real simple mechanical concepts.

**Pratt (Direct)**

11:02:21  1   There's nothing magic there.

11:02:23  2   **Q**   And would it have made it safer than these units that

11:02:27  3   we have before us?

11:02:28  4   **A**   Oh, absolutely, yes.

11:02:35  5   **Q**   Now, I want to move for a minute to some other

11:02:46  6   questions about value.

11:02:53  7        You heard Mr. Lewis say in his opening statement,

11:03:01  8   well, this thing is a slow cooker, this thing can brown and

11:03:06  9   other things that he may have said that everybody can check

11:03:09  10  their memory on.

11:03:10  11       What is your understanding of the purpose of these

11:03:12  12  units?

11:03:12  13  **A**   Well, the primary purpose is to shorten the cooking

11:03:17  14  time by being able to cook under pressure.

11:03:20  15  **Q**   Right.

11:03:20  16       I mean, have you seen the advertisements on the boxes

11:03:23  17  and all over the lids that, you know, these things are the

11:03:30  18  power cooker, the Power Pressure Cooker XL?  I mean, that's

11:03:33  19  how it's sold and marketed, right?

11:03:35  20  **A**   Yes.

11:03:44  21  **Q**   I want to ask you a few questions within a reasonable

11:03:48  22  degree of engineering certainty, because we've talked a

11:03:52  23  little bit about it before.  But I want to make sure that

11:03:56  24  the jury understands what your opinions are in the case so

11:04:00  25  that they can consider it when they're deliberating.

**Pratt (Direct)**

11:04:05  1    Based upon your review of the Tristar owner's manual

11:04:09  2  that you've talked about, based upon your own testing and

11:04:13  3  the testing done with Mr. Mattice at SEA, and based upon

11:04:18  4  everything that you've reviewed in the case, I'm going to

11:04:21  5  ask you some opinions within a reasonable degree of

11:04:24  6  professional engineering certainty.

11:04:27  7    Can we agree to that, sir?

11:04:29  8  **A**    Okay.

11:04:30  9  **Q**    All right.  In your opinion, are the Power Pressure

11:04:34  10  Cooker XLs, as they were designed, manufactured, and sold to

11:04:37  11  these three classes, are they unreasonably dangerous and

11:04:42  12  defective?

11:04:42  13  **A**    They are.

11:04:43  14  **Q**    Can you tell the Court and jury why?

11:04:46  15  **A**    Well, yeah.  Because they can be opened under

11:04:50  16  pressure, under dangerously high pressure.

11:04:52  17  **Q**    Like you demonstrated for the jury earlier?

11:04:56  18  **A**    Correct.

11:04:58  19  **Q**    Also, within that same standard of a reasonable degree

11:05:01  20  of professional and engineering certainty, what can

11:05:03  21  happen -- and we can't get into injuries per se, but what

11:05:07  22  happens when the user is able to remove the lid while the

11:05:13  23  units are under pressure?

11:05:14  24    MR. LEWIS:  Objection, Your Honor.  That's

11:05:16  25  speculation.  He's never done the test.

**Pratt (Direct)**

11:05:18  1        THE COURT:  Overruled.

11:05:20  2   **A**      Yeah.  Well, I had done testing with these types of

11:05:24  3   units and the XL, that exemplar XL that I have, at low

11:05:30  4   pressures.  And I know that the contents can spew out.  I

11:05:34  5   know that there's a danger, especially at the higher

11:05:37  6   pressures, of wrist injury, either spraining the wrists or

11:05:42  7   breaking them.

11:05:43  8        I purchased protective equipment at my own cost so

11:05:48  9   that I could run tests under pressure for the XLs and for

11:05:52  10  some other models.  But based on some low pressure testing,

11:05:58  11  I'm afraid to use it.  Because while the protective

11:06:02  12  equipment I'm sure is going to protect me from steam and

11:06:05  13  burns, I'm afraid I'm going to snap my wrist.  When I saw

11:06:08  14  that one pop off at 4 psi, you know, it forever cured me of

11:06:14  15  any aspirations to open one of these things by hand under

11:06:20  16  that high a pressure.

11:06:21  17  **Q**      And so far as the user is concerned, and based upon

11:06:25  18  your testing and your review of the materials, what happens

11:06:27  19  to the fluid and the contents inside the units if you're

11:06:30  20  able to open the lid under pressure?

11:06:33  21  **A**      Well, it comes out.  I mean, the testing that I'd done

11:06:37  22  under pressure with, say, two cups of quarter on a 30-inch

11:06:42  23  counter height, it will go to a 9-foot ceiling easily.  If

11:06:48  24  it were filled all the way up to full capacity, you know, it

11:06:54  25  would make an even bigger mess.

**Pratt (Direct)**

| | | |
|---|---|---|
| 11:06:57 | 1 | **Q**     Are these power pressure cooker units defective and |
| 11:07:01 | 2 | unreasonably dangerous at the point of sale? |
| 11:07:04 | 3 | **A**     Yes.  They're defective when they leave the factory, |
| 11:07:13 | 4 | absolutely. |
| 11:07:14 | 5 | **Q**     Now, with respect to these power pressure cookers, are |
| 11:07:22 | 6 | they unfit for use or for their intended purpose as a power |
| 11:07:30 | 7 | pressure cooker because of the defect? |
| 11:07:33 | 8 | **A**     Yes, they are, because the defect makes them unsafe. |
| 11:07:36 | 9 | **Q**     Now, Doctor, that's a good segue into the next |
| 11:07:42 | 10 | exhibit. |
| 11:07:43 | 11 |                 MR. COLEMAN:  Dawn, let's get up those ethics |
| 11:07:46 | 12 | and canons, please, for engineers. |
| 11:07:55 | 13 | **Q**     Doctor, is there a group that you and Mr. Mattice, at |
| 11:07:58 | 14 | least according to his resumé, are a member of with respect |
| 11:08:01 | 15 | to a society of engineers? |
| 11:08:02 | 16 | **A**     Yes.  We're both licensed professional engineers in |
| 11:08:05 | 17 | our respective states.  I think Mr. Mattice is licensed in |
| 11:08:10 | 18 | several states.  I'm licensed in California.  Both as |
| 11:08:14 | 19 | mechanical engineers.  And we both belong, to the best of my |
| 11:08:19 | 20 | knowledge, to the National Society of Professional |
| 11:08:23 | 21 | Engineers. |
| 11:08:23 | 22 | **Q**     And are you familiar with the code of ethics and the |
| 11:08:27 | 23 | canons of that particular society? |
| 11:08:32 | 24 | **A**     Yes.  I couldn't recite it here offhand, but, yes, I'm |
| 11:08:35 | 25 | familiar with it. |

**Pratt (Direct)**

11:08:35  1    **Q**     The great thing is it's right in front of you there if

11:08:40  2    you look at the screen.

11:08:40  3    **A**     Actually, my screen doesn't work.

11:08:43  4    **Q**     Oh, okay.

11:08:43  5                    MR. COLEMAN:  Any way to help us there?

11:08:52  6                    THE COURT:  Your screens are on, aren't they?

11:08:52  7                    MR. COLEMAN:  Yes.  Your Honor, if that

11:08:53  8    doesn't work, can he just come down here with me?

11:08:56  9                    THE COURT:  Did you try turning the button

11:09:00  10   that says "on"?

11:09:02  11                   THE WITNESS:  Is there a button?  Oh, yes.

11:09:07  12   **Q**     We didn't say you're a software engineer.

11:09:11  13   **A**     No, strictly mechanical.

11:09:14  14   **Q**     That's okay, Doc.  I'm right with you.  That's why I

11:09:18  15   have an army of folks to help me not screw up so much.

11:09:22  16        All right.  So, here's the Engineers' Creed.  Is this

11:09:25  17   part of the document that we're going to make as an exhibit

11:09:29  18   to this case, Doctor?

11:09:30  19   **A**     Yes.  This is the Engineers' Creed for the National

11:09:36  20   Society of Professional Engineers.

11:09:38  21   **Q**     And part of the creed, and if you would, you pledged

11:09:41  22   to do a number of things, but to place service before

11:09:43  23   profit, the honor and standing of the profession before

11:09:46  24   personal advantage, and the public welfare above all other

11:09:50  25   considerations.

**Pratt (Direct)**

11:09:52  1      Is that something that as members of this society, you

11:09:54  2  and Mr. Mattice are supposed to hold to?

11:09:56  3  **A**      That's right.  I mean, not only as members of the

11:09:58  4  society, but they -- you know, they beat this in your head

11:10:01  5  all during engineering school.

11:10:03  6  **Q**      All right.  I'm going to show you another page from

11:10:05  7  that booklet or code of ethics.

11:10:12  8      Here, you see at the top left-hand corner, it says

11:10:16  9  National Society of Professional Engineers, Code of Ethics

11:10:19  10  for Engineers.  In the preamble, can you just look there

11:10:23  11  with me.  I'll read it and ask you some questions about it.

11:10:26  12      It says:  Accordingly, the services provided by

11:10:30  13  engineers require honesty, impartiality, fairness and

11:10:35  14  equity, and must be dedicated to the protection of the

11:10:38  15  public health, safety and welfare.

11:10:41  16      Do you agree with that statement, Doctor?

11:10:43  17  **A**      Absolutely, yes.

11:10:44  18  **Q**      Is that part of -- not the only part, but is that part

11:10:46  19  of the basis of your opinion as to why these things are

11:10:49  20  unsafe, to protect the public welfare?

11:10:51  21  **A**      Well, yeah, they're not protecting the public welfare

11:10:56  22  if they can be opened under pressure.  They're unsafe.

11:10:56  23  **Q**      And that's -- one of the reasons you're giving your

11:10:58  24  opinions in this case is to make sure that these kinds of

11:11:02  25  defective, unsafe products are known so that things can be

11:11:05  1   done about it?

11:11:05  2   **A**    Yes.

11:11:07  3   **Q**    Now, let's look at another part underneath the

11:11:13  4   preamble.  It will come up shortly.

11:11:19  5        It's under the Fundamental Canon section.  And it

11:11:25  6   says, I believe, right there:  Engineers, in the

11:11:32  7   fulfillment -- this is under the Canons -- of their

11:11:34  8   professional duties shall, not might, not kind of, shall

11:11:39  9   hold paramount the safety, health, and welfare of the

11:11:43  10  public.

11:11:44  11       Is that accurate, sir?

11:11:45  12  **A**    It is.

11:11:45  13  **Q**    And is that something you strive to do?

11:11:48  14  **A**    It is.

11:11:50  15  **Q**    Now, I want to talk about another issue that Mr. Lewis

11:11:56  16  brought up, and that's the value of these units, even

11:12:00  17  if -- even if it is defective as a pressure cooker, it's got

11:12:04  18  other value.  And I want to ask you a few questions about

11:12:06  19  that.

11:12:07  20       Since the defect, as you've talked about earlier, is

11:12:20  21  unknown to the consumers when they purchase it, does it

11:12:26  22  matter, from your perspective as an engineer bound by those

11:12:31  23  ethics, that some folks who might have been able to use it

11:12:35  24  safely a couple of times before the next time, like

11:12:39  25  Ms. Vennel, Mr. Jackson, and Mr. Chapman, the unit exploded?

**Pratt (Direct)**

11:12:45  1   **A**     No, it doesn't matter.  I mean, it's unsafe from the

11:12:47  2   day it leaves the factory.  It's like a ticking time bomb or

11:12:51  3   a Russian roulette.  It may not erupt the first or the

11:12:55  4   second or the fourth time, but it can at any time.

11:12:58  5   **Q**     All right.  And that's a pretty high price to pay for

11:13:04  6   a 100 to $160 product, isn't it, sir?

11:13:08  7   **A**     Yes.

11:13:08  8   **Q**     I mean, so far as it erupting all over you, causing

11:13:12  9   burns and other things to occur, right?

11:13:14  10  **A**     Knowing that that can happen, you know, I wouldn't

11:13:17  11  have one of those in my house, right.

11:13:20  12  **Q**     Now, again, from a value standpoint, is the primary

11:13:25  13  purpose of these things, a pressure cooker as opposed to a

11:13:29  14  browner or a slow cooker, based upon your review of the

11:13:33  15  marketing materials and the pressure cooker unit itself?

11:13:36  16  **A**     Pressure cooking and pressure canning.

11:13:45  17  **Q**     And are those your opinions as well within a

11:13:48  18  reasonable degree of professional and scientific certainty?

11:13:51  19  **A**     They are.

11:13:52  20                  MR. COLEMAN:  One moment, Your Honor.  I'm

11:13:54  21  almost done.

11:14:01  22          Just some housecleaning, Your Honor.  I think we'll

11:14:04  23  introduce them all at the end, but I just wanted to make

11:14:08  24  them exhibits for the Court, the pressure cookers --

11:14:12  25                  THE COURT:  I mean, you can reopen the case if

**Pratt (Cross)**

11:14:14  1  there's an admission issue.

11:14:15  2  MR. COLEMAN:  Okay.  All right.  Your Honor,

11:14:17  3  just the Vennel, the Jackson, and the Chapman pressure

11:14:20  4  cookers into evidence along --

11:14:22  5  THE COURT:  Well, once again, you move the

11:14:24  6  admission at the close of your case.

11:14:26  7  MR. COLEMAN:  Okay.  Will do, Your Honor.

11:14:28  8  THE COURT:  Okay.

11:14:38  9  MR. COLEMAN:  The plaintiff rests for this

11:14:40  10  witness.

11:14:44  11  THE COURT:  Cross-examination.

11:14:46  12  MR. LEWIS:  Thank you, Your Honor.

11:14:46  13  - - - - -

11:15:03  14  CROSS-EXAMINATION

11:15:03  15  BY MR. LEWIS:

11:15:05  16  **Q**  Good morning, Dr. Pratt.  How are you?

11:15:07  17  **A**  Fine.  Good morning.

11:15:08  18  **Q**  We met today.  My name is John Lewis.  I represent

11:15:12  19  Tristar.  You know that, right, sir?

11:15:13  20  **A**  Yes, sir.

11:15:14  21  **Q**  I have some questions for you today about your

11:15:17  22  testimony that you've given this morning.  But I want to

11:15:21  23  start with -- before we switch, I want to start with this

11:15:28  24  number 5 here on code of ethics for engineers.

11:15:34  25  Engineers shall avoid deceptive acts.  Right, sir?

**Pratt (Cross)**

| | | |
|---|---|---|
| 11:15:39 | 1 | **A**   That's right. |
| 11:15:40 | 2 | **Q**   Okay.  You agree with that? |
| 11:15:41 | 3 | **A**   I do. |
| 11:15:42 | 4 | **Q**   Follow that? |
| 11:15:42 | 5 | **A**   I do. |
| 11:15:43 | 6 | **Q**   Okay.  Finished with that. |
| 11:15:46 | 7 | MR. LEWIS:  May we switch over to our side? |
| 11:15:56 | 8 | **Q**   I notice, sir, what you didn't tell the jury in your |
| 11:16:00 | 9 | direct examination was that, in fact, you and Mr. Mattice |
| 11:16:03 | 10 | cooked hot water in all three of those without incident, |
| 11:16:06 | 11 | didn't you? |
| 11:16:07 | 12 | **A**   Well, Mr. Mattice ran them through their normal cook |
| 11:16:12 | 13 | cycles, all the cook cycles, using two cups of hot water.  I |
| 11:16:17 | 14 | didn't participate but I watched, yes. |
| 11:16:20 | 15 | **Q**   You watched.  And they worked as intended, correct? |
| 11:16:23 | 16 | **A**   I beg your pardon. |
| 11:16:24 | 17 | **Q**   They worked as intended, correct? |
| 11:16:26 | 18 | **A**   Yes. |
| 11:16:26 | 19 | **Q**   Okay.  Now, how many people -- because I noticed you |
| 11:16:32 | 20 | picked the cooker up and you flipped it upside down. |
| 11:16:38 | 21 | How many people do you think cook using their cooker |
| 11:16:41 | 22 | upside down? |
| 11:16:42 | 23 | **A**   Yeah.  That wasn't intended to do that.  I think that |
| 11:16:45 | 24 | would have been obvious to the jury as well as everybody |
| 11:16:48 | 25 | else in the courtroom. |

**Pratt (Cross)**

11:16:49    1    **Q**     Sure.

11:16:50    2          And my point is is that when you did the test on the

11:16:52    3    cooker turning it upside down, that's not how someone would

11:16:56    4    normally use the cooker.  You agree with me on that?

11:16:59    5    **A**     I didn't test the cooker upside down, sir.

11:17:02    6    **Q**     Okay.  When you turned the cooker upside down to raise

11:17:05    7    the float valve, you agree with me, that's not how normally

11:17:09    8    would use the cooker.  Correct?

11:17:10    9    **A**     And it wasn't intended to convey that impression at

11:17:13   10    all.

11:17:13   11    **Q**     So you agree with me?

11:17:15   12    **A**     I do.

11:17:15   13    **Q**     All right.  And as I understand it, you also used some

11:17:19   14    fondue sticks to play around with this float valve in your

11:17:22   15    testing; is that right?

11:17:22   16    **A**     I used fondue sticks and plastic bowels and other

11:17:27   17    implements to pull that up to put it in position for various

11:17:31   18    testing protocols that I put it through.

11:17:33   19    **Q**     Do you expect that consumers would take fondue sticks

11:17:37   20    or a bowel and stick it down into the float valve area to

11:17:41   21    pull it up when they're using it?

11:17:42   22    **A**     Not unless they were trying to replicate my test

11:17:46   23    protocols.

11:17:46   24    **Q**     Okay.  They wouldn't use it if they were trying to

11:17:49   25    cook a meal?

**Pratt (Cross)**

| | | |
|---|---|---|
| 11:17:50 | 1 | **A**      Oh, of course not. |
| 11:17:52 | 2 | **Q**      All right.  In fact, I guess let me ask you this: |
| 11:17:57 | 3 | When -- how many times did you cook a meal in one of these? |
| 11:18:02 | 4 | **A**      I cooked a meal just one time as part of this case. |
| 11:18:06 | 5 | **Q**      Right.  You cooked a meal in the XL, right? |
| 11:18:09 | 6 | **A**      Well, I have to think back or look at my notes.  It |
| 11:18:14 | 7 | was either an XL or a WAL1. |
| 11:18:16 | 8 | **Q**      Okay.  Do you know for sure whether you cooked a meal |
| 11:18:19 | 9 | in the XL? |
| 11:18:20 | 10 | **A**      As I sit here, I can't remember which one.  It was |
| 11:18:23 | 11 | several months ago and it was a order of beans. |
| 11:18:26 | 12 | **Q**      Did you eat it? |
| 11:18:27 | 13 | **A**      No, I didn't like it.  Beans need to be stirred |
| 11:18:31 | 14 | slowly, and this doesn't have a stirring mechanism in it. |
| 11:18:34 | 15 | **Q**      Did you use the Power Pressure Cooker XL in its |
| 11:18:38 | 16 | canning feature?  Did you test it for that? |
| 11:18:41 | 17 | **A**      No, not for canning.  I may have tested it on the |
| 11:18:46 | 18 | canning setting as part of my various pressure testing |
| 11:18:52 | 19 | protocols but not for canning. |
| 11:18:53 | 20 | **Q**      Did you use it as a slow cooker? |
| 11:18:56 | 21 | **A**      No. |
| 11:18:56 | 22 | **Q**      Did you use it to saute anything as can be done? |
| 11:19:02 | 23 | **A**      No. |
| 11:19:02 | 24 | **Q**      Okay.  You didn't test any of those features of this |
| 11:19:07 | 25 | XL, correct? |

**Pratt (Cross)**

| | | |
|---|---|---|
| 11:19:08 | 1 | **A**      Well, I tested other features, like keep warm and |
| 11:19:12 | 2 | tested it on various settings, like soups and stews and |
| 11:19:17 | 3 | played with changing the cook times and pressures.  But the |
| 11:19:21 | 4 | only thing I actually cooked, other than water, was that one |
| 11:19:25 | 5 | bean recipe. |
| 11:19:27 | 6 | **Q**      Okay.  And those features worked well when you tested |
| 11:19:30 | 7 | the XL, right?  It worked as intended, right? |
| 11:19:33 | 8 | **A**      Yeah, the programming on the XL worked as intended, |
| 11:19:37 | 9 | yes. |
| 11:19:37 | 10 | **Q**      And it worked safely when you used it with the slow |
| 11:19:41 | 11 | cooker, with the soup, with the sauteing, whatever you used |
| 11:19:47 | 12 | it for it worked safely.  Correct? |
| 11:19:49 | 13 | **A**      As long as I didn't try to remove the lid under |
| 11:19:52 | 14 | pressure, it worked safely. |
| 11:19:53 | 15 | **Q**      It worked safely, right? |
| 11:19:55 | 16 | **A**      Yes. |
| 11:19:56 | 17 | **Q**      Okay.  Now, I noticed when you were describing to the |
| 11:20:00 | 18 | jury the lid use, you were holding it up here.  Do you |
| 11:20:05 | 19 | remember that?  Or maybe you didn't even realize it.  But |
| 11:20:10 | 20 | you grabbed the lid up here when you were describing these |
| 11:20:14 | 21 | three to the jury. |
| 11:20:15 | 22 |         Do you recall that? |
| 11:20:16 | 23 | **A**      Okay.  No. |
| 11:20:17 | 24 | **Q**      Any reason to disbelieve that was your natural |
| 11:20:20 | 25 | tendency? |

**Pratt (Cross)**

| | | |
|---|---|---|
| 11:20:20 | 1 | **A**     No, that's fine. |
| 11:20:21 | 2 | **Q**     Okay.  In the testing that the jury saw, you didn't |
| 11:20:26 | 3 | grab it up here, did you? |
| 11:20:29 | 4 | **A**     Well, trying to open it, no, I used both hands. |
| 11:20:34 | 5 | **Q**     And if I recall your -- I wrote this down.  I wrote |
| 11:20:37 | 6 | this down.  Because I think you said, correct me if I'm |
| 11:20:42 | 7 | wrong, when it gets hard to turn, someone would use two |
| 11:20:51 | 8 | hands. |
| 11:20:53 | 9 | Do you recall testifying to that? |
| 11:20:55 | 10 | **A**     I believe so, yes. |
| 11:20:56 | 11 | **Q**     You agree with that statement? |
| 11:20:57 | 12 | **A**     I don't disagree. |
| 11:21:00 | 13 | **Q**     Okay. |
| 11:21:02 | 14 | MR. LEWIS:  Do you have the manual pages?  In |
| 11:21:08 | 15 | particular, the one with the highlights that go through |
| 11:21:12 | 16 | that.  No force it open.  I think it's number 6. |
| 11:21:16 | 17 | BY MR. LEWIS: |
| 11:21:22 | 18 | **Q**     When it gets hard to turn, you put two hands on it. |
| 11:21:26 | 19 | Right? |
| 11:21:26 | 20 | **A**     Yes. |
| 11:21:27 | 21 | **Q**     When it got hard to turn, you put two hands on it in |
| 11:21:31 | 22 | your testing.  Right? |
| 11:21:31 | 23 | **A**     Well, I think I started with two hands in the testing. |
| 11:21:36 | 24 | **Q**     Right. |
| 11:21:37 | 25 | **A**     I think my comment earlier to the jury was, if |

**Pratt (Cross)**

11:21:40  1    something is hard to turn, the natural tendency is going to

11:21:45  2    be to go to the outer periphery.

11:21:47  3    **Q**    Right.  And that was your natural tendency, too, when

11:21:51  4    you were testing, correct?

11:21:52  5    **A**    Yes.

11:21:52  6    **Q**    Okay.  And you see that?  Were you able to keep your

11:21:55  7    monitor on?  Is it still on in front of you, your monitor?

11:21:59  8    The computer.

11:21:59  9    **A**    Oh, my monitor, yes.

11:22:01  10   **Q**    Yeah.  You got that in front of you?

11:22:03  11        By the way, did you read the manual before you started

11:22:07  12   operating this?

11:22:07  13   **A**    Yes.

11:22:08  14   **Q**    Cover to cover?

11:22:09  15   **A**    Yes.

11:22:09  16   **Q**    You would have seen these pages or this page in front

11:22:12  17   of you, correct?

11:22:13  18   **A**    Yes.

11:22:14  19   **Q**    All right.  And did you read the statement that says:

11:22:27  20   Never force open the Power Pressure Cooker XL?

11:22:32  21        Did you read that?

11:22:33  22   **A**    Yes.

11:22:33  23   **Q**    Okay.  You read it.  Before you started putting two

11:22:36  24   hands on it during your testing, you had read that, correct?

11:22:40  25   **A**    Yes.

**Pratt (Cross)**

11:22:40  1  **Q**     Okay.  And before Mr. Mattice started putting two

11:22:44  2  hands on it, you had read that, correct?

11:22:46  3  **A**     That's correct.

11:22:47  4  **Q**     Okay.  All right.  Let me ask you a few questions

11:22:56  5  about some other things that -- well, I want to know, I

11:23:04  6  guess, if you did this or not.

11:23:10  7          I guess your testimony is that this has a defect in it

11:23:13  8  as a -- I guess as a pressure cooker, right?

11:23:15  9          Is that -- have I summarized it correctly?

11:23:19  10         This has a defect in it, in your opinion?

11:23:22  11 **A**     Yes.

11:23:22  12 **Q**     Okay.  You know there are other pressure cookers on

11:23:25  13 the market, correct?

11:23:26  14 **A**     I do.

11:23:26  15 **Q**     Okay.  From other manufacturers, correct?

11:23:28  16 **A**     Yes.

11:23:28  17 **Q**     Okay.  And so I imagine that what you did is you went

11:23:32  18 out from other manufacturers and you compared the designs

11:23:36  19 and safety features of pressure cookers from those other

11:23:39  20 manufacturers.

11:23:40  21 **A**     I haven't evaluated other manufacturers, other than

11:23:44  22 I've observed some in the market.  And I have a stovetop

11:23:50  23 case, a stovetop pressure cooker that I examined.  But I

11:23:56  24 haven't examined other electric power cookers like this in

11:24:01  25 detail other than just what you see in the market.

**Pratt (Cross)**

11:24:03   1   **Q**   So you can't tell us whether this might just be the

11:24:08   2   safest pressure cooker on the market or not.  You haven't

11:24:12   3   done that comparison, correct?

11:24:14   4   **A**   That's right.

11:24:15   5   **Q**   Okay.  Have you studied the quality assurance steps

11:24:20   6   that Tristar takes for each one of these pressure cookers?

11:24:24   7   **A**   Yes.

11:24:24   8   **Q**   Okay.  And you understand the certifications and the

11:24:27   9   compliance?  You sat in here while I outlined those.

11:24:30   10   You understand that there are certifications and

11:24:33   11   compliance with testing standards that were met with this

11:24:36   12   pressure cooker, right?

11:24:37   13   **A**   I understand that I believe it was ETL or Intertek

11:24:42   14   that performed testing to the 1026 spec, UL1026.

11:24:47   15   **Q**   And that's this label right here on the back of the

11:24:51   16   pressure cooker.  You see that label?  Can you see it from

11:24:54   17   here?

11:24:54   18   **A**   I can see it from here, yeah.

11:24:55   19   **Q**   You know it's there from your examination?

11:24:58   20   **A**   I can read it, yes.

11:25:00   21   **Q**   And you know that this pressure cooker met the testing

11:25:02   22   standards that are outlined on the back of that cooker,

11:25:04   23   right?

11:25:05   24   **A**   What that says is that Intertek says it met -- it

11:25:09   25   complies with UL1026.  That's all it tells me.

**Pratt (Cross)**

11:25:12  1   **Q**    Right.  And those are internationally recognized

11:25:17  2   testing standards, correct?

11:25:18  3   **A**    Well, I know that Intertek did not do a lid locking

11:25:23  4   test on that unit.

11:25:24  5   **Q**    That's not my question.  Do you want me to repeat it?

11:25:27  6   **A**    Sure.

11:25:28  7   **Q**    My question was, you know that those testing standards

11:25:31  8   are international testing standards, correct?

11:25:34  9   **A**    Well, the UL is a U.S. national standard.

11:25:39  10  **Q**    Okay.  UL is a United States testing standard, and it

11:25:43  11  passed the UL standard.  Correct?

11:25:45  12  **A**    Well, I didn't say it passed the UL standard.  I said

11:25:50  13  Intertek claims it complies with UL1026.  That's all that

11:25:56  14  sticker tells me.

11:25:56  15  **Q**    Understood.  Thank you.

11:25:58  16        Next subject.  I would imagine that if you're going to

11:26:01  17  testify about whether there's a defect in this product, that

11:26:04  18  you went out and looked at customer reviews or how the 2

11:26:09  19  million other people who have used this product talk about

11:26:14  20  it.

11:26:16  21  **A**    I guess I didn't understand the question.

11:26:18  22  **Q**    Well --

11:26:20  23        THE COURT:  He can't -- that's out-of-court

11:26:22  24  statements by somebody else, so go to something else.

11:26:25  25        MR. LEWIS:  Okay.

**Pratt (Cross)**

| | | |
|---|---|---|
| 11:26:36 | 1 | THE COURT:  What's the hearsay exception? |
| 11:26:38 | 2 | MR. LEWIS:  Well, I wasn't asking him the |
| 11:26:40 | 3 | substance, Your Honor.  I was just asking him if he had done |
| 11:26:45 | 4 | any of that work. |
| 11:26:46 | 5 | THE COURT:  Go to something else. |
| 11:26:49 | 6 | BY MR. LEWIS: |
| 11:26:49 | 7 | Q    I think you testified on direct that you didn't |
| 11:26:52 | 8 | conduct an accident reconstruction with the information that |
| 11:26:58 | 9 | you had from any of the three plaintiffs in this case; is |
| 11:27:04 | 10 | that correct? |
| 11:27:04 | 11 | A    That's correct. |
| 11:27:05 | 12 | Q    Okay.  But as I understand it, you do have protective |
| 11:27:14 | 13 | equipment and a cage that you have for pressure cookers in |
| 11:27:19 | 14 | your facilities.  Correct? |
| 11:27:20 | 15 | A    That's right. |
| 11:27:21 | 16 | Q    Okay.  Did you review information about how the |
| 11:27:26 | 17 | plaintiffs describe the incidents that occurred? |
| 11:27:30 | 18 | A    Yes. |
| 11:27:31 | 19 | Q    You read their deposition testimony? |
| 11:27:33 | 20 | A    I did. |
| 11:27:33 | 21 | Q    Did you talk to them individually? |
| 11:27:36 | 22 | A    I did not. |
| 11:27:36 | 23 | Q    Okay.  You only read deposition testimony? |
| 11:27:40 | 24 | A    That's correct. |
| 11:27:41 | 25 | Q    Okay.  And if you did that, then you know that each of |

**Pratt (Cross)**

11:27:45  1    the plaintiffs indicate that they followed all of the

11:27:49  2    instructions when they used the cooker, correct?

11:27:53  3    **A**    Well, their testimony speaks for itself, yes.

11:27:58  4    **Q**    But I'm going to ask you about --

11:27:59  5              THE COURT:  Don't ask him to characterize what

11:28:01  6    the testimony was.  You can ask them questions.  But you're

11:28:07  7    asking him to say -- recall what somebody else's deposition

11:28:11  8    said.

11:28:13  9    BY MR. LEWIS:

11:28:13  10   **Q**    I really want your understanding for purposes of a

11:28:17  11   question that I want to ask you about the incident.

11:28:19  12             THE COURT:  Well, how could he -- he didn't

11:28:21  13   have personal knowledge of the incidents.  So if you want to

11:28:23  14   ask the plaintiffs themselves questions about the incidents,

11:28:26  15   you can.  But don't ask him to -- what happened in the

11:28:30  16   incidents.  And I don't understand his opinion on the

11:28:33  17   incidents -- or his understanding of the incidents.  I don't

11:28:38  18   see the connection.

11:28:41  19             MR. LEWIS:  Okay.

11:28:41  20   BY MR. LEWIS:

11:28:42  21   **Q**    Well, let me ask you this:  In your testing that you

11:28:44  22   did, you did on occasion -- you ran a cycle with hot water

11:28:52  23   and pressure inside the very devices used by the plaintiffs,

11:28:59  24   right?

11:28:59  25   **A**    That's right.

**Pratt (Cross)**

| | | |
|---|---|---|
| 11:29:00 | 1 | **Q**    Okay.  And when you were done with that cycle, you |
| 11:29:03 | 2 | released the pressure from inside the cooker, correct? |
| 11:29:05 | 3 | **A**    Are you talking about the SEA testing? |
| 11:29:08 | 4 | **Q**    The testing of those devices, yes. |
| 11:29:11 | 5 |     One of the tests that you did was to run through a |
| 11:29:17 | 6 | cycle with hot water, pressurized, and then to release the |
| 11:29:22 | 7 | pressure at the end of the cook cycle.  Correct? |
| 11:29:24 | 8 | **A**    I'd like to clarify.  I didn't do that testing. |
| 11:29:28 | 9 | Mr. Mattice did. |
| 11:29:28 | 10 | **Q**    You observed it? |
| 11:29:29 | 11 | **A**    That's correct. |
| 11:29:30 | 12 | **Q**    Okay.  You were present, you observed it? |
| 11:29:33 | 13 | **A**    I watched him run the test, yes. |
| 11:29:35 | 14 | **Q**    Okay.  And you saw that the cook cycle was run and the |
| 11:29:40 | 15 | pressure was -- and by the way, this was an agreed test with |
| 11:29:43 | 16 | you and Mr. Mattice on a particular day.  It was January of |
| 11:29:46 | 17 | this year where you guys got together and sort of figured |
| 11:29:51 | 18 | out, okay, we're going to run this series of tests.  Right? |
| 11:29:54 | 19 | **A**    No.  Mr. Mattice had his own test protocol.  The first |
| 11:29:59 | 20 | time I saw it was when he started running the test. |
| 11:30:03 | 21 | **Q**    So you had some tests that you wanted to run while he |
| 11:30:05 | 22 | observed.  He had some tests that he was going to run while |
| 11:30:09 | 23 | you observed.  Correct? |
| 11:30:11 | 24 | **A**    That's correct. |
| 11:30:11 | 25 | **Q**    Okay.  And so one of the tests that was run that day |

**Pratt (Cross)**

11:30:14  1   that you observed was the cooker being tested under normal

11:30:17  2   cook cycle with hot water, and at the end of that cook cycle

11:30:22  3   the pressure was released from the cooker.  Correct?

11:30:25  4   **A**     That's correct.

11:30:26  5   **Q**     And all of the pressure came out of the very cookers

11:30:29  6   right here, right?

11:30:30  7   **A**     Right.

11:30:30  8   **Q**     And then the lid was opened, correct?

11:30:32  9   **A**     That's correct.

11:30:32  10  **Q**     It was opened easily, correct?

11:30:35  11  **A**     Well, it opens.  You could have opened it with one

11:30:38  12  finger.  It opened as easily as it closed.

11:30:42  13  **Q**     And it did not explode, correct?

11:30:45  14  **A**     That's correct.

11:30:51  15  **Q**     Any test that you have done on the XL, has any test

11:30:55  16  that you've done on the XL shown that if the pressure is

11:31:01  17  released from the cooker, as instructed, that the lid will

11:31:09  18  blow off?

11:31:09  19  **A**     No.  I mean, it's obvious that if all the pressure is,

11:31:12  20  in fact, released, not just seemingly released but in fact

11:31:17  21  released, then the lid should not blow off.

11:31:20  22  **Q**     And it can't because there's no pressure inside the

11:31:22  23  cooker, correct?

11:31:23  24  **A**     That's correct.

11:31:24  25  **Q**     It's fundamental physics, correct?

**Pratt (Cross)**

11:31:26   1   **A**   That's right.

11:31:28   2   **Q**   If the pressure is outside of this cooker, it's no

11:31:30   3   longer a cooker, it's a pot of hot water.  Correct?

11:31:34   4   **A**   That's correct.

11:31:47   5   **Q**   When you did your tests at SEA or otherwise, one of

11:31:55   6   the things that you did was you removed this pressure gauge,

11:32:00   7   correct?

11:32:00   8   **A**   That's not a gauge.  It's actually a manual release

11:32:06   9   valve.

11:32:06   10   **Q**   Pressure manual release valve.

11:32:09   11   You removed it?

11:32:10   12   **A**   We removed it.

11:32:11   13   **Q**   And you put a gauge in there instead, correct?

11:32:14   14   **A**   Yeah, just to replicate the way the manufacturer does

11:32:17   15   it.

11:32:17   16   **Q**   That's one way that you modified the device during

11:32:21   17   your testing, correct?

11:32:21   18   **A**   That's correct.

11:32:22   19   **Q**   Another way that you modified the device during your

11:32:23   20   testing was you artificially lifted the float valve during

11:32:27   21   some of your tests, correct?

11:32:29   22   **A**   Not during the SEA test.

11:32:30   23   **Q**   During some of your examination of the cookers, you

11:32:33   24   artificially lifted the float valve?

11:32:36   25   **A**   Yes, for my in-home test, that's right.

**Pratt (Cross)**

| | | |
|---|---|---|
| 11:32:36 | 1 | **Q**    Correct. |
| 11:32:39 | 2 | **A**    That was for the non-pressure version of the test. |
| 11:32:41 | 3 | **Q**    I understand. |
| 11:32:42 | 4 | You also for one of your tests, you used that little |
| 11:32:46 | 5 | clip that you showed the jury, correct? |
| 11:32:48 | 6 | **A**    Yes. |
| 11:32:49 | 7 | **Q**    Okay.  That was a modification.  You put that inside |
| 11:32:52 | 8 | of the lid, correct? |
| 11:32:53 | 9 | **A**    Well, not on the inside.  It's between the lid and |
| 11:32:57 | 10 | base on the outside. |
| 11:32:58 | 11 | **Q**    Correct.  Okay. |
| 11:33:04 | 12 | That's not called for in the instruction manual |
| 11:33:16 | 13 | anywhere, is it? |
| 11:33:07 | 14 | **A**    No, you wouldn't use a cooker that way.  You would |
| 11:33:11 | 15 | only test it that way. |
| 11:33:13 | 16 | **Q**    Okay.  The last kind of concept here. |
| 11:33:30 | 17 | In any of the materials that you saw related to the |
| 11:33:36 | 18 | XL, whether -- I guess, did you watch some videos?  You made |
| 11:33:40 | 19 | some statements about representations and warranties. |
| 11:33:43 | 20 | Did you watch some videos? |
| 11:33:45 | 21 | **A**    Yes. |
| 11:33:45 | 22 | **Q**    Okay.  Did you look at the written materials that come |
| 11:33:48 | 23 | with the product, including the instruction guide? |
| 11:33:51 | 24 | **A**    I have, yes. |
| 11:33:52 | 25 | **Q**    Okay.  Video from Eric Theiss, the chef, did you watch |

**Pratt (Redirect)**

| | | |
|---|---|---|
| 11:34:00 | 1 | that video? |
| 11:34:00 | 2 | **A**    Yes. |
| 11:34:01 | 3 | **Q**    Okay.  Could you cite me to anyplace where they open |
| 11:34:09 | 4 | the cooker with force and two hands on the outside? |
| 11:34:13 | 5 | **A**    No, I haven't seen that. |
| 11:34:17 | 6 | MR. LEWIS:  Pass the witness, Your Honor. |
| 11:34:20 | 7 | MR. COLEMAN:  Just brief redirect, Your Honor. |
| 11:34:23 | 8 | - - - - - |
| 11:34:23 | 9 | REDIRECT EXAMINATION |
| 11:34:23 | 10 | BY MR. COLEMAN: |
| 11:34:25 | 11 | **Q**    Dr. Pratt, you were asked a question by Mr. Lewis, |
| 11:34:27 | 12 | when you and Mr. Mattice tested the units and brought the |
| 11:34:31 | 13 | units up to pressure, if it was working as intended.  And |
| 11:34:35 | 14 | you said, yes. |
| 11:34:36 | 15 | Is that -- do you remember that question and answer, |
| 11:34:38 | 16 | sir? |
| 11:34:39 | 17 | **A**    Yeah.  Well, actually, there were two phases to the |
| 11:34:42 | 18 | test.  When we were doing the lid rotation test, they came |
| 11:34:46 | 19 | up to pressure as like they're supposed to.  We cut the |
| 11:34:49 | 20 | pressure off, let it drop until we could rotate the lids. |
| 11:34:53 | 21 | But then there was another protocol that Mr. Mattice |
| 11:34:55 | 22 | had put together where he ran them through their cycles |
| 11:34:58 | 23 | without the pressure gauges or without the analog pressure |
| 11:35:02 | 24 | gauges.  That was different.  They functioned as they were |
| 11:35:04 | 25 | expected to function in that test. |

**Pratt (Redirect)**

| | | |
|---|---|---|
| 11:35:07 | 1 | **Q**    Yes.  But with respect to the testing you and |
| 11:35:12 | 2 | Mr. Mattice did to determine if the lids could be opened |
| 11:35:15 | 3 | while there was pressure still in the unit, is that what |
| 11:35:17 | 4 | actually occurred?  You could open the unit -- or you could |
| 11:35:22 | 5 | open the lid while there was still pressure in the unit? |
| 11:35:25 | 6 | **A**    That's right. |
| 11:35:26 | 7 | **Q**    And is that supposed to happen? |
| 11:35:28 | 8 | **A**    No, it's not supposed to happen.  I mean, the owner's |
| 11:35:32 | 9 | manuals say it's not supposed to happen.  The videos say |
| 11:35:35 | 10 | it's not supposed to happen. |
| 11:35:36 | 11 | **Q**    In fact, we talked about this.  You heard in my |
| 11:35:43 | 12 | opening statement, Mr. Cruz -- we couldn't get his video up |
| 11:35:47 | 13 | and running then, but Mr. Cruz says, all these features are |
| 11:35:52 | 14 | designed to make sure that whether human error or mechanical |
| 11:35:57 | 15 | malfunction occur, using the power pressure cooker is always |
| 11:36:02 | 16 | safe. |
| 11:36:02 | 17 | Do you remember seeing that video of Mr. Cruz? |
| 11:36:05 | 18 | **A**    Yes, I do. |
| 11:36:06 | 19 | **Q**    So their whole argument, as you've heard from |
| 11:36:11 | 20 | Mr. Lewis and other lawyers on the defendant side, is that, |
| 11:36:13 | 21 | well, these plaintiffs must have used force to open these |
| 11:36:18 | 22 | lids under pressure. |
| 11:36:19 | 23 | Do you understand that to be the defense? |
| 11:36:21 | 24 | **A**    I do. |
| 11:36:21 | 25 | **Q**    But even if there was human error by forcing the unit, |

**Pratt (Redirect)**

11:36:28  1   according to Mr. Cruz, is it your understanding from that

11:36:31  2   material that the power pressure cooker is always supposed

11:36:36  3   to be safe anyway?

11:36:38  4   **A**     Yes, it is.  Yes.  That's my understanding.

11:36:41  5   **Q**     All right.  Well, let's play that now.  I think we

11:36:45  6   finally after some trial and error --

11:36:47  7                    MR. LEWIS:  Objection, Your Honor.

11:36:48  8                    MR. COLEMAN:  Stop it.

11:36:50  9                    MR. LEWIS:  This wasn't the subject --

11:36:51  10                   THE COURT:  You can use it to cross-examine

11:36:53  11  the witness, but you can't use it now.

11:36:57  12                   MR. COLEMAN:  Okay.  Will do, Your Honor.

11:36:59  13                   THE COURT:  Do you have any other questions?

11:37:02  14                   MR. COLEMAN:  Let me just check with counsel

11:37:04  15  here.

11:37:11  16       I don't think so, Your Honor.  Thank you.

11:37:13  17                   THE COURT:  Okay.  Thank you.

11:37:15  18       Would the plaintiff call your next witness.

11:37:21  19                   MR. EDWARDS:  Your Honor, our next witness on

11:37:23  20  the list is the videoconference witness.  So may we have

11:37:27  21  just a minute to set that up?

11:38:05  22                   THE COURT:  Ladies and gentlemen, you're going

11:38:05  23  to observe testimony given by way of videoconference.

11:38:11  24  You're to receive and consider that testimony the same as if

11:38:15  25  the witness were here live.

**Vennel (Direct)**

| | | |
|---|---|---|
| 11:38:21 | 1 | And I'd guess if you'd raise your right hand. |
| 11:38:26 | 2 | (Witness sworn.) |
| 11:38:34 | 3 | THE COURT:  And tell us your name and tell us |
| 11:38:36 | 4 | how you spell your last name. |
| 11:38:37 | 5 | THE WITNESS:  My name is Jessica Ruth Vennel. |
| 11:38:41 | 6 | V, as in Victor, E-N-N-E-L. |
| 11:38:51 | 7 | THE COURT:  And are you one of the plaintiffs |
| 11:38:53 | 8 | in this case? |
| 11:38:54 | 9 | THE WITNESS:  I am. |
| 11:38:56 | 10 | MR. EDWARDS:  Thank you, Your Honor. |
| 11:38:56 | 11 | JESSICA R. VENNEL |
| 11:38:30 | 12 | - - - - - |
| 11:38:30 | 13 | DIRECT EXAMINATION |
| 11:38:30 | 14 | BY MR. EDWARDS: |
| 11:38:59 | 15 | **Q**    Ms. Vennel, can you hear me okay? |
| 11:39:01 | 16 | **A**    I can. |
| 11:39:02 | 17 | **Q**    I'll admit I'm a little nervous about taking testimony |
| 11:39:07 | 18 | from somebody over the videoconference.  But if you can't |
| 11:39:08 | 19 | hear me, just let me know and we'll get it figured out.  All |
| 11:39:12 | 20 | right? |
| 11:39:12 | 21 | **A**    Okay. |
| 11:39:13 | 22 | **Q**    Before I start asking you questions, Ms. Vennel, would |
| 11:39:17 | 23 | you just tell the Court and jury why you're unable to be in |
| 11:39:21 | 24 | the courtroom today, please. |
| 11:39:22 | 25 | **A**    Yes.  On June 28th I had abdominal surgery to repair |

| | | |
|---|---|---|
| 11:39:27 | 1 | pelvic organ prolapse, so my surgeon and my PCP felt it best |
| 11:39:33 | 2 | that I do not travel for the trial. |
| 11:39:35 | 3 | **Q**    Okay.  Would you like to be here today in person? |
| 11:39:37 | 4 | **A**    I would. |
| 11:39:42 | 5 | **Q**    All right.  Go ahead and state your full address for |
| 11:39:44 | 6 | me, if you would, Ms. Vennel. |
| 11:39:46 | 7 | **A**    229 Munson Avenue, McKees Rocks, Pennsylvania, 15136. |
| 11:39:53 | 8 | **Q**    Okay.  And how long have you been a resident of the |
| 11:39:55 | 9 | state of Pennsylvania? |
| 11:39:56 | 10 | **A**    40 years. |
| 11:39:58 | 11 | **Q**    40 years.  Okay. |
| 11:39:59 | 12 | Do you live there by yourself? |
| 11:40:03 | 13 | **A**    No.  I live along with my husband, my son, and two of |
| 11:40:09 | 14 | my three daughters. |
| 11:40:10 | 15 | **Q**    Three daughters. |
| 11:40:11 | 16 | Okay.  What are their ages? |
| 11:40:14 | 17 | **A**    21, 19, 14. |
| 11:40:19 | 18 | **Q**    Okay. |
| 11:40:19 | 19 | **A**    And my son is 13. |
| 11:40:21 | 20 | **Q**    Okay.  I'm imagining you're like me and probably a lot |
| 11:40:24 | 21 | of us that those kids are a handful having that many kids |
| 11:40:29 | 22 | around the house? |
| 11:40:30 | 23 | **A**    Yes. |
| 11:40:30 | 24 | **Q**    Okay.  Any special challenges with your children? |
| 11:40:34 | 25 | **A**    My 21-year-old child is autistic and also disabled. |

**Vennel  (Direct)**

11:40:41   1   **Q**      So in addition to taking care of your children there

11:40:43   2   at home, and I understand we'll talk about this later, but

11:40:48   3   also doing the cooking, do you work outside of the home?

11:40:51   4   **A**      I do, full time.

11:40:55   5   **Q**      Okay.  Tell the Court and jury what you do for a

11:40:58   6   living.

11:40:58   7   **A**      I am an account clerk for the Allegheny County Health

11:41:03   8   Department.

11:41:03   9   **Q**      And what does that involve, Ms. Vennel?

11:41:05  10   **A**      That involves budgets, projections, daily revenue

11:41:11  11   reports, reporting to the controller's office along with the

11:41:14  12   budget office.

11:41:14  13   **Q**      Okay.  So you're not a professional chef.  We want to

11:41:18  14   be clear about that.

11:41:19  15   **A**      No, I am not.

11:41:24  16   **Q**      Explain how you first became aware of the Power

11:41:28  17   Pressure Cooker XL sold by Tristar.

11:41:31  18   **A**      Numerous infomercials on different cable channels.

11:41:34  19   **Q**      Okay.  That's how you first actually became of the

11:41:38  20   unit is TV infomercials?

11:41:42  21   **A**      Yes.

11:41:42  22   **Q**      Those are kind of like the as-seen-on-TV commercials

11:41:48  23   that we've all seen?

11:41:50  24   **A**      Yes.

11:41:50  25   **Q**      Was it those TV ads that ultimately led to your

**Vennel  (Direct)**

11:41:54  1   decision to go out and make this purchase of the Tristar

11:42:00  2   Power Pressure Cooker?

11:42:00  3   **A**     Yes, they were.

11:42:01  4   **Q**     Okay.  And I'm not asking you to recount specific

11:42:06  5   details of these infomercials because it's been some time, I

11:42:10  6   understand, but what factors stood out to you in those TV

11:42:16  7   infomercials that ultimately led to your decision to go make

11:42:19  8   the purchase of this particular Power Pressure Cooker XL

11:42:23  9   unit?

11:42:24  10  **A**     That I could safely and quickly cook meals for my

11:42:29  11  family.

11:42:29  12  **Q**     Okay.  Did you understand that, I guess at some point,

11:42:34  13  that this power pressure cooker could be used for things

11:42:38  14  like as a slow cooker?

11:42:40  15  **A**     Yes, I did.

11:42:41  16  **Q**     Okay.  Did you buy it to use it as a slow cooker,

11:42:45  17  though?

11:42:46  18  **A**     No.  I actually bought the unit to replace my previous

11:42:51  19  pressure cooker.

11:42:52  20  **Q**     Okay.  Let me ask you about that.

11:42:58  21       So you did have experience using a pressure cooker

11:43:02  22  before you bought the Tristar Power Pressure Cooker XL?

11:43:06  23  **A**     Yes, I did.

11:43:07  24  **Q**     Okay.  How long had you used your old pressure cooker

11:43:13  25  before you bought the Tristar pressure cooker?

**Vennel (Direct)**

| | | |
|---|---|---|
| 11:43:17 | 1 | **A**     Well over ten years. |
| 11:43:19 | 2 | **Q**     Ten years. |
| 11:43:21 | 3 |     Okay. Was this one of the newer pressure cooker |
| 11:43:28 | 4 | models like the Tristar brand that you plug in or is this |
| 11:43:32 | 5 | one of the old stovetop pressure cookers? |
| 11:43:35 | 6 | **A**     The old stovetop. |
| 11:43:36 | 7 | **Q**     Okay. Was Tristar -- was this one of the made in |
| 11:43:40 | 8 | China Tristar pressure cookers that you had before? |
| 11:43:44 | 9 | **A**     No, not at all. |
| 11:43:46 | 10 | **Q**     Okay. Well, let me ask you this: Did the old |
| 11:43:52 | 11 | pressure cooker that you used for ten years prior to the |
| 11:43:54 | 12 | Tristar product ever explode? |
| 11:43:56 | 13 | **A**     No, it did not. |
| 11:43:58 | 14 | **Q**     Were you ever injured in any way through 10 years of |
| 11:44:01 | 15 | using your old pressure cooker, not manufactured by Tristar? |
| 11:44:06 | 16 | **A**     Not once. |
| 11:44:08 | 17 | **Q**     Okay. Do you recall what you paid for your Tristar |
| 11:44:22 | 18 | power cooker? |
| 11:44:22 | 19 | **A**     $99. |
| 11:44:24 | 20 | **Q**     And where did you make the purchase, if you recall? |
| 11:44:27 | 21 | **A**     In Target in Pittsburgh, Pennsylvania. |
| 11:44:32 | 22 | **Q**     When you went out and you bought the Power Pressure |
| 11:44:34 | 23 | Cooker XL from Target in Pennsylvania, tell me what you did |
| 11:44:38 | 24 | when you got the unit home for the first time. |
| 11:44:41 | 25 | **A**     We unpacked -- my husband and I unpacked the pressure |

**Vennel (Direct)**

11:44:46  1   cooker, and I read the manual.

11:44:49  2   **Q**    Okay.  Did you read the entire instruction manual

11:44:53  3   before you used it?

11:44:55  4   **A**    Yes, I did.

11:44:56  5   **Q**    Okay.  Do you remember seeing something about safety

11:45:03  6   features when you read the manual involving the lid?

11:45:07  7   **A**    Yes, I did.

11:45:08  8   **Q**    Okay.  And what do you remember seeing in the manual

11:45:11  9   about the safety features and the lid specifically?

11:45:15  10  **A**    That the lid would not -- could not be removed if

11:45:20  11  there was any pressure in the unit.

11:45:21  12  **Q**    Okay.  So when you -- after you read that and you

11:45:25  13  started cooking with your pressure cooker, were you taking

11:45:28  14  care to pay special attention when removing the lid, or was

11:45:33  15  this something you thought, wow, I don't need to worry about

11:45:40  16  it?

11:45:40  17  **A**    I thought that I didn't need to worry about it.

11:45:43  18  **Q**    And was that because of the representations made in

11:45:46  19  the manual which indicated that the lid can't be removed

11:45:49  20  while the contents are under pressure?

11:45:51  21  **A**    Yes.

11:45:52  22  **Q**    Okay.  And did those statements, those representations

11:45:56  23  made by Tristar about the safety and the inability to remove

11:46:00  24  the lid under pressure, did that lead to your decision to

11:46:03  25  keep the cooker and to go ahead and start using it in your

11:46:07  1    home and to cook for your family?

11:46:10  2    **A**    Yes.

11:46:12  3    **Q**    Did you ever use the Power Pressure Cooker XL for any

11:46:18  4    of these other reasons, like a slow cooker or anything else,

11:46:22  5    other than to quickly and safely cook food under pressure?

11:46:27  6    **A**    No, just as a pressure cooker.

11:46:28  7    **Q**    Okay.  Have you got a Crock-Pot at home and other

11:46:32  8    things which would allow -- I'm assuming a saute pan that

11:46:36  9    you can do these other things?

11:46:38  10    **A**    I do.  I have something for everything that this unit

11:46:42  11    could do.

11:46:42  12    **Q**    Okay.  So the intended use for you was just as a

11:46:45  13    pressure cooker, that's it?

11:46:46  14    **A**    Yes.

11:46:46  15    **Q**    Okay.  How many times did you use this Power Pressure

11:46:55  16    Cooker XL before the explosion that we're here about today?

11:46:58  17    **A**    Twice.

11:46:59  18    **Q**    Okay.  Let's talk about, correct me if I'm wrong, I

11:47:11  19    believe the date of the explosion was February 25th, 2016.

11:47:16  20    Is that correct?

11:47:17  21    **A**    Yes.

11:47:17  22    **Q**    Explain to the Court and jury how you intended to use

11:47:21  23    your cooker.

11:47:24  24    **A**    I intended to prepare homemade chicken soup for my

11:47:29  25    family that evening.  I had gone through all the steps to

11:47:34  1  prepare the chicken, the vegetables, along with filling the

11:47:38  2  pot with the water in preparation to make the soup.

11:47:44  3  **Q**     Okay.  Did you do anything out of the ordinary,

11:47:48  4  anything that you would consider abnormal as a person

11:47:52  5  experienced for over ten years in using a pressure cooker on

11:47:55  6  February 25th, 2016?

11:47:57  7  **A**     No.

11:47:57  8  **Q**     Okay.  So what did you do after you got the

11:48:03  9  contents of the recipe you were going to make into the

11:48:06  10  pressure cooker?

11:48:06  11  **A**     I put the lid on and locked it into place.

11:48:11  12  **Q**     Okay.

11:48:12  13  **A**     Then I proceeded to push the soup/stew button, set it

11:48:16  14  for 20 minutes, and hit -- hit "start."

11:48:21  15  **Q**     Okay.  All right.  So did you stay staring at the

11:48:26  16  pressure cooker the entire time while it cooked or did you

11:48:29  17  go do something else?

11:48:31  18  **A**     No, I went to sit in my dining room.

11:48:35  19  **Q**     Is it close and connected there to your kitchen area?

11:48:39  20  **A**     Yes.  There's absolutely no wall between my kitchen

11:48:41  21  and my dining room.

11:48:43  22  **Q**     So you told us about 20 minutes passed.

11:48:46  23       Tell us what happened next.

11:48:47  24  **A**     After 20 minutes, I went into the kitchen to check to

11:48:51  25  see if the pressure cooker was finished cooking.  The front

**Vennel  (Direct)**

11:48:57  1    display flashed stating that the cooking process was

11:49:00  2    finished.

11:49:01  3        I then reached the steam valve, turned it to the open

11:49:07  4    position, and allowed the steam to escape.

11:49:10  5    **Q**    When you say steam valve, are you talking about the

11:49:14  6    black valve that rotates to an open and closed position on

11:49:18  7    top of the lid of the pressure cooker?

11:49:20  8    **A**    Yes.

11:49:25  9    **Q**    Okay.  So you actually opened it from the closed

11:49:27  10   position to the open position.

11:49:28  11       You're sure about that?

11:49:30  12   **A**    Yes, positive.

11:49:31  13   **Q**    Did you actually see steam start to come out of the

11:49:35  14   unit?

11:49:35  15   **A**    Yes, I did.

11:49:36  16   **Q**    Okay.  So what did you do next after you started

11:49:39  17   seeing steam come out of the unit?

11:49:41  18   **A**    I allowed the unit to expel the steam for 10 to 15

11:49:48  19   minutes.

11:49:49  20   **Q**    Okay.  Did you actually stay and watch it shoot all

11:49:53  21   the steam out or, again, did you leave the room?

11:49:55  22   **A**    I left the room.

11:49:56  23   **Q**    Okay.  So you leave the room and then you come back to

11:49:59  24   check on the unit.

11:50:00  25       When you got back, was it still in the open position

**Vennel  (Direct)**

11:50:03  1   or had somebody come along and tampered with it?

11:50:07  2   **A**     No, it was still in the open position.

11:50:09  3   **Q**     Okay.  And while it was in the open position, did you

11:50:13  4   observe whether any steam was coming out of the unit at that

11:50:17  5   time?

11:50:17  6   **A**     No.  There was no steam expelled.

11:50:21  7   **Q**     Okay.  So the pressure cooker is in the open position

11:50:24  8   but no more steam was coming out.  Did this give you the

11:50:28  9   green light that it was okay to go ahead and open the unit?

11:50:33  10  **A**     Yes.

11:50:33  11  **Q**     Tell us how you positioned your hands on the unit to

11:50:36  12  open it.

11:50:37  13  **A**     My one hand was on the handle on the base of the unit,

11:50:43  14  and my other hand was on the handle, the bottom part of the

11:50:49  15  handle, on the lid.

11:50:50  16  **Q**     Okay.  Now, do you consider yourself an individual

11:50:54  17  who's got particularly strong hands, Ms. Vennel?

11:50:58  18  **A**     Absolutely not.  In 2015, I had a carpal tunnel

11:51:05  19  surgery that left my hands with rather a noted weakness.

11:51:08  20  **Q**     Okay.  Is that surgery on your right hand or your left

11:51:12  21  hand?

11:51:12  22  **A**     It was actually on both.

11:51:13  23  **Q**     You had carpal tunnel surgery on both hands in 2015?

11:51:18  24  **A**     Yes, I did.

11:51:19  25  **Q**     Okay.  Did you have to get help from husband or kids

**Vennel  (Direct)**

11:51:22  1    around the house to open ordinary household things like

11:51:26  2    jars?

11:51:27  3    **A**    Oh, yes.

11:51:29  4    **Q**    Okay.

11:51:29  5    **A**    Always.

11:51:30  6    **Q**    Okay.  So since 2015, just so I understand, you've

11:51:38  7    been left with permanent weakness in the strength of your

11:51:42  8    hands due to your carpal tunnels?

11:51:45  9    **A**    Yes.

11:51:45  10   **Q**    Okay.  Is that why you used the palm of your hand to

11:51:48  11   open the pressure cooker?

11:51:49  12   **A**    Yes.

11:51:53  13   **Q**    Is that how you've done it in all the times before

11:51:57  14   that you'd used the pressure cooker?  And I'm talking about

11:52:00  15   your old pressure cooker.

11:52:01  16   **A**    Yes, that was the same way.

11:52:03  17   **Q**    Okay.  You told me that you'd used this Tristar

11:52:06  18   pressure cooker two times before you got hurt, correct?

11:52:09  19   **A**    Yes.

11:52:10  20   **Q**    When you opened your pressure cooker on February 25th,

11:52:15  21   2016, did you open it any differently than you did the two

11:52:18  22   times prior?

11:52:19  23   **A**    No.  There wasn't a difference.

11:52:21  24   **Q**    Okay.  Did you feel any difference in terms of the

11:52:25  25   difficulty in getting the lid to rotate versus the two times

**Vennel (Direct)**

11:52:30  1  prior?

11:52:30  2  **A**     No, there wasn't a difference.

11:52:31  3  **Q**     Do you feel like you misused the product on

11:52:35  4  February 25th, 2016, as you opened the lid and the contents

11:52:40  5  erupted?

11:52:41  6  **A**     No, not at all.

11:52:43  7  **Q**     Did you force the lid open in contravention of the

11:52:49  8  owner's manual on February 25th, 2016?

11:52:53  9  **A**     No, I did not.

11:52:54  10  **Q**     Okay.  Tell the Court and jury what happened when you

11:53:06  11  were able to rotate the lid on a pressurized Tristar Power

11:53:13  12  Pressure Cooker on February 25th, 2016.

11:53:16  13  **A**     Well, when I went to turn the lid to open it, the

11:53:22  14  pressure from within had forced the lid up and the contents,

11:53:27  15  scalding all myself, my countertops, all over my cabinets,

11:53:35  16  my dishes, as well as it showered down over everything and

11:53:44  17  splattered the ceiling.

11:53:46  18  **Q**     Well, I mean, is there any chance that you simply

11:53:49  19  spilled the contents on yourself?

11:53:51  20  **A**     Absolutely not.

11:53:52  21  **Q**     Okay.

11:53:53  22  **A**     There was no way for me to spill it as every ounce

11:53:58  23  that was inside the pressure cooker was expelled.

11:54:02  24  **Q**     Did you actually damage your cabinets when this

11:54:06  25  happened?

**Vennel  (Direct)**

11:54:06   1   **A**     Yes.   The cabinets -- or some of the cabinets are

11:54:10   2   warped where the scalding hot liquid hit.

11:54:16   3   **Q**     Okay.   And were you also severely burned as a result

11:54:21   4   of this exploding pressure cooker?

11:54:24   5   **A**     I was.

11:54:25   6   **Q**     All right.   And I'm not going to ask you any details

11:54:28   7   about those injuries because that's not what we're here

11:54:31   8   about today.   But is it fair to say that those burns have

11:54:34   9   caused you a lot of issues that you're still dealing with?

11:54:38   10   **A**     Yes.

11:54:38   11   **Q**     Okay.   Miss Vennel, when Tristar represented to you

11:54:58   12   through infomercials and through at least two places in the

11:55:02   13   owner's manual that the lid of this product cannot be

11:55:05   14   removed while the contents are under pressure, in your

11:55:08   15   experience, were those true statements?

11:55:10   16   **A**     No, they were not.

11:55:14   17   **Q**     And how do you know that?

11:55:15   18   **A**     Because on February 25th, it exploded all over without

11:55:21   19   any force being put on the lid.   The lid opened easily.

11:55:27   20   **Q**     Okay.   Would you have paid anything for this product

11:55:34   21   if you had known about this safety defect?

11:55:36   22   **A**     Absolutely not.   I wouldn't have paid a penny.

11:55:39   23   **Q**     Will you ever plug this unit in in your home around

11:55:43   24   your family for any of the purposes that Tristar may tout,

11:55:47   25   other than pressure cooking?

**Vennel  (Direct)**

11:55:50  1    **A**     Absolutely not.  It's a dangerous product.

11:55:57  2    **Q**     Okay.  Will you ever use the Power Pressure Cooker XL

11:56:01  3    for any reason ever again?

11:56:02  4    **A**     No, I will not.

11:56:03  5    **Q**     Knowing what you know now about this defect, did the

11:56:07  6    Power Pressure Cooker XL have any value on the date you

11:56:11  7    purchased it?

11:56:12  8    **A**     No.  It was worthless.

11:56:18  9    **Q**     Miss Vennel, the last question I have for you is, why

11:56:22  10   have you agreed to serve as a class representative in this

11:56:26  11   litigation?

11:56:27  12   **A**     Basically, I don't want this to happen to any other

11:56:31  13   person.  This was a horrendous thing that occurred, and I

11:56:36  14   want people to be protected and owners of this pressure

11:56:39  15   cooker to know that this can happen.  And if they would like

11:56:42  16   to get a refund, that it is an option for them.

11:56:47  17            MR. EDWARDS:  Okay.  Miss Vennel, thank you

11:56:49  18   very much for your time.  I know you've been through a lot

11:56:53  19   with the recent surgery, and I appreciate you visiting with

11:56:56  20   us today.  Okay?

11:56:57  21            THE WITNESS:  Thank you.

11:56:58  22            THE COURT:  Cross-examination.

11:57:01  23            MR. LEWIS:  Am I allowed to use documents

11:57:03  24   through this system or is that not permissible?

11:57:08  25            THE COURT:  I don't know.  Has she received

**Vennel (Cross)**

11:57:13  1   the documents?

11:57:14  2         MR. LEWIS:  I didn't send them to her because

11:57:17  3   they just filed a motion.

11:57:20  4         THE COURT:  I don't know if there's some way

11:57:21  5   to -- I don't know how you --

11:57:22  6         DEPUTY CLERK:  Yeah, how we'd show it to her.

11:57:25  7         MR. LEWIS:  I'll work with it.

11:57:25  8         THE COURT:  Okay.

11:57:28  9                       - - - - -

11:57:28  10                   CROSS-EXAMINATION

11:57:28  11  BY MR. LEWIS:

11:57:40  12  **Q**    Good morning Miss -- is it Vennel?  Did I pronounce

11:57:44  13  that correctly?

11:57:45  14  **A**    Yes.

11:57:45  15  **Q**    Yes, thanks --

11:57:46  16  **A**    Yes.

11:57:46  17  **Q**    -- for joining us.  This is me standing at the podium

11:57:51  18  here.  And it's nice that our court can accommodate this.

11:57:55  19  Sorry about the awkwardness of you looking at my back while

11:58:00  20  I get to look at you testify.

11:58:04  21        But my name is John Lewis, and I represent Tristar.

11:58:07  22  And I just have a few questions for you today about some of

11:58:10  23  the testimony that you gave.  Okay, ma'am?

11:58:12  24  **A**    Okay.

11:58:13  25  **Q**    All right.  The first topic is related to TV ads.

**Vennel (Cross)**

| | | |
|---|---|---|
| 11:58:19 | 1 | Did you see TV ads prior to purchasing the Power |
| 11:58:26 | 2 | Pressure Cooker XL? |
| 11:58:26 | 3 | **A**    Yes, I did. |
| 11:58:27 | 4 | **Q**    Okay.  And was it those TV ads that caused you or the |
| 11:58:32 | 5 | information in those TV ads that caused you to make the |
| 11:58:37 | 6 | purchase of the Power Pressure Cooker XL? |
| 11:58:41 | 7 | **A**    Yes. |
| 11:58:42 | 8 | **Q**    Do you have specific recollection of what TV ads you |
| 11:58:47 | 9 | did see or just a general recollection of that? |
| 11:58:52 | 10 | **A**    A general recollection. |
| 11:58:54 | 11 | **Q**    Okay.  Next topic. |
| 11:59:07 | 12 | You get home, and I just want to make sure, you read a |
| 11:59:16 | 13 | small square instruction manual that came with the cooker; |
| 11:59:22 | 14 | is that right? |
| 11:59:22 | 15 | **A**    Yes. |
| 11:59:23 | 16 | **Q**    Okay.  And you have a recollection that you read that |
| 11:59:26 | 17 | from cover to cover, right? |
| 11:59:29 | 18 | **A**    Yes.  Yes, I did. |
| 11:59:31 | 19 | **Q**    And do you recall that there was warranty information |
| 11:59:36 | 20 | in that particular instruction manual? |
| 11:59:40 | 21 | **A**    Yes. |
| 11:59:41 | 22 | **Q**    And you understood that the warranty said that if |
| 11:59:47 | 23 | there was misuse or modification of the device, it would |
| 11:59:50 | 24 | void the warranty. |
| 11:59:51 | 25 | Do you remember that part? |

**Vennel (Cross)**

| | | |
|---|---|---|
| 11:59:53 | 1 | **A**      Yes. |
| 11:59:53 | 2 | **Q**      Okay.  And then there were also other instructions |
| 11:59:57 | 3 | within that manual, correct? |
| 11:59:59 | 4 | **A**      Yes. |
| 11:59:59 | 5 | **Q**      One of the instructions, do you recall, said that you |
| 12:00:04 | 6 | should always check the pressure release valve for clogs |
| 12:00:08 | 7 | before you use it. |
| 12:00:10 | 8 |        Do you recall that? |
| 12:00:11 | 9 | **A**      Yes. |
| 12:00:11 | 10 | **Q**      Okay.  And you did that, right?  You -- before cooking |
| 12:00:18 | 11 | on the incident that you described, you checked to make sure |
| 12:00:22 | 12 | the pressure release valve was free of any clogs, correct? |
| 12:00:26 | 13 | **A**      Yes. |
| 12:00:28 | 14 | **Q**      Okay.  And then you cooked a meal that took about 20 |
| 12:00:33 | 15 | minutes; is that right? |
| 12:00:35 | 16 | **A**      Yes. |
| 12:00:36 | 17 | **Q**      And during that 20 minutes you left the room, but you |
| 12:00:40 | 18 | came back at the end of the cook cycle; is that correct? |
| 12:00:45 | 19 | **A**      That's correct. |
| 12:00:46 | 20 | **Q**      Okay.  And when you came back at the end of the cook |
| 12:00:50 | 21 | cycle, are you sure that you turned the pressure release |
| 12:00:55 | 22 | valve to open?  Are you sure about that? |
| 12:00:58 | 23 | **A**      Absolutely. |
| 12:00:58 | 24 | **Q**      Okay.  And you -- did you hear whistling, or you |
| 12:01:07 | 25 | definitely saw steam come out; is that right? |

**Vennel (Cross)**

12:01:10  1    **A**    Yes.

12:01:10  2    **Q**    And it came out for -- I mean, you witnessed it,

12:01:13  3    right?

12:01:14  4    **A**    Yes, for a few -- for a few seconds, and then I went

12:01:17  5    to set in the dining room where I could see it from sitting.

12:01:21  6    **Q**    And was it whistling too, kind of like -- you know how

12:01:27  7    like steam on a -- if you make a pot of tea or something,

12:01:33  8    you hear that whistle sound when it's ready?  Did you hear a

12:01:37  9    whistling here as well?

12:01:37  10    **A**    Yes.

12:01:37  11    **Q**    And then you left the room, right, for about 10 or 15

12:01:41  12    minutes?

12:01:42  13    **A**    Yes.

12:01:42  14    **Q**    Okay.  And are you pretty sure that was about the

12:01:45  15    estimated time?  It wasn't like 1 or 2 minutes?  It was --

12:01:47  16    you're pretty sure it was 10 or 15 minutes?

12:01:50  17    **A**    Yes, 10, 15 minutes.

12:01:52  18    **Q**    And did at some point in time the whistling and the

12:01:59  19    steam just kind of stop?

12:02:00  20    **A**    When I returned back into the kitchen, it had all

12:02:04  21    stopped.

12:02:04  22    **Q**    It had all stopped.

12:02:06  23    But were you sure that the pressure release valve was

12:02:10  24    still open at that time?

12:02:13  25    **A**    Yes, it was still open.

**Vennel (Cross)**

| | | | |
|---|---|---|---|
| 12:02:11 | 1 | **Q** | Nobody had bumped it? |
| 12:02:14 | 2 | **A** | No. |
| 12:02:14 | 3 | **Q** | Still completely open? |
| 12:02:15 | 4 | **A** | Yes. |
| 12:02:16 | 5 | **Q** | So it was absolutely still open 10, 15 minutes later |
| 12:02:19 | 6 | | when you walked back into the kitchen, correct? |
| 12:02:22 | 7 | **A** | Correct. |
| 12:02:22 | 8 | **Q** | Okay.  And then when you opened the lid, it opened |
| 12:02:29 | 9 | | easily, correct? |
| 12:02:32 | 10 | **A** | It did. |
| 12:02:33 | 11 | **Q** | I mean, although you used two hands, you -- it pretty |
| 12:02:38 | 12 | | much just easily turned and opened up; is that right? |
| 12:02:44 | 13 | **A** | Yes, that's correct. |
| 12:02:46 | 14 | **Q** | Okay.  You didn't force it? |
| 12:02:49 | 15 | **A** | No, I did not. |
| 12:02:50 | 16 | **Q** | Okay.  Was anybody else around when this occurred? |
| 12:02:56 | 17 | **A** | My 21-year-old daughter was sitting in the dining room |
| 12:03:00 | 18 | | with me, and my other children were upstairs. |
| 12:03:13 | 19 | **Q** | Okay.  So did your daughter witness the incident? |
| 12:03:15 | 20 | **A** | I believe so. |
| 12:03:19 | 21 | | MR. LEWIS:  Pass the witness, Your Honor. |
| 12:03:21 | 22 | | THE COURT:  Do you have any redirect? |
| 12:03:25 | 23 | | MR. EDWARDS:  No more questions, Your Honor. |
| 12:03:27 | 24 | | THE COURT:  Okay.  Thank you, ma'am. |
| 12:03:29 | 25 | | THE WITNESS:  Thank you. |

**Chapman (Direct)**

| | | |
|---|---|---|
| 12:03:30 | 1 | THE COURT:  Thank you. |
| 12:03:30 | 2 | And would plaintiff call your next witness? |
| 12:03:35 | 3 | MR. EDWARDS:  I called Kenneth Chapman. |
| 12:03:45 | 4 | THE COURT:  Would you raise your right hand. |
| 12:03:53 | 5 | (Witness sworn.) |
| 12:03:53 | 6 | THE COURT:  If you'll take a seat.  And get |
| 12:04:03 | 7 | close to the microphone, then tell us your name and how you |
| 12:04:06 | 8 | spell your last name. |
| 12:04:08 | 9 | THE WITNESS:  My is Kenneth Chapman, |
| 12:04:13 | 10 | C-H-A-P-M-A-N. |
| 12:04:13 | 11 | KENNETH CHAPMAN |
| 12:04:13 | 12 | - - - - - |
| 12:04:16 | 13 | DIRECT EXAMINATION |
| 12:04:16 | 14 | BY MR. WALLACE: |
| 12:04:16 | 15 | **Q**    Mr. Chapman, hello. |
| 12:04:18 | 16 | **A**    Hi. |
| 12:04:18 | 17 | **Q**    Go ahead, you just gave the jury an introduction and |
| 12:04:18 | 18 | told them what your name is.  Go ahead and tell the jury |
| 12:04:23 | 19 | where you live. |
| 12:04:23 | 20 | **A**    I live on Hathaway Drive in Brunswick, Ohio. |
| 12:04:27 | 21 | **Q**    Brunswick, Ohio? |
| 12:04:28 | 22 | **A**    Brunswick, Ohio. |
| 12:04:29 | 23 | **Q**    Okay.  That's Big Ten -- I'm an SCC guy.  That's a Big |
| 12:04:34 | 24 | Ten country, right? |
| 12:04:36 | 25 | Okay.  How long have you been an Ohio guy? |

**Chapman (Direct)**

| 12:04:38 | 1 | **A**    My whole life, 55 years. |
| 12:04:40 | 2 | **Q**    Okay.  And who do you live there with at your home in |
| 12:04:45 | 3 | Brunswick? |
| 12:04:46 | 4 | **A**    My wife, Pamela, and my daughter, Gracie. |
| 12:04:50 | 5 | **Q**    All right.  And what do you do for a living, |
| 12:04:54 | 6 | Mr. Chapman? |
| 12:04:55 | 7 | **A**    I'm in fasteners.  I run a national bolt make and |
| 12:05:03 | 8 | header. |
| 12:05:03 | 9 | **Q**    Okay.  Are you an engineer? |
| 12:05:05 | 10 | **A**    No, no engineer. |
| 12:05:06 | 11 | **Q**    Okay.  So what does a guy that makes headers do?  What |
| 12:05:10 | 12 | do you -- |
| 12:05:11 | 13 | **A**    Bolts.  Any kind of fasteners, any, you know, screws, |
| 12:05:15 | 14 | bolts. |
| 12:05:15 | 15 | **Q**    All right.  You're in a suit today and I appreciate |
| 12:05:18 | 16 | that.  But you consider yourself kind of a blue-collar guy? |
| 12:05:23 | 17 | **A**    Yeah. |
| 12:05:23 | 18 | **Q**    Okay.  All right.  Explain to the Court and jury, if |
| 12:05:26 | 19 | you would, how you first became aware of the Power Pressure |
| 12:05:33 | 20 | Cooker XL. |
| 12:05:33 | 21 | **A**    On TV, on the infomercials.  I seen a couple of |
| 12:05:39 | 22 | different infomercials on the pressure cooker. |
| 12:05:41 | 23 | **Q**    Okay.  And was it those TV ads that led to your |
| 12:05:45 | 24 | decision to buy the power pressure cooker? |
| 12:05:50 | 25 | **A**    Yes. |

**Chapman (Direct)**

| | | |
|---|---|---|
| 12:05:50 | 1 | **Q**    Okay.  Did you have to do some coaxing of your wife to |
| 12:05:56 | 2 | make that happen? |
| 12:05:57 | 3 | **A**    Yeah.  My wife really didn't want a pressure cooker. |
| 12:06:00 | 4 | **Q**    Was she afraid of them? |
| 12:06:01 | 5 | **A**    Yes. |
| 12:06:02 | 6 | **Q**    Okay.  Did you point out to your wife that these |
| 12:06:07 | 7 | pressure cookers, based on the ads, were supposed to be the |
| 12:06:09 | 8 | safe ones? |
| 12:06:10 | 9 | **A**    Absolutely, yes.  They say you couldn't open it under |
| 12:06:13 | 10 | pressure. |
| 12:06:14 | 11 | **Q**    Okay.  All right.  And so you talked her into it for |
| 12:06:17 | 12 | those reasons, right? |
| 12:06:19 | 13 | **A**    Yes. |
| 12:06:19 | 14 | **Q**    Is she the cook in the family or are you the cook? |
| 12:06:23 | 15 | **A**    Yes, she is. |
| 12:06:24 | 16 | **Q**    Okay.  In fact, did she do all the cooking with this |
| 12:06:27 | 17 | Tristar Power Pressure Cooker? |
| 12:06:29 | 18 | **A**    Yes, she did. |
| 12:06:30 | 19 | **Q**    And when did you guys actually make the purchase, if |
| 12:06:34 | 20 | you remember?  I know it's been a while. |
| 12:06:35 | 21 | **A**    I believe sometime in early 2016. |
| 12:06:38 | 22 | **Q**    Okay.  When you got the power pressure cooker home for |
| 12:06:47 | 23 | the first time, did you and your wife go through it, go |
| 12:06:50 | 24 | through what was in the box? |
| 12:06:51 | 25 | **A**    Yes. |

**Chapman  (Direct)**

| | | |
|---|---|---|
| 12:06:52 | 1 | **Q**     Did you guys read the entire instruction manual? |
| 12:06:57 | 2 | **A**     Everything up to the recipes. |
| 12:06:58 | 3 | **Q**     Okay.  Did you actually read them or did she read them |
| 12:07:02 | 4 | to you? |
| 12:07:02 | 5 | **A**     She read them to me.  We went over them together. |
| 12:07:06 | 6 | **Q**     Okay.  And you bailed when it got to the recipe part? |
| 12:07:10 | 7 | **A**     Yeah. |
| 12:07:14 | 8 | **Q**     Do you remember hearing something about the safety |
| 12:07:17 | 9 | features involving the lid in the manual?  And, if so, tell |
| 12:07:21 | 10 | us what you remember. |
| 12:07:21 | 11 | **A**     Well, the chef that was on the infomercial says they |
| 12:07:27 | 12 | were safe.  You couldn't open them, you know, under any |
| 12:07:31 | 13 | pressure. |
| 12:07:31 | 14 | **Q**     Okay. |
| 12:07:33 | 15 | **A**     Then you get the manual, the manual said the same |
| 12:07:36 | 16 | thing, you know? |
| 12:07:37 | 17 | **Q**     Okay.  All right.  And was it those representations |
| 12:07:40 | 18 | both before you made the purchase and after that led to your |
| 12:07:43 | 19 | decision to go ahead and try this thing out, take it out of |
| 12:07:46 | 20 | the box, use it in your home? |
| 12:07:48 | 21 | **A**     Yeah, yeah. |
| 12:07:59 | 22 | **Q**     Okay.  You said your wife had used it a few times |
| 12:08:02 | 23 | before this incident where it exploded on you, correct? |
| 12:08:04 | 24 | **A**     Right. |
| 12:08:05 | 25 | **Q**     Okay.  Do you remember anything that she had made with |

**Chapman (Direct)**

12:08:07  1   it?

12:08:08  2   **A**    Well, there was one thing, chicken wings.

12:08:12  3   **Q**    Okay.  How did the -- did she cook them from frozen

12:08:15  4   like they do in the infomercial?

12:08:15  5   **A**    From frozen like they show on the infomercial.  And

12:08:19  6   they were just gummy.  They were terrible.

12:08:23  7   **Q**    You weren't a fan of the chicken wings?

12:08:26  8   **A**    No, we didn't like the chicken wings.

12:08:29  9   **Q**    All right.  Before I get to the actual St. Patrick's

12:08:37  10  Day 2016, I know you didn't use this cooker for really

12:08:41  11  anything, but did your wife intend to use this pressure

12:08:44  12  cooker for anything other than cooking foods under pressure?

12:08:49  13  **A**    No, that was it, just to cook food under pressure.

12:08:52  14  **Q**    Okay.  All right.  Go back to St. Patrick's Day,

12:09:00  15  March 17th, 2016.  And I'm not going to ask you about the

12:09:04  16  preparation of the meal because Pam did all that, your wife.

12:09:09  17  Right?

12:09:09  18  **A**    Right.

12:09:09  19  **Q**    Well, what was Pam preparing on St. Patty's day 2016,

12:09:16  20  if you recall?

12:09:16  21  **A**    Corned beef.

12:09:18  22  **Q**    Traditional corned beef?

12:09:22  23  **A**    Traditional corned beef, St. Patrick's Day.

12:09:22  24  **Q**    Okay.  And so at some point did you get beckoned to

12:09:28  25  come and open the pressure cooker?

**Chapman (Direct)**

12:09:30  1   **A**     Well, yeah, she said supper was ready.  I get out

12:09:33  2   there and supper's not ready, and she's doing something over

12:09:38  3   here.  And I asked her about the pressure cooker, and she

12:09:40  4   said it's ready to go.  And I even asked her, are you sure

12:09:43  5   the steam is out?  And she said yes.  And she went over

12:09:47  6   there and she physically showed me where it was open,

12:09:50  7   closed, opened it again.  All right.

12:09:51  8       She turned around to get the bowel to put the corned

12:09:55  9   beef in.  I turned that lid and it popped.  It come out

12:10:00  10  right at me, face, all the way down.  And I mean, it was

12:10:04  11  nothing to turn.

12:10:06  12  **Q**     All right.  Let me ask you about -- let me ask you

12:10:10  13  about that.

12:10:12  14      If I understood your testimony correctly, did your

12:10:15  15  wife actually physically demonstrate to you turning the

12:10:19  16  pressure cooker back and forth from the open to the closed

12:10:23  17  position just to make double sure --

12:10:25  18  **A**     Yes, she did.

12:10:27  19  **Q**     -- that no more steam was coming out?

12:10:29  20  **A**     Yes, she did.

12:10:30  21  **Q**     And you're sure about that?

12:10:31  22  **A**     I'm sure.

12:10:32  23  **Q**     Okay.  All right.  So at that point, did you have any

12:10:34  24  reason to think that it was unsafe to go ahead and open the

12:10:37  25  lid?

**Chapman  (Direct)**

12:10:38  1   **A**      Not at all.

12:10:39  2   **Q**      Okay.  Did you get out a crowbar or a broom handle or

12:10:47  3   anything like that to open the lid?

12:10:49  4   **A**      No.  No.

12:10:49  5   **Q**      You just used your two hands, right?

12:10:52  6   **A**      Yes.

12:10:52  7   **Q**      Okay.  And other than, I guess, playing with it in the

12:10:55  8   box when you first got it, you never opened the lid before,

12:10:59  9   right?

12:10:59  10  **A**      No.

12:10:59  11  **Q**      Okay.  So do you believe you came up and forced this

12:11:07  12  lid open?  Is that how you got it open?

12:11:09  13  **A**      Absolutely not.

12:11:09  14  **Q**      Okay.  Do you feel like you tried to open it just like

12:11:13  15  any other reasonable person might if they were just opening

12:11:15  16  a pressure cooker?

12:11:16  17  **A**      Yeah, that's what I did.  I mean . . .

12:11:18  18  **Q**      Okay.  And tell us in detail exactly what happened

12:11:22  19  when you rotated the lid of that pressure cooker without a

12:11:26  20  stop key device on it.

12:11:28  21  **A**      Well, everything that was in that pot, it seemed like

12:11:31  22  just about everything come out at me.  Ceiling, floor.  I

12:11:36  23  knocked my wife over going back so far.

12:11:40  24           I turned around to make sure she was all right, and

12:11:43  25  she said, you got to get to the shower.  Your nose is

12:11:47  1    already blistering, you're peeling.  So I went into the

12:11:51  2    shower and stayed there for like 45 minutes.  Telling her,

12:11:56  3    you got to keep checking on me.  I think I might -- I felt

12:11:59  4    funny.  I thought maybe I was going to go into shock or

12:12:02  5    something.  But everything turned out -- you know, we just

12:12:04  6    packed it with salve.

12:12:06  7         She works for a doctor, and she called the doctor

12:12:09  8    right away.  And he told us what we needed to do, so that's

12:12:14  9    what we did.

12:12:15  10   **Q**     All right.  Mr. Chapman, when Tristar represented in

12:12:23  11   those infomercials and the manual those provisions that your

12:12:27  12   wife read to you that the Tristar Power Pressure Cooker XL's

12:12:31  13   lid could not be removed unless the contents were under

12:12:34  14   pressure, were those representations true and accurate, in

12:12:38  15   your experience?

12:12:38  16   **A**     No, they weren't true.  You can pop that thing off at

12:12:46  17   anytime.  It's just like a ticking -- just like a bomb.

12:12:51  18   **Q**     Okay.  Would you have paid anything for this product

12:12:53  19   if you'd known about this safety defect?

12:12:55  20   **A**     Absolutely not.

12:13:01  21   **Q**     Did it have any value to your family to use as a slow

12:13:05  22   cooker or any other reason?

12:13:07  23   **A**     No, that's not what we bought it for.

12:13:10  24   **Q**     Okay.  You bought a pressure cooker to use it as a

12:13:12  25   pressure cooker, right?

**Chapman (Direct)**

| | | |
|---|---|---|
| 12:13:13 | 1 | **A**      Correct. |
| 12:13:18 | 2 | **Q**      Okay.  Will you ever plug this pressure cooker in for |
| 12:13:21 | 3 | reason again? |
| 12:13:22 | 4 | **A**      No. |
| 12:13:22 | 5 | **Q**      Okay.  I understand at some point this -- right after |
| 12:13:24 | 6 | this, this pressure cooker made it out to the trash, right? |
| 12:13:28 | 7 | **A**      Yeah, this pressure cooker went out to the trash. |
| 12:13:33 | 8 | **Q**      Okay.  And then you rethought that because it |
| 12:13:36 | 9 | eventually became a claim rep and it's now evidence, right? |
| 12:13:38 | 10 | **A**      Right. |
| 12:13:39 | 11 | **Q**      And why did you make the decision to serve as a class |
| 12:13:42 | 12 | rep in this case? |
| 12:13:43 | 13 | **A**      I don't want it to happen to anybody else. |
| 12:13:45 | 14 | **Q**      Okay. |
| 12:13:46 | 15 | **A**      It's a dangerous machine. |
| 12:13:50 | 16 | **Q**      Okay. |
| 12:13:52 | 17 |           MR. EDWARDS:  Mr. Chapman, thank you very much |
| 12:13:53 | 18 | for your time today.  I appreciate it. |
| 12:13:55 | 19 |           THE COURT:  Cross-examination. |
| 12:13:55 | 20 |           - - - - - |
| 12:13:55 | 21 |           CROSS-EXAMINATION |
| 12:13:55 | 22 | BY MR. FECZKO: |
| 12:14:00 | 23 | **Q**      Good afternoon, Mr. Chapman.  How are you? |
| 12:14:09 | 24 | **A**      Good.  How are you? |
| 12:14:10 | 25 | **Q**      Good. |

**Chapman (Cross)**

12:14:14  1    So it's your testimony that you did not actually read

12:14:16  2    the owner's manual yourself; is that correct?

12:14:18  3    **A**    No, I didn't physically.  Me and the wife sat there

12:14:21  4    together flipping the pages together.  But did I take it and

12:14:24  5    read it by myself?  No, I did not.

12:14:26  6    **Q**    Since you didn't read it, can you be sure that she

12:14:29  7    read every word of every page to you along the way?

12:14:31  8    **A**    Yeah, I'm sure she read every page.

12:14:34  9    **Q**    In that case, did she see on page 1 or did she read to

12:14:38  10   you on page 1 of the manual --

12:14:40  11              MR. FECZKO:  Jeff, can you pull it up?  Go the

12:14:43  12   next page, page 1.  Can you call out in the second column,

12:15:03  13   the second bullet point.

12:15:05  14   **Q**    Did she read to you where it says:  Do not open the

12:15:08  15   Power Pressure Cooker XL until the unit has cooled and all

12:15:10  16   internal pressure has been released?

12:15:12  17   **A**    Yes.

12:15:12  18   **Q**    You recall her reading that to you?

12:15:14  19   **A**    Yes.

12:15:14  20   **Q**    Do you recall her reading:  If the unit is difficult

12:15:17  21   to open, this indicates that the cooker is still

12:15:20  22   pressurized.  Do not force it open?

12:15:22  23   **A**    Right, we knew that.

12:15:23  24   **Q**    And did you follow those instructions?

12:15:25  25   **A**    I did.

**Chapman (Cross)**

12:15:25  1  **Q**     And did your wife follow those instructions when she

12:15:28  2  used it?

12:15:29  3  **A**     Yes.

12:15:31  4                MR. FECZKO:  Can you pull up the sticker from

12:15:33  5  the lid?

12:15:38  6  **Q**     Now, I recognize that your wife did the cooking with

12:15:42  7  this primarily, but did you ever see the sticker on the lid

12:15:44  8  of the unit?

12:15:45  9  **A**     Yes.

12:15:45  10  **Q**     Do you see in part 2 where it says:  After cooking and

12:15:49  11  before opening the lid, turn the pressure valve to the vent

12:15:52  12  position and release steam.

12:15:53  13        And then under number 3:  Once the float valve has

12:15:56  14  dropped, the lid may be removed?

12:15:58  15  **A**     Mm-hmm.

12:15:58  16  **Q**     Did you and your wife follow those instructions when

12:16:01  17  using the machine?

12:16:02  18  **A**     I believe she did.  I tell you what, to be honest with

12:16:05  19  you, she said it before we -- I said, is the steam out.  She

12:16:07  20  said, I let the steam out a long time ago.  Because she

12:16:10  21  programmed it to cook while we were at work.  So when she

12:16:14  22  got home, she let that steam out.  So, I mean, the pot

12:16:18  23  itself wasn't really hot at all.

12:16:20  24  **Q**     It wasn't hot, the steam was out?

12:16:24  25  **A**     Yes, it wasn't hot, the steam was out.

**Chapman  (Cross)**

12:16:25  1  **Q**    When you say the pot wasn't hot, did you touch the

12:16:27  2  sides of the lid?

12:16:28  3  **A**    The sides of the lid?  I put one hand on the middle of

12:16:34  4  the lid and one on the side of the lid.

12:16:40  5  **Q**    So when you opened it, you were like that?

12:16:42  6  **A**    No, not like that, no.  Both my hands were on the lid.

12:16:46  7  **Q**    Like this?

12:16:47  8  **A**    But one was in the middle and the other one was where

12:16:51  9  I slipped it, you know, like that.  That's --

12:16:53  10  **Q**    Like that right there?

12:16:54  11  **A**    Yeah.  We'll say like that, yeah.

12:17:02  12  **Q**    Now, you mentioned some prior occasions that your wife

12:17:06  13  had cooked with the unit, correct?

12:17:07  14  **A**    Yes.

12:17:07  15  **Q**    You discussed the chicken wings.  She also made some

12:17:10  16  lasagne, too; is that right?

12:17:12  17  **A**    That's correct.

12:17:12  18  **Q**    Did you enjoy the lasagne that your wife made with the

12:17:19  19  unit?

12:17:19  20          THE COURT:  You're under oath.

12:17:21  21  **A**    It was okay.

12:17:23  22  **Q**    Was that a "yes"?  Sorry.

12:17:26  23  **A**    Yeah.

12:17:27  24  **Q**    Do you recall anything else that was cooked with it in

12:17:30  25  addition to the chicken wings or the lasagne?

**Chapman (Cross)**

| | | |
|---|---|---|
| 12:17:33 | 1 | **A**     No, that was about what I can remember.  You know, and |
| 12:17:35 | 2 | the corned beef. |
| 12:17:37 | 3 | **Q**     And she never had any issues opening the lid, correct? |
| 12:17:40 | 4 | **A**     No, I believe she was a very lucky girl. |
| 12:17:44 | 5 | **Q**     Are you related to a James Chapman? |
| 12:17:46 | 6 | **A**     Not that I know of, no. |
| 12:17:48 | 7 | **Q**     Okay.  Now, the date of your accident was |
| 12:17:56 | 8 | St. Patrick's Day, correct? |
| 12:17:57 | 9 | **A**     Correct. |
| 12:17:58 | 10 | **Q**     About what time did your wife call you in and say |
| 12:18:03 | 11 | things are ready to eat? |
| 12:18:04 | 12 | **A**     I want to say around 5, 5:00. |
| 12:18:07 | 13 | **Q**     Had you taken part in any other St. Patrick's Day |
| 12:18:11 | 14 | festivities that day? |
| 12:18:12 | 15 | **A**     No, no. |
| 12:18:12 | 16 | **Q**     Now, where were you when your wife called you in? |
| 12:18:15 | 17 | **A**     I was in the family room watching the basketball game. |
| 12:18:20 | 18 | **Q**     And where is the family room in relation to the |
| 12:18:23 | 19 | kitchen? |
| 12:18:23 | 20 | **A**     Backside of the house. |
| 12:18:24 | 21 | **Q**     Kind of -- |
| 12:18:26 | 22 | **A**     The house is sort of like in an L with the addition, |
| 12:18:32 | 23 | so I was on the far end of the L side. |
| 12:18:34 | 24 | **Q**     And when you came into the kitchen, where was the unit |
| 12:18:37 | 25 | in the kitchen? |

**Chapman  (Cross)**

12:18:38  1   **A**     On the countertop.

12:18:39  2   **Q**     Okay.  Can you describe for me the layout of your

12:18:43  3   kitchen?

12:18:44  4   **A**     It's also a straight up refrigerator, sink, and then

12:18:51  5   you got counters on each side.  And it was between the

12:18:56  6   refrigerator and the sink.

12:18:58  7   **Q**     And you didn't observe anything about the cook cycles

12:19:01  8   or what you did -- what your wife did that morning, correct?

12:19:04  9   **A**     No, I don't know how it was programmed, no.

12:19:07  10  **Q**     Do you have any idea how much time had passed between

12:19:11  11  when the cook cycle completed that day and when your wife

12:19:15  12  called you?

12:19:16  13  **A**     All I know is that she said it cooked earlier in the

12:19:19  14  day and had sat there most of the -- most of the day I take

12:19:24  15  it, you know.  I'm not exactly sure how -- you know, she

12:19:31  16  came home from work.  She works so close to home, she went

12:19:33  17  home from work and put it together.  When I came in the door

12:19:36  18  from work and just got a little relaxed, it was -- she said

12:19:42  19  supper is ready.

12:19:43  20  **Q**     Sure.  But aside from knowing that the steam was out

12:19:48  21  and it had cooled, do you have any idea how much time had

12:19:51  22  passed between when the cook cycle ended and when your wife

12:19:56  23  called you into the room?

12:19:56  24  **A**     I'm sorry, I don't.  I don't.

12:20:09  25  **Q**     And when you opened the unit, where was your wife in

12:20:12  1    relation to you?

12:20:12  2    **A**    She was right behind me.

12:20:14  3    **Q**    Immediately behind you?

12:20:15  4    **A**    Yeah, immediately behind me, because when that thing

12:20:19  5    exploded, I fell back and I hit her or I knocked her over.

12:20:25  6    So she was right behind me -- when I cocked that pot open,

12:20:30  7    she was behind me on the other side of the cabinet, on the

12:20:33  8    backside, getting a bowel.  She turned around with that

12:20:37  9    bowel and, bam, you know, that thing come out.  And I

12:20:42  10   just -- well, we just collided together is what we did.

12:20:45  11   **Q**    You were here for Dr. Pratt's testimony, correct?

12:20:48  12   **A**    Yes.

12:20:48  13   **Q**    When you opened the unit, did you grab it on the sides

12:20:52  14   at all?

12:20:53  15   **A**    No, I did not.

12:20:53  16   **Q**    And you made sure or your wife made sure that all of

12:21:00  17   the steam was out of the unit?

12:21:01  18   **A**    Yes.

12:21:01  19   **Q**    And you didn't have to exert any force whatsoever when

12:21:06  20   you opened the lid; is that correct?

12:21:08  21   **A**    No force, no.  It was very easy.

12:21:12  22              MR. FECZKO:  No further questions.

12:21:13  23              THE COURT:  Any more redirect?

12:21:16  24              MR. EDWARDS:  No, Your Honor.  We're done.

12:21:19  25              THE COURT:  We're going to take the lunchtime

12:21:21   1    recess.  Over that time period, don't talk about the case

12:21:24   2    with anyone, don't form any opinions, don't express any

12:21:26   3    opinions, no private research.  All the admonitions and

12:21:33   4    cautions I gave before continue to apply.

12:21:35   5         We'll stand adjourned a little over -- just because of

12:21:38   6    some other responsibilities, we're going to adjourn until

12:21:42   7    about 1:20, okay, so about an hour from now.  Okay?

12:21:45   8         So take your pads, put your names on the first page of

12:21:48   9    them.  Leave them on your seats, and we'll collect them and

12:21:53   10   then bring them back to you when we reconvene.

12:21:56   11        So we'll stand adjourned until that time.

12:22:02   12              (Luncheon recess taken.)

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

```
12:22:02    1                        AFTERNOON SESSION

01:52:38    2           (At side bar.)

01:52:38    3                THE COURT:  We'll go back on the record.  Let

01:52:43    4    me ask counsel if they might walk up.

01:52:53    5       I just happened to speak with Magistrate Judge

01:52:57    6    Greenberg, and he indicated that the settlement may be in

01:53:02    7    the offing.

01:53:06    8       Is that your understanding as well?

01:53:07    9       Good afternoon.

01:53:11   10       And so, is that true?

01:53:17   11                MR. LANDSKRONER:  We are just finishing that

01:53:18   12    up, and I can divert if you want to --

01:53:19   13                THE COURT:  Well, the way we typically do it,

01:53:20   14    and I'll do it in this case, if the parties believe they've

01:53:24   15    reached a settlement, I ask the parties to then kind of lay

01:53:27   16    out the terms of the settlement as they understand them.

01:53:30   17       But if you could all stand close to this microphone,

01:53:36   18    and I don't know if the lead counsel wants to take the lead,

01:53:43   19    or whether you want to, John?

01:53:43   20                MR. LEWIS:  Mr. Colaizzi is not of counsel --

01:53:43   21                THE REPORTER:  I can't hear.  I'm sorry.

01:53:43   22                MR. LEWIS:  Mr. Colaizzi, who is from Venable,

           23    is not counsel of record, but he's been handling the

           24    settlement.  May he speak to the terms --

           25                THE COURT:  Sure.
```

1          MR. LEWIS:  -- if there are terms to be

2     spoken?

01:53:44   3          MR. LANDSKRONER:  Your Honor, and I've been

01:53:44   4     working with Mr. Colaizzi, along with Judge Greenberg, and

01:54:05   5     so we've been on that tack, and we were going back and forth

01:54:07   6     and I didn't want to miss coming back up to court when we

01:54:07   7     resumed, so --

01:54:10   8          THE COURT:  And you're with Venable?

01:54:12   9          MR. COLAIZZI:  I'm with a law firm, Venable,

01:54:12  10     yes, Your Honor.

01:54:14  11          THE COURT:  But you're representing . . .

01:54:17  12          MR. COLAIZZI:  Tristar.

01:54:18  13          THE COURT:  Okay.  For settlement purposes?

01:54:20  14          MR. COLAIZZI:  Yes, sir.

01:54:21  15          THE COURT:  Why don't you lay out what you

01:54:23  16     believe the terms of the settlement are?

01:54:26  17          MR. COLAIZZI:  Yeah.  I have not heard the

01:54:27  18     last back and forth, so I just want to make sure we're on

01:54:27  19     the same page.

01:54:29  20          JUDGE GREENBERG:  The only three issues that

01:54:37  21     we were discussing had to --

01:54:37  22        There's no jury.  Can you hear me?

01:54:37  23          THE COURT:  If you --

01:54:29  24          JUDGE GREENBERG:  The only three issues that

01:54:37  25     we were discussing were the coupon credit issue which the

01:54:41  1  parties have agreed to the amount not 72.50, along with a

01:54:45  2  three-minute video.

01:54:47  3      With regard to the reach, there would be a 80-percent

01:54:50  4  reach with a cap fee of 890,000.  There will be a range

01:54:55  5  which -- for fees, without objection, submitted to the

01:54:59  6  Court.  The Court will not know the range, and the parties

01:55:02  7  will go from there.

01:55:03  8      The parties confidentially can, I guess, for purposes

01:55:06  9  of now, these are the numbers that they agreed on.

01:55:09  10      That's correct?

01:55:11  11          MR. LEWIS:  Yes.

01:55:11  12          JUDGE GREENBERG:  Counsel?

01:55:12  13          MR. COLAIZZI:  Yes, sir.

01:55:14  14          JUDGE GREENBERG:  There's also, not something

01:55:16  15  that I negotiated with them, Your Honor, but there's a

01:55:18  16  warranty issue and a plaintiffs' fee issue, which they

01:55:21  17  likewise agree on.

01:55:21  18      Those are the material issues that I was able to have

01:55:25  19  the parties agree to.

01:55:26  20          THE COURT:  Mr. Landskroner, does that outline

01:55:29  21  what you belive the parties have agreed upon?

01:55:29  22          MR. LANDSKRONER:  It is, Your Honor, with one

01:55:29  23  addition, that there is an additional case --

01:55:29  24          THE REPORTER:  I can't hear.

01:55:35  25          MR. LANDSKRONER:  There is an additional case

01:55:36   1    that involves a different unit that Mr. Colaizzi has been

01:55:40   2    working on, and that might be transferred into the

01:55:43   3    settlement part of this case, and when --

01:55:45   4                    THE COURT:  They're on the same terms?

01:55:49   5                    MR. COLAIZZI:  Yes, Your Honor.  There are

01:55:50   6    other terms that we agree on.  Judge Greenberg was

01:55:54   7    addressing the terms we were not agreeing on that we now

01:55:57   8    agree on, and so it will be a national class.  There will

01:56:02   9    be -- all models of Tristar Products would be taken care of

01:56:05   10   on one class.  There's a case in California named Piñon

01:56:10   11   versus Tristar.  They would either be transferred here or

01:56:14   12   they'll dismiss without prejudice and plaintiffs here will

01:56:19   13   amend the complaint to bring in that plaintiff and those

01:56:21   14   lawyers.  We've already negotiated a fee with those lawyers

01:56:24   15   of $225,000, and the -- so that will take care of -- cover

01:56:28   16   all the models in that way.

01:56:30   17                   THE COURT:  Okay.  Would it generally be a

01:56:32   18   claims made --

01:56:32   19                   MR. COLAIZZI:  Yes.

01:56:33   20                   MR. LANDSKRONER:  It's a national class.

01:56:36   21                   THE COURT:  Okay.  And then with some

01:56:37   22   discussion in terms of compensation, but would there be an

01:56:45   23   accompanying -- a requirement to return the pressure

01:56:47   24   cookers?

01:56:50   25                   MR. COLAIZZI:  No, Your Honor.  They have to

01:56:52  1   watch a safety video in order to receive a benefit.  The

01:56:55  2   benefit is a $72.50 credit to be used towards the purchase

01:57:01  3   of three very popular products, one of which is another

01:57:04  4   pressure cooker, if they want a more advanced one.

01:57:07  5        And they also receive, without doing anything, except

01:57:11  6   watching the video, a one-year warranty on their current

01:57:16  7   pressure cooker.  And then the notice that you had mentioned

01:57:21  8   in your order a week ago Sunday about opting out if you have

01:57:28  9   a personal injury claim will be part of that as well.

01:57:31  10  We'll, of course, make a denial and then there won't be

01:57:35  11  anything in the settlement agreement to suggest, expressly

01:57:39  12  or implicitly, that there's a defect.

01:57:43  13             MR. LANDSKRONER:  And, Your Honor, there's

01:57:45  14  also an insensitive award that we've agreed to --

01:57:45  15             MR. COLAIZZI:  Yes.

01:57:45  16             MR. LANDSKRONER:  -- that we would provide the

01:57:48  17  Court for, and then we also have agreed to terms to resolve

01:57:49  18  the personal injury claims outside of that for these three

01:57:51  19  claims.

01:57:53  20             THE COURT:  Okay.  Is everybody agreed I

01:57:55  21  should retain jurisdiction --

01:57:58  22             MR. LANDSKRONER:  Yes.

01:57:59  23             MR. COLAIZZI:  Yes.

01:57:59  24             THE COURT:  -- enforce the terms?

01:58:02  25        Well, thank you.

01:58:03    1              We'll go off the record.

2                          - - -

3              (Proceedings adjourned at 2:00 p.m.)

4

5

6                      **C E R T I F I C A T E**

7

8         I certify that the foregoing is a correct transcript

9     from the record of proceedings in the above-entitled matter.

10

11    */s/ Donnalee Cotone            10th of July, 2017*
      DONNALEE COTONE, RMR, CRR, RSA                 DATE
12

13

14

15

16

17

18

19

20

21

22

23

24

25